**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division – In Admiralty**

| | |
|---|---|
| In Re: Application of Consol Pennsylvania Coal Company, LLC<br><br>                Applicants,<br><br>For Order Authorizing Discovery Pursuant to FRCP RULE 27 And/ Or For Use In Foreign Proceedings Under 28 U.S.C. § 1782. | Case No. 2:25-mc-6<br><br>**DECLARATION OF JONATHAN THAMES IN SUPPORT OF CONSOL PENNSYLVANIA COAL COMPANY, LLC'S PETITION/APPLICATION** |

I, Jonathan Thames, upon information and belief, declare as follows:

1.      I am a partner in Kennedys CMK LLP, counsel for Consol Pennsylvania Coal Company, LLC ("Consol"), and am admitted to practice law before the United States Supreme Court, and all state and federal courts in Louisiana, Mississippi (inactive), Washington and California. I make this declaration based on my own personal knowledge, or on information and belief gathered in my role as counsel for Consol here. I also attach true and correct copies of the referenced exhibits to my declaration, all of which are documents gathered in my role as counsel for Consol.

2.      At all relevant times, the vessel M/V ANGLO MARIE LOUISE (the "Vessel") was on time charter from the owner Anglo Marie Louise Shipping Limited to the time charterer SwissMarine PTE Ltd. That charterparty contains a London arbitration clause subject to English law. ***Exhibit A.***

3.      On or about October 9, 2024, Consol entered into Purchase Order No. 06-2024IT to sell 75,000 – 100,000 metric tons +/- 10%  of Bailey High Volume Coking Coal to Itochu Singapore Pte Ltd ("Itochu"). The Purchase Order contains an arbitration clause stating, "all claims, disputes, or controversies arising out of or referring to this Agreement," will be arbitrated in New York applying US law.  ***Exhibit B.***

1

4.      Itochu[1] sold the coal to Pacific Minerals Limited.  Pacific Minerals' shipping affiliate PSL Shipping Limited thereafter entered into a voyage charterparty with SwissMarine Pte Ltd to deliver the coal from Baltimore, MD to a port in China. The charterparty between PSL and SwissMarine, unlike the Consol-Itochu purchase order or the Angle Marie Louise-SwissMarine time charter, requires that any dispute between those parties be arbitrated in Hong Kong using English law. ***Exhibit C.***

5.      Consol delivered the coal at the Port of Baltimore. On November 23, 2024, the cargo was loaded onboard the M/V ANGLO MARIE LOUISE Free On Board Trimmed (FOBT). At that point, title to the coal transferred to purchaser Itochu which then in turn transferred to Pacific Minerals.

### *A.        The Incident and Subsequent Repairs*

6.      On or around November 27, 2024, the Vessel was about 105 miles east of the North Carolina Outer Banks. At 3:10 a.m. an explosion occurred in or around cargo holds 1 and 2, causing significant damage to the hatch coverings and related machinery. The parties dispute whether the coal was unsafe, whether Consol accurately described the coal's properties in the documents Consol presented to the ship's master, and whether ship conditions and crew actions or inactions may have caused or contributed to the explosion.

7.      After this incident, the Vessel headed to Norfolk, Virginia, where it remains. The Vessel's hatch covers and related machinery needs significant repairs, and these repairs will all be subject to approval by the U.S. Coast Guard as well as the Vessel's classification society. These repairs are necessary before the Vessel can depart US waters. On information and belief, there is presently no repair plan, but it is likely the Vessel will have to leave this District in order to offload the cargo and have repairs made.

### *B.        The Foreign Proceedings*

---

[1] Itochu essentially acted as a broker, selling the coal it bought from Consol to third party buyer Pacific Minerals even before the Vessel arrived at the Port of Baltimore.

8.     There are several possible foreign proceedings here. First of all, the Anglo Shipping-SwissMarine charterparty calls for London arbitration under English law. Second, the Consol-Itochu Purchase Order requires New York arbitration. Finally, the SwissMarine-PSL voyage charterparty calls for Hong Kong arbitration under English law. *Exhibits A, B, and C.*

### C.     *Consol's Informal Efforts to Obtain Discovery*

9.     The cause of the explosion/source of ignition remains at issue. Over the two months that the Vessel has been anchored at Cape Henry, the parties have cooperated on conducting several limited inspections. On or about January 15, 2025, Consol requested access to inspect 20 items related to gas ventilation, gas monitoring, and potential ignition sources prior to its fire expert, Paul Willis of Hawkins Ltd., arriving at the Vessel from Bristol, England. *Exhibit D.*

10.     Vessel owners, though, only permitted Mr. Willis to make visual observations on deck and refused him access to the hatches and other areas, including access to any documentation kept onboard the Vessel in the normal course. Vessel owners granted Mr. Willis permission to visually inspect ventilation points in holds 1 and 2, as well as some (but not all) electrical switches and panels near those holds, but he was not allowed to test or operate any of these devices. Mr. Willis was not permitted in the engine room, the bridge, parts of the forecastle, and other areas germane to his investigation. Vessel owners have also refused to allow crew depositions, production of all requested documents, or an inspection of relevant Vessel conditions and systems per Mr. Willis's specifications. *Exhibit D.*

11.     On or around March 7, 2025, Vessel owners granted cargo owner Pacific Minerals access to the cargo to test its methane properties. This testing concluded on March 11, 2025. . While gas level testing is one of the inspections that the parties had requested, there is much more that needs to be done before the Vessel leaves, as outlined in Consol's communications with Vessel owners.

### D.     Jurisdiction and Venue

12.    The Vessel is currently at temporary anchorage off Cape Charles, Virginia, which is within the bounds of the Eastern District of Virginia. Once the Vessel leaves Cape Charles, Consol will likely be deprived of this practical and reasonable opportunity to inspect the Vessel and obtain evidence necessary to protect its interests in the potential arbitration proceedings in Hong Kong, as well as the prospective proceedings in Virginia, New York and/or London. Although the Vessel's repair date is unknown at this time, the repairs will likely take place outside the district (discussions have mentioned Detyen's Shipyard in Charleston, South Carolina), therefore Consol requests the opportunity to inspect the Vessel while it is anchored at Cape Charles.

13.    Consol commits to obtain all discovery swiftly and without impact on the Vessel's operations.

### E.    Consol also Filed a Declaratory Judgment Action and a Request for a Preliminary Injunction

14.    Consol has filed a Complaint for Declaratory Judgment and Request for Injunctive Relief in the United States District Court for the Eastern District of Virginia, Norfolk Division, seeking a judicial determination that Consol is not contractually bound to arbitrate this dispute in Hong Kong because it is not a party to any arbitration agreement with Anglo. Consol further seeks to enjoin Anglo from proceeding with arbitration in Hong Kong. *See* Complaint (Doc. 1), *Consol Pennsylvania Coal Company, LLC v. Anglo Marie Louise Shipping Limited*, No. 2:25-cv-145 (filed on 3/12/25).

I declare under penalty of perjury under the laws of the United States and the Commonwealth of Virginia that the foregoing is true and correct.

Executed this 12th day of March, 2025 at San Francisco, California.

_____
Jonathan W. Thames

# **<u>EXHIBIT A</u>**

Code Name: "NYPE 93"
Recommended by:
The Baltic and International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)

# TIME CHARTER©

New York Produce Exchange Form
Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th 1993.

1    **THIS CHARTER PARTY,** made and concluded in **Cardiff**
2    this **28th** day of **June** ~~19~~**2021**
3    Between **Anglo Jessica Shipping Ltd 15th Floor, 33 Cavendish Square, London, W1G 0PW, United Kingdom**
4
5    Owners of the Vessel described below, and **Swiss Marine PTE Ltd 9 Battery Road, 15-01 MYP Centre,**
    **Singapore (049910)**
6
7
8    Charterers.
9    **Description of Vessel**
10    Name **Anglo Jessica** Flag **United Kingdom** Built **2011** (year).
11    ~~Port and number of Registry~~
12    ~~Classed         in~~
13    ~~Deadweight          long*/metric* tons (cargo and bunkers, including freshwater and~~
14    ~~stores not exceeding          long*/metric* tons) on a salt water draft of~~
15    ~~on summer freeboard.~~
16    ~~Capacity      cubic feet grain      cubic feet bale space.~~
17    ~~Tonnage      GT/GRT.~~
18    ~~Speed about      knots, fully laden, in good weather conditions up to and including maximum~~
19    ~~Force      on the Beaufort wind scale, on a consumption of about      long*/metric*~~
20    ~~tons of~~
21    * Delete as appropriate.
22    For further description see Appendix "A" (if applicable )
23    **1. Duration**
24    The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period
25    of about 17 to about 18 months in direct continuation of current CP dated 27th May 2020 trading worldwide.
    about to mean a maximum of either 15 days less or 15 days more on either side in Charterers' option
26
27
28                           **within below mentioned trading limits.**

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

29 **2. Delivery**

30 The Vessel shall be placed at the disposal of the Charterers ~~at~~ **in direct continuation of current Charter Party date 27th May 2020**

31

32

33                                                  The Vessel on her delivery

34 shall be ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted

35 for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear

36 simultaneously.

37 The Owners shall give the Charterers ~~not less than~~ **10/7 approximate and 5/3/1 firm** days notice of expected date of

38 delivery.

39 **3. On-Off Hire Survey**

40 Prior to delivery and redelivery the parties shall, ~~unless otherwise agreed, each appoint surveyors, for their~~

41 ~~respective accounts,~~ appoint a mutually agree surveyor who shall not later than at first loading port/last discharging port respectively, conduct

42 joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition

43 of the Vessel. The parties shall equally share the cost of the aforementioned surveys. A single report shall be prepared on each occasion and signed by each surveyor, without

44 prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.

45 If either party fails to have a representative attend the survey and sign the joint survey report, such party

46 shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.

47 On-hire survey shall be on Charterers' time and off-hire survey on Owners' time.

48 **4. Dangerous Cargo/Cargo Exclusions** (see Clause 46)

49 (a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous,

50 injurious, flammable or corrosive nature unless carried in accordance with the requirements or

51 recommendations of the competent authorities of the country of the Vessel's registry and of ports of

52 shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must

53 pass. Without prejudice to the generality of the foregoing, in addition the following are specifically excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials. ~~Without~~ ~~prejudice to the generality of the foregoing, in addition the following are specifically~~

54 ~~excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials,~~

55 **(See Clause 46)**

56

57

58

59

60

61

62

63

64

65 (b) If IMO-classified cargo is agreed to be carried, the amount of such cargo shall be limited to

66       tons and the Charterers shall provide the Master with any evidence he may

67 reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO

68 regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at

69 the Charterers' risk and expense.

70 **5. Trading Limits** (see Clause 47)

71 ~~The Vessel shall be employed in such lawful trades between safe ports and safe places~~

72 ~~within~~

73                                                                  ~~excluding~~

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this BIMCO SmartCon document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

74
75
76 ~~as the Charterers shall direct.~~

77 **6. Owners to Provide**

78 The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for
79 all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; shall pay for
80 wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the
81 crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and
82 equipment for and during the service, and have a full complement of officers and crew.

83 **7. Charterers to Provide**

84 The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise
85 agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory
86 garbage disposal), ~~all communication expenses pertaining to the Charterers' business at cost,~~ pilotages,
87 towages, agencies, commissions, consular charges (except those pertaining to individual crew members
88 or flag of the Vessel), <u>canal dues and boatage on Charterers' business, fresh water for hold cleaning</u> and all
   other usual expenses except those stated in Clause 6, but when the Vessel
89 puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all
90 such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew
91 shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while
92 the Vessel is employed under this Charter Party shall be for the Charterers' account. All other fumigations
93 shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six
94 months or more.

95 The Charterers shall provide and pay for necessary dunnage<u>, lashing materials</u> and also any extra fittings
   requisite for a
96 special trade or unusual cargo, but the Owners shall allow them the use of any dunnage<u>, lashing materials</u>
   already aboard
97 the Vessel<u>, replacing or paying for same when so used</u>. Prior to redelivery the Charterers shall remove their
   dunnage and fittings at their cost and in
98 their time.

99 **8. Performance of Voyages**

100 (a) The Master shall perform the voyages with due despatch <u>or as per instructions received from Charterers</u>,
    and shall render all customary assistance
101 with the Vessel's crew. The Master shall be conversant with the English language and (although
102 appointed by the Owners) shall be under the orders and directions of the Charterers as regards
103 employment and agency; and the Charterers shall perform all cargo handling, including but not limited to
104 loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk
105 and expense, under the supervision of the Master.

106 (b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or
107 officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if
108 necessary, make a change in the appointments.

109 **9. Bunkers**

110 (a) The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and
111 diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with:
112 **about [XXX]** ~~long*/~~metric* tons of <u>HS</u> fuel oil at the price of          per <u>metric</u> ton;
113 **about [XXX]** <u>metric</u> tons of ~~diesel oil~~ <u>LSMGO</u> at the price of          per ton. The vessel shall
114 be redelivered with: **about the same quantities as on delivery as per Platts prices from the nearest main
    bunkering port on the day of redelivery per meteric ton.** ~~tons of fuel oil at the price of          per ton;~~
115 ~~tons of diesel oil at the price of          per ton.~~ <u>If redelivery falls on a weekend or holiday, then the prices</u>
    <u>from the preceding working day shall apply. Any excess on redelivery is to be settled as per Platts prices from</u>

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this **BIMCO SmartCon** document may be copied, reproduced or
distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.



nearest main bunkering port on the day of redelivery or preceding working day, if redelivery falls on a weekend or holiday.

Value of bunkers on delivery to be paid together with first hire payment.

If bunkers with such specifications as described in Appendix A are not available at a particular port of supply, Charterers shall advise Owners accordingly and Owners shall approve the available or local usual bunker grade if suitable. However, specifications should be no lower than ISO standard RMG 380. Such approval shall not be unreasonably withheld.

Charterers have the option of bunkering the vessel for their own account prior to delivery, provided same does not interfere with Owners' operations.

Owners have the option of bunkering the vessel for their own account prior to redelivery, provided same does not interfere with Charterers' operations.

Master shall have the liberty of using diesel oil for starting / stopping of main engines and for manoeuvring in narrow / shallow waters, canals, rivers, in and out of port and for generator engines in case of low load operation.

Charterers are responsible for all requirements towards fuel supply as per applicable IMO regulations.

The vessel will participate in a fuel quality testing program by DNVPS (or similar). Sealed samples are to be taken during each bunkering from the barge, unless local regulations determine otherwise. The Owners shall provide the Charterers and Master with copies of reports on every occasion. The cost involved in the program to be equally shared by the Owners and Charterers.

The results of this sample / test are not considered to be final or binding. The MARPOL sample will not be used commercially, but for determining quality if that is needed. Vessel must keep such sample on board in case fuel is questioned by PSC.

Bunkers supplied at different ports / dates shall not be comingled in vessels tanks unless Owners' consent obtained.

116    * Same tons apply throughout this clause.
117    (b) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and
118    auxiliaries and which conform to the specification(s) as set out in Appendix A.

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

119  The Owners reserve their right to make a claim against the Charterers for any damage to the main engines
120  or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed
121  specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed
122  specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners
123  shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker
124  consumption, nor for any time lost and any other consequences.

125  **10. Rate of Hire/Redelivery Areas and Notices**

126  **The Charterers shall pay for the use and hire of the said Vessel** as follows: at the rate of $

127  **U.S. currency, daily,** hire payable 15 (fifteen) days in advance including overtime. First hire payable latest 3 (three) banking days after delivery. or $       U.S. currency per ton on the Vessel's total deadweight

128  carrying capacity, including bunkers and stores, on       summer freeboard, per 30 days,

For the period from 0001hrs on 8th October 2021 to 2400hrs on 7th November 2021 the rate of hire to be US$10,500 per day.

For the period from 0001hrs 8th November 2021 to 2400hrs on 7th December 2021 the rate of hire to be US$29,000 per day.

For the period from 0001hrs on 8th December 2021 to 2400hrs on 7th October 2021 the rate of hire to be 103% of the BCI/BPI74 at 40/60 with option to lock as described below.

For the period 0001hrs on 8th October 2021 until redelivery the rate of hire to be 104% of the BCI/BPI74 at 40/60 with option to lock as described below.

Where the rate of hire is an index linked formula basis 40% of the 5 Baltic Capesize Time Charter Average Routes (BCI) and 60% of the Baltic Panamax Index (BPI 74) published by the Baltic Exchange, it is specifically agreed that Owners retain multiple option declaration rights, subject to this Clause. Owners have the option to declare a fixed rate period for the Charter Party basis the index formula. When Owners declare any period as a fixed rate then that period is always subject to a minimum 3 (three) months. Owners can declare such option on London working days only. When declaring, Owners shall have direct telephone contact with Charterers to inquire about the current FFA level for the period they wish to convert, which Owners may or may not accept. If Owners do accept then Charterers may either agree to same on clean basis right away or ask for a subject to FFA market liquidity and then try to execute the trade in the FFA market at the agreed level. In case Charterers cannot execute the trade due to market liquidity the Owners declaration to be considered null and void, but Owners maintain their option in full and may declare at a later stage under the same conditions stipulated in this Clause. The agreed level, whether clean or re-confirmed after Charterers subject to FFA liquidity to be applicable as fixed gross rate of hire for the converted period less 3.75% address commission to Charterers.

In case of disagreement between Owners and Charterers about the current FFA market level the parties shall discuss in good faith.

Should the BCI type be recalibrated in the future then the size adjustment premium is to be adjusted up or down accordingly by the official conversion factor as advised by the Baltic Exchange.

129  Hire shall be paid **commencing on and from the day** and hour **of her delivery, as aforesaid, and at and after the same rate for any part**

130  **of a month; hire shall continue until the** month hour of **the day of her redelivery in like good order and condition,**

131  **ordinary wear and tear excepted, to the Owners (unless Vessel lost) at dropping last outward sea pilot one safe port within Skaw / full Mediterranean range including United Kingdom / Eire / Black Sea or in Charterers' option passing Muscat outbound / Japan range at any time day or night Sundays and Holidays included**

132

133

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this BIMCO SmartCon document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

134                                                     unless otherwise mutually agreed.

135    The Charterers shall give the Owners not less than **30, 25, 15, 10 approximate and 7, 5, 3, 2, 1 definite** days notice of the Vessel's

136    ~~expected~~ date and ~~probable~~ port of redelivery.

137    For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be
138    adjusted to GMT.

139    **11. Hire Payment**

140    (a) Payment

141    Payment of Hire shall be made so as to be received by the Owners or their designated payee in to the account
       specified in writing by the Owners, which may change from time to time.

142    , viz

143    Hire is payable every 15 days in advance, first hire is payable latest 3 banking days after delivery / receipt of
       Owners invoice

144

145    in

146    currency, or in United States Currency, in funds available to the

147    Owners on the due date, 15 days in advance, and for the last ~~month~~ 15 days or part of same the approximate
148    amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day
149    as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,
150    or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to
151    withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)
152    may otherwise have on the Charterers.

153    At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the
154    hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold
155    the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever
156    for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire
157    shall continue to accrue and any extra expenses resulting from such withholding shall be for the
158    Charterers' account.

159    (b ) Grace Period

160    Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors
161    or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners
162    **3** clear banking days (as recognized at the agreed place of payment) written notice to rectify the
163    failure, and when so rectified within those **3** days following the Owners' notice, the payment shall
164    stand as regular and punctual.

165    Failure by the Charterers to pay the hire within **3** days of their receiving the Owners' notice as
166    provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above.

167    (c) Last Hire Payment

168    Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate
169    payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and
170    the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking
171    into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for
172    the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the
173    balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be
174    refunded by the Owners or paid by the Charterers, as the case may be.

175    (d) Cash Advances (see Clause 48)

176    ~~Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required~~
177    ~~by the Owners, subject to 2¼ percent commission and such advances shall be deducted from the hire.~~
178    ~~The Charterers, however, shall in no way be responsible for the application of such advances.~~

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org

179 **12. Berths**

180  The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that
181  Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat
182  at any time of tide, except at such places where it is customary for similar size vessels to safely lie aground in

   Argentina, Brazil and Uruguay. Charterers are responsible for all damages and direct consequences attributed

   to such trading..

183 **13. Spaces Available**

184  (a) The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can
185  reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the
186  Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,
187  apparel, furniture, provisions, stores and fuel.

188  (b) In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the
189  Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a
190  result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.

191 **14. Supercargo and Meals**

192  The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers'
193  risk and see that voyages are performed with due despatch. He is to be furnished with free
194  accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of
195  **US$15** per day. The Owners shall victual pilots and customs officers, and also, when
196  authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,
197  Charterers paying at the rate of **US$1,500** per ~~meal~~ 30 days for all such victualling and cables / communication

   expenses, meals and representations.

198 **15. Sailing Orders and Logs**

199  The Charterers shall furnish the Master from time to time with all requisite instructions and sailing
200  directions, in writing, in the English language, and the Master shall keep full and correct deck and engine
201  logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the
202  Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs,
203  showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts
204  required by the Charterers shall be in the English language.

205 **16. Delivery/Cancelling**

206  ~~If required by the Charterers, time shall not commence before~~          ~~and s~~Should the
207  Vessel not be ready for delivery on or before        but not later than        hours,
208  the Charterers shall have the option of cancelling this Charter Party.

209       Extension of Cancelling

210  If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready
211  for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty
212  the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is
213  expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will
214  cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two
215  days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date
216  of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the
217  Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers
218  in accordance with this Clause.

219 **17. Off Hire**

220  In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency
221  of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this BIMCO SmartCon document may be copied, reproduced or
distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

222 arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants,
223 agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless
224 resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or
225 painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of
226 hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back
227 during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident
228 to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time
229 of her deviating or putting back until she is again in the same or equidistant position from the destination
230 and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners'
231 account. In the event of the Vessel being driven into port or to anchorage through stress of weather,
232 trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses
233 resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be
234 reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and
235 the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be
236 deducted from the hire.

**18. Sublet**

238 Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of
239 the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this
240 Charter Party.

**19. Drydocking**

242 The Vessel was last drydocked

243 *(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter
244 at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for
245 bottom cleaning and painting and/or repair as required by class or dictated by circumstances.

246 *(b) Except in case of emergency no drydocking shall take place during the currency of this Charter
247 Party.

248 * Delete as appropriate

**20. Total Loss**

250 Should the Vessel be lost, hire shall cease at noon on the day of her loss and should the Vessel be missing, hire
shall cease from noon on the day she was last heard of and any hire paid in advance and not earned shall be
returned to Charterers. money paid in advance and not earned (reckoning from the date of loss or
251 being last heard of) shall be returned to the Charterers at once.

**21. Exceptions**

253 The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the
254 seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always
255 mutually excepted.

**22. Liberties**

257 The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels
258 in distress, and to deviate for the purpose of saving life and property. All fuel used by the Vessel while off hire
shall be for Owners' account, except for deviation to save life at sea, in which case the total deviation time and
cost of bunkers to be shared equally by the Owners and Charterers.

**23. Liens**

260 The Owners shall have a lien upon all cargoes, bunkers and all sub-freights and/or sub-hire for any amounts
due
261 under this Charter Party, including general average contributions, and the Charterers shall have a lien on
262 the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

263    returned at once.

264    The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,
265    which might have priority over the title and interest of the Owners in the Vessel. The Charterers
266    undertake that during the period of this Charter Party, they will not procure any supplies or necessaries
267    or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.

268    **24. Salvage**

269    All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting
270    Owners' and Charterers' expenses and crew's proportion.

271    **25. General Average**

272    General average shall be adjusted according to York-Antwerp Rules 1974, as amended 1990, or any
273    subsequent modification thereof, in **London** and settled in **US$**
274    currency.

275    The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will
276    contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules
277    1974, as amended 1990, or any subsequent modification thereof and will include the "New Jason
278    Clause" as per Clause 31 .

279    Time charter hire shall not contribute to general average.

280    **26. Navigation**

281    Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners
282    shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew,
283    and all other matters, same as when trading for their own account.

Charterers may supply independent weather bureau advise (from a reputable weather bureau as selected by Charterers) to the master during voyages specified by the Charterers. The master is to comply with the reporting bureau procedures of the routing service selected by Charterers, however the master remains responsible for the safe navigation and choice of route. Should the master deviate from the instructions of the weather routing service, he shall inform Charterers immediately, stating reason for such deviation.

Evidence of weather conditions to be taken from the vessel's deck logs and independent weather reports. In the event of a discrepancy between deck logs and the independent weather bureau reports, the parties shall discuss any claim presented by the Charterers in good faith and in the event than an agreement cannot be reached still, then either the average between the parties performance figures be used or an independent 3rd party professional be mutually appointed and paid for by both Owners and Charterers in order to assess the claim in dispute and his conclusion shall be final.

284    **27. Cargo Claims** (see Clause 66)

285    Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club
286    New York Produce Exchange Agreement of February 1970, as amended May, 1984, or any subsequent
287    modification or replacement thereof.

288    **28. Cargo Gear and Lights**

289    The Owners shall maintain the cargo-handling gear of the Vessel which is as follows:

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this BIMCO SmartCon document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

290
291
292
293    ~~providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also~~
294    ~~provide on the Vessel for night work lights as on board, but all additional lights over those on board shall~~
295    ~~be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If~~
296    ~~required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the~~
297    ~~Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or~~
298    ~~insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that~~
299    ~~time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned~~
300    ~~thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If~~
301    ~~required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which~~
302    ~~case the Vessel shall remain on hire.~~

_____ Vessel is to work day and night if required by Charterers, but always in accordance with the Maritime Labour Convention 2016 (as amended). If the vessels gear for opening and closing hatches becomes inoperative, the vessel to be off hire. Such off hire to be calculated pro rata to the number of inoperative hatches and is to only count if the ships loading or discharging is actually delayed. Crew to open and close hatches, before during and after stevedore work when and where required and when permitted by local shore regulations. All intermediate opening and closing of hatches as a result of loading grains or other weather sensitive cargoes to be for Charterers' account.

_____ The Owners shall also provide lights on the Vessel 'as on board' for carrying out night work. Any additional lights over those supplied on board shall be at the Charterers' time and expense.

303    **29. Crew Overtime**
304    ~~In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,~~
305    ~~the Charterers shall pay the Owners, concurrently with the hire,          per month~~
306    ~~or pro rata.~~ Any overtime payments to officers or crew to be paid by the party ordering the same, unless otherwise agreed.

307    **30. Bills of Lading** (see Clause 57)
308    (a) The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates
309    or tally clerk's receipts. However, the Charterers or their nominee or agents may sign bills of lading or waybills on behalf of the
310    Master, ~~with the Owner's prior written authority,~~ always strictly in conformity with mates or tally clerk's
       receipts.

311    (b) All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall
312    indemnify the Owners against all consequences or liabilities which may arise from any inconsistency
313    between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master
314    at their request.

315    (c) Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and
316    Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for
317    any loss, damage, expense or delay howsoever caused."

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

(d) In case Bill(s) of Lading are not available at discharge port, Owners agree to release the entire cargo against a single Letter of Indemnity (as per Owners' P&I Club wording) signed by Charterers only. No through or liner bills of lading to be issued under this Charter Party.

(e) Charterers shall have the right to change discharge port(s) against a Letter of Indemnity as per Owners' P&I Club wording to be signed by Charterers only.

318 **31. Protective Clauses**

319 This Charter Party is subject to the following clauses all of which are also to be included in all bills of lading
320 or waybills issued hereunder:

321 (a) CLAUSE PARAMOUNT

322 "This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the
323 United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national
324 legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall
325 be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the
326 carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said
327 applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such
328 term shall be void to that extent, but no further."

329 and

330 (b) BOTH-TO-BLAME COLLISION CLAUSE

331 "If the ship comes into collision with another ship as a result of the negligence of the other ship and any
332 act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in
333 the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against
334 all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents
335 loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other
336 or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the
337 other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

338 The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or
339 objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or
340 contact."

341 and

342 (c) NEW JASON CLAUSE

343 "In the event of accident, danger, damage or disaster before or after the commencement of the voyage
344 resulting from any cause whatsoever, whether due to negligence or not, for which, or for the
345 consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods,
346 shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the
347 payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred,
348 and shall pay salvage and special charges incurred in respect of the goods.

349 If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship
350 or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover
351 the estimated contribution of the goods and any salvage and special charges thereon shall, if required,
352 be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."

353 and

354 (d) U.S. TRADE -DRUG CLAUSE

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this BIMCO SmartCon document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

355     "In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the
356     Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested
357     narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

358     Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences
359     of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel
360     harmless and shall keep them indemnified against all claims whatsoever which may arise and be made
361     against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines,
362     as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account
363     and the Vessel shall remain on hire.

364     Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this
365     clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable
366     time the Vessel is released and at their expense put up the bails to secure release of the Vessel.

367     The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the
368     event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the
369     Vessel's personnel."

370     and

371     (e) WAR CLAUSES (see Clause 88)

372     ~~"(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the~~
373     ~~Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state~~
374     ~~of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration~~
375     ~~of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,~~
376     ~~seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de~~
377     ~~facto authority or any purported governmental organization maintaining naval, military or air forces).~~

378     ~~(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring~~
379     ~~the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not~~
380     ~~exceeding a valuation of            in addition, the Owners may purchase and the~~
381     ~~Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements,~~
382     ~~total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a~~
383     ~~government program, the Vessel shall not be required to enter or remain at any such port or zone.~~

384     ~~(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter,~~
385     ~~or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such~~
386     ~~port or zone assume the provable additional cost of wages and insurance properly incurred in connection~~
387     ~~with master, officers and crew as a consequence of such war, warlike operations or hostilities.~~

388     ~~(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the~~
389     ~~Charterers' account."~~

390     **32. War Cancellation**

391     In the event of the outbreak of war (whether there be a declaration of war or not) between any two or
392     more of the following countries: **United Kingdom, USA, Russia, China, Japan**

393
394
395

396     either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall
397     redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after
398     discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near
399     open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she
400     then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall
401     continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this
402     Charter Party shall apply until redelivery. **It is understood, that war or actual hostilities means war or**

     **hostilities directly between these nations affecting the trading of the vessel and does not include local**

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

hostilities or civil war where any of the above countries support sides.

403 **33. Ice**

404 The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area
405 where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is
406 risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and
407 remain in the port or area or to get out after having completed loading or discharging. ~~Subject to the~~
408 ~~Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her~~
409 ~~size, construction and ice class.~~ Vessel shall never force ice nor push ice nor follow ice breaker.

410 **34. Requisition**

411 Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter
412 Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid
413 by the said government in respect of such requisition period shall be retained by the Owners. The period
414 during which the Vessel is on requisition to the said government shall count as part of the period provided
415 for in this Charter Party.
416 If the period of requisition exceeds **3** months, either party shall have the option
417 of cancelling this Charter Party and no consequential claim may be made by either party.

418 **35. Stevedore Damage**

419 Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all
420 damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their
421 agents in writing as soon as practical but not later than 48 hours after any damage is discovered. Such
422 notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent
423 of such damage.

424 (a) In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew
425 and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs
426 of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed
427 and if required passed by the Vessel's classification society.

428 (b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option,
429 before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will
430 be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for
431 which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the
432 Owners' work.

433 **36. Cleaning of Holds**

434 ~~The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between~~
435 ~~Voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by~~
436 ~~local regulations, at the rate of          per hold.~~

437 ~~In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not~~
438 ~~accepted or passed by the port or any other authority. The Charterers shall have the option to re-deliver~~
439 ~~the Vessel with unclean/unswept holds against a lumpsum payment of          in lieu of cleaning.~~

_____ Intermediate hold cleaning - Charterers have the option to employ the vessel's crew for hold cleaning during the currency of this Charter, provided that sufficient time is available and that the local labour and / or port regulations and weather conditions between previous final discharging port and subsequent loading port permit. In any case such cleaning is at Charterers' time and risk. Owners are not responsible for any delays.

_____ Crew will endeavour to effect such cleaning as best possible but without guarantee that the cargo holds will be

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this BIMCO SmartCon document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

sufficiently cleaned and accepted on arrival at loading port and Owners shall not be responsible for any consequences arising from the fact that vessel's crew has been employed in cleaning. All fuel, chemicals, fresh water and consumable material used to be for Charterers' account.

Owners not to be responsible for intermediate hold cleaning and any expense resulting thereof / incurred directly thereby and any detention through any of the above causes and vessel to remain always on hire. Charterers to supply all necessary chemicals required to perform intermediate hold cleaning. Charterers to pay for the disposal of wash waters.

Charterer to pay Owners US$650 per hold net of address commission.

The Charterers shall have the option to redeliver the vessel with unclean / unswept holds against a lump sum in lieu of cleaning of US$7,000 net of address commission.

If the vessel is delivered with grain clean holds then Charterers have the option to redeliver with unclean / unswept holds against a lump sum in lieu of cleaning of US$12,000

Iron ore, pig iron, sulphur and all cargoes that require lime washing not to be last.

440 **37. Taxes**
441 Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners
442 resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter
443 Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding
444 taxes levied by the country of the flag of the Vessel or the Owners).

Any tax and / or dues imposed on account of Owners, the vessel, vessel's flag or crew and / or charter hire to be for Owners' account with the exception of all taxes and / or dues whatsoever imposed in Charterers' domicile (including but not limited to Chinese Enterprise Income Tax and / or Business Tax), which to be for Charterers' account. All Taxes and / or dues imposed on cargo or freight to be for receivers / Charterers' account, including MMRT (Merchant Marine Renewal Tax) / wharfage / Inframar P.U. Tax (Port Utilization Tax) or PIUT (Port Infrastructure Utilization Tax).

445 **38. Charterers' Colors**
446 The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their
447 own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter
448 Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers
449 shall be for the Charterers' account.

450 **39. Laid Up Returns**
451 The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their
452 underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum
453 period of 30 days if on full hire for this period or pro rata for the time actually on hire.

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

454 **40. Documentation**

455 The Owners shall provide any documentation relating to the Vessel that may be required to permit the
456 Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial
457 responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners'
458 P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate
459 of registry and certificates relating to the strength and/or serviceability of the Vessel's gear.

460 **41. Stowaways**

461 (a)  (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining
462 Access to the Vessel by means of secreting away in the goods and/or containers shipped by the
463 Charterers.

464 (ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained
465 Access to the Vessel by means of secreting away in the goods and/or containers shipped by the
466 Charterers, this shall amount to breach of charter for the consequences of which the Charterers
467 shall be liable and shall hold the Owners harmless and shall keep them indemnified against all
468 claims whatsoever which may arise and be made against them. Furthermore, all time lost and all
469 expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account
470 and the Vessel shall remain on hire.

471 (iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to
472 sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a
473 reasonable time, the Vessel is released and at their expense put up bail to secure release of the
474 Vessel.

475 (b) (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained
476 access to the Vessel by means other than secreting away in the goods and/or containers shipped
477 by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including
478 fines, shall be for the Owners' account and the Vessel shall be off hire.

479 (ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel
480 by means other than secreting away in the goods and/or containers shipped by the Charterers,
481 the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel
482 is released and at their expense put up bail to secure release of the Vessel.

483 **42. Smuggling**

484 In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any
485 fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof. Any delay,
expenses and / or fines incurred on account of smuggling to be for Charterers' account, if caused by Charterers'
supercargo and / or their staff or agents.

486 **43. Commissions**

487 A commission of        percent is payable by the Vessel and the Owners to
488
489
490
491 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

492 **44. Address Commission**

493 An address commission of **3.75** percent is payable to **Singapore Marine PTE Ltd**
494
495
496                                       on hire earned and paid under this Charter.

497 **45. Arbitration**

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this **BIMCO SmartCon** document may be copied, reproduced or
distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

498 (a) NEW YORK
499 All disputes arising out of this contract shall be arbitrated at New York in the following manner, and
500 subject to U.S. Law:

501 One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their
502 decision or that of any two of them shall be final, and for the purpose of enforcing any award, this
503 agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with
504 shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of
505 Maritime Arbitrators Inc.

506 For disputes where the total amount claimed by either party does not exceed US $          **
507 the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society
508 of Maritime Arbitrators Inc.

509 (b) LONDON
510 All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree
511 forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business
512 in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping,
513 one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No
514 award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as
515 above, unless objection to his action be taken before the award is made. Any dispute arising hereunder
516 shall be governed by English Law.

517 For disputes where the total amount claimed by either party does not exceed US $          **
518 the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime
519 Arbitrators Association.

520 *Delete para (a) or (b) as appropriate

521 ** Where no figure is supplied in the blank space this provision only shall be void but the other provisions
522 of this clause shall have full force and remain in effect.

BIMCO Standard Dispute Resolution Clause

(a)    This Contract shall be governed by and construed in accordance with English law and any dispute arising out of
       or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration
       Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to
       the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms
       current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator
       and send notice of such appointment in writing to the other party requiring the other party to appoint its own
       arbitrator within fourteen (14) calendar days of that notice and stating that it will appoint its arbitrator as sole
       arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the
       fourteen (14) days specified. If the other party does not appoint its own arbitrator and give notice that it has
       done so within the fourteen (14) days specified, the party referring a dispute to arbitration may, without the
       requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall
       advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this BIMCO SmartCon document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 100,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b)    Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.

In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply:

(i) A party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party (or parties) of a written notice (the "Mediation Notice") calling on the other party (or parties) to agree to mediation.

(ii) The other party (or parties) shall thereupon within fourteen (14) calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further fourteen (14) calendar days, failing which on the application of either party (or parties) a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other party (or parties) does (do) not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv) The mediation shall not affect the right of either party (or parties) to seek such relief or take such steps as it (they) considers (consider) necessary to protect its (their) interests.

(v) A party (or parties) may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

(vi)  Unless otherwise agreed or specified in the mediation terms, each party (or parties) shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii)  The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)

(e)    If this Clause has been incorporated in to the Contract without an express choice of law and arbitration forum chosen from sub-clauses (a), (b) and (c), then sub-clause (a) of this Clause shall apply. Sub-clause (d) shall apply in all cases.

523    If mutually agreed, cClauses 46 to 89, both inclusive, as well as Appendix "A" and Anglo International Know-Your-Client-Customer-Checklist **as attached hereto are fully**
524    **incorporated in this Charter Party.**

The Owners
Anglo Jessica Shipping Limited

The Charterers
Singapore Marine PTE Ltd

SwissMarine Pte. Ltd.
UEN 201909081R

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this BIMCO SmartCon document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

525                                    APPENDIX "A"

526    To Charter Party dated
527    Between        Owners
528    And        Charterers
529    Further details of the Vessel:

530

Copyright © 1993 ASBA. All rights reserved. Published by BIMCO. No part of this **BIMCO SmartCon** document may be copied, reproduced or distributed in any form without the prior written permission of ASBA. Explanatory notes are available from BIMCO at www.bimco.org.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

# Additional Clauses
## Clause 46 – Dangerous Cargoes / Cargo Exclusions

Without prejudice to the generality of Clause 4, the following are specifically excluded:

All dangerous, injurious and inflammable or self-combustible cargoes (IMO cargoes) and the following:

Logs, industrial waste, sodium sulphate, naphtha, saltpetre, ironswarf, steel swarf, bitumen, nickel ore, asphalt, ammonium nitrate, ammonium nitrate fertilisers Class B, asbestos, acids, arms, ammunition, aluminium ashes, aluminium residues, barium nitrate, bombs and any kind of explosive, blasting caps and detonator caps, calcined pyrites Class B, calcium nitrate Class B, castor beans, charcoal, charcoal briquettes, copra, copra meals, copra cakes, copra expellers, copra pellets, dynamite, TNT, borax, calcium carbide, calcium hypochloride, creosoted goods, pellets metallised, iron oxide spent, lead nitrate, livestock, logs, magnesium nitrate, metal sulphide concentrates Class B, nuclear and radioactive goods or pyrites, petroleum and all its by-products except petroleum coke, which is permitted (see Clause here below), pitch, pitch prill, potassium nitrate, potassium / sodium nitrate mixture quicklime, refuse and garbage of any kind, resins, radio isotopes, sawdust, seed cakes Class B, sodium nitrate, sodium / potassium nitrate mixture, expellers sulphur, sulphur, salt, all scraps including motor blocks and turnings and shavings, cocoa, direct reduced iron and its products including hot briquetted iron, sponge iron, turpentine, tar, ammonium sulphate, tankage, tankage fertilisers, woodchip with less than 15 percent moisture, woodpulp pellets with less than 15 percent moisture (vessel does not have Certificate of the Carriage of Dangerous / IMO Cargoes), black powder, war materials of any kind, motor spirits, sponge iron briquettes, bulk clay, sunflower seed expellers, manioc or manioc pellets, sludge ore, silver sand bulk, bulk rice, direct iron pellets, sand and its by-products, mineral sand and its products, sludge ore, cement / cement clinker, logs, also steel products with California block stowage, all types of blocks including stone and marble blocks, oil cakes, fuels, fishmeal, cotton, coffee, caustic soda, Indian coal, pond coal, quebracho, fertilisers of hazardous nature, pencil pitch, and all other hazardous, corrosive, toxic / chemical, boycott, contraband, unlawful cargoes, all IMO / IMDG cargoes and / or cargoes listed under Appendix B of the BC Code, but ferro silicon is allowed. Coal, other than those already excluded and always in compliance with the vessels certificates and the IMSBC Code, to be allowed.

Soybean meal, Soybean meal pellets, Sunflower meal pellets and Citrus pulp pellets always allowed.

Iron ore and/or iron ore pellets and/or iron ore fines and/or iron ore concentrates are allowed providing same are loaded and shipped in accordance with latest IMO regulations, but always excluding direct reduced iron ore and direct reduced iron ore pellets.

Owners not to be responsible for any contamination and / or damage to cargo, which may arise due to mixed cargo loaded in same hold.

No deck cargo allowed.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

Charterers have option to carry a total of 2 (two) restricted cargoes in each year period out of the following:

2 (two) of zinc / copper concentrates,
1 (one) of pig iron,
1 (one) of salt / rock salt,
1 (one) of sulphur,
2 (two) of petcoke.

Dirty cargoes not to be first, last or consecutively. Furthermore, Owners / Master are not to be responsible for passing hold inspection for loading next cargo and for any consequences whatsoever caused due to carrying any restricted cargo and any extra expenses resulting therefrom/ incurred thereby and any detention through any of above caused to be for Charterers' account.

i)    Concentrates Protecting Clause
Charterers to have the option to carry cargoes of harmless, lawful zinc, copper concentrates, provided that same is loaded / stowed / carried / trimmed and discharged at Charterers' time / risk and expense in strict accordance with IMO / IMDG / SOLAS regulations / recommendations, as well as in strict accordance with the local / international regulations / recommendations applicable at the port of load / discharge and at the ports / places / countries through whose waters vessel must navigate.

In addition to the above, the said concentrates are to be loaded in strict accordance with vessel's loading manual. If any damage is caused to the paints of the holds, then to be rectified at Charterers' time / risk / expense.

Before loading, Charterers to supply vessel with certificate of water and flow moistures' contents evidencing safety margin are in compliance with IMO regulations for water transport. The stowage to be within vessel's strengths and all necessary separation, if required, to be properly erected to Master and / or P&I Club surveyors' satisfaction.

Owners are entitled to appoint P&I Club surveyor to supervise cargo operations at Charterers' time and expense. All extra cost and time including preparing the ship for loading and cleaning after discharge shall be for Charterers account.

ii)    Pig Iron Protecting Clause
Prior commencement of loading, an independent surveyor to be appointed by Owners P&I Club to carry out jointly on behalf of Charterers and Owners a holds' and tank top condition survey in order to establish any pre-existing damages, with fees to be shared equally between Charterers and Owners.

Charterers undertake that the loading of the first layers to be released as close to the tanktop as reasonably possible. Thereafter the cargos is not to be dumped from a height more than 1 metre from the top layer of the cargo.

Charterers also undertake to supply on board, at their expense, dunnage and / or other materials which Master considers necessary to provide safe protection from damage by loading pig iron. If any dispute arises between Charterers / Master, an independent

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

surveyor should be appointed jointly by Owners / Charterers and his decision should be final. Any extra expenses resulting therefrom / incurred thereby and any detention through any of the above causes to be for Charterers' account.

iii)    Salt Protecting Clause
a)    Charterers undertake to use holds as little as possible, provided vessel's stability, trim and stress permit.
b)    Before loading, all holds assigned for salt to be hold blocked where readily available by Charterers at their time / risk and expense to the satisfaction of Master and independent surveyors appointed by Charterers at their time and expense. If hold block is not available, then lime washing to be similarly arranged at Charterers' time / risk / expense, etc.
c)    Cargo to be loaded / stowed / trimmed/ discharged strictly in accordance with latest IMO/ SOLAS/ IMSBC Code and/ or any other latest regulations/ rules applicable to such cargo, all at Charterers' time/ risk / expense.
d)    Deleted
e)    All fresh water used for irrigation onto sulphur/ salt during loading/ voyage/ discharging to be for Charterers' account.
f)    After discharging Charterers to supply sufficient fresh water at their expense/ time/ risk for washing down of all holds.
g)    Any directly related extra expenses resulting therefrom/ incurred thereby (such as hold cleaning to Master's satisfaction/ hold survey/ etc.) and any detention through above causes to be for Charterers' account. Owners/ Master/ crew shall not be held responsible for passing hold cleanliness for loading next cargo.
h)    Removal of hold block/ lime from vessel's holds to be arranged by Charterers at their time/ risk and expense, by shore labour.

iv)    Petroleum Coke Protecting Clause
a)    Petroleum coke mentioned herein is limited to the type of non-hazardous, non-dangerous, non-oily green delayed type and/or calcined type and metallurgical type.
b)    If Charterers exercise such option, Charterers undertake to use holds as less as possible, provided vessel's stability/ trim and stress permit and provided commercially allowed.
c)    Such cargo to be loaded, stowed, trimmed, discharged strictly in accordance to latest IMO and/ or any other latest regulations / rules applicable to such cargo.
d)    Should any additional/ special wash down of holds before loading be reasonably required/ recommended by Master, Charterers undertake to arrange the same at their time/ expense.
e)    After discharge Charterers to arrange at their expense/ time of any additional/ special wash down of holds carrying such cargo by chemical as Master reasonably considers necessary. Charterers are allowed to use ship's crew to perform cleaning as necessary against paying US$ 8,000 lump sum in addition to the normal intermediate hold cleaning per hold, but always subject to local regulations permitting and all time so used to be for Charterers' account.
f)    Any directly related extra expenses resulting therefrom/ incurred thereby (such as hold cleaning to Masters' satisfaction/ hold survey/ etc.) and any detention through any of the above causes to be for Charterers' account.
g)    Owners/ Master shall not be held responsible for passing hold cleanliness for loading next cargo and vessel to remain on-hire at all times.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

**Clause 47 – Trading Limits**

a)   The vessel shall be employed in such lawful trades between safe ports and safe places within International Navigating Limits, excluding:

i)   Iceland, Sea of Azov, Turkish occupied Cyprus, Zaire, Nigeria, Cabinda, Congo, New Zealand, Tasmania, North Korea, Haiti, Georgia including Abkhazia, Somalia, Great Lakes, Nicaragua, Ethiopia, Sierra Leone, Mauritania (but Nouadhibou allowed), Albania, Eritrea, Sudan, Angola including Cabinda, Bosnia-Herzegovina, Cuba, Kampuchea, Iran, Iraq, Syria, Libya, Yemen, Bangladesh, Myanmar, Papua New Guinea, Cameroon, Gabon, Equatorial Guinea, Ivory Coast, Namibia, Malabo, Ghana (but Takoradi allowed), Djibouti, Lebanon, Tanzania, Togo, former Yugoslavia (but Koper, Bakar, Plomin, Bar and Rijeka allowed), Crimea, Commonwealth of Independent States Pacific between 40/50 degrees North, Benin, Sri Lanka to be allowed for bunkering operations and embarkation/disembarkation of armed guards only. CIS ports are allowed within the period 1st September and 30th March every year.

ii)   All war areas and UN / EU / USA / Switzerland / UK sanctioned countries and countries/ places prohibited by Owners' underwriters and / or excluded by the vessel's flag state authority / Owners' domicile, whether currently in force or coming into force during the duration of this Charter.

b)     i)     Hainan Strait Clause:
Transit of the Hainan strait is allowed only during day light, with good weather and visibility. If vessel will have to stop drift waiting for daylight, time and bunkers consumed during such drifting will be for time Charterers' account.

ii)     West Coast IndiaTransit Clause:
Notwithstanding the BIMCO Piracy Clause 2009 and the CONWARTIME 2004 Clause captioned in this Charter Party, if requested by Charterers, Owners agree to transit via the coast of Pakistan and Iran into the Persian Gulf. Any applicable insurances net of no claim bonus are for Charterers' account, but Charterers will not be required to pay for crew bonus and / or armed / unarmed guards.

iii)     West Coast South America Clause:
Mooring ropes / wires as on-board, but any additional mooring ropes / wires or other fittings required for trading to such areas / ports to be supplied and paid for by Charterers.

iv)     Algeria & Tunisia Clause:
Algeria and Tunisia trading to be allowed with the following protective clause to apply: Charterers will indemnify and hold Owners harmless from any cargo shortage claims when discharging any port(s) in either Algeria and / or Tunisia, but always limited to the difference between vessel's cargo figure (calculated by crew's draft survey(s)) and disport figure (whether disport figures calculated / measured by shore-scale or otherwise). Any cargo shortage claim that may arise at discharging port(s) will be settled by Owners / their P&I Club at the first instance (always exercising reasonable mitigation) and will be reimbursed in full by Charterers within a reasonable time against supporting documentation. The provisions of this clause supersede clauses 7 and 8 of

**Rider Clauses to the Charter Party dated 28th June 2021
MV Anglo Jessica / Swiss Marine**

the Inter-Club Agreement.

v)    Coastal / Shuttle Trades:
Maximum 3 consecutive voyages with a duration of less than 10 days.

vi)    In winter in Pacific / Atlantic Ocean and monsoon of Indian ocean or bad weather, Master to have right to choose the safest routing irrespective of ocean routes or similar advice and this shall not be deemed as deviation and vessel remain on hire, but same to be considered reasonable and Master to supply justification for same.

vii)    Orinoco / Amazon:
Maximum 2 (two) calls total during every 12 months, not to be consecutive, to Orinoco River up to and including Puerto Ordaz and to Amazon River up to and including Trombetas and Itacoatiara.Magellan

viii)    Cape Horn:
Charterers have the option to trade the vessel via Cape Horn (or via Magellan Strait if required by Owners / Master) due to adverse weather conditions. All pilotage costs including Cape Pilar to Cape Possession and vice versa, if required by Master, to be for Charterers' account.

ix)    Sierra Leone:
Trading to Sierra Leone is allowed under the following provision:
Pre-loading surveys clause – Owners shall appoint, at charterers time and expense, an independent surveyor/expert to perform proper cargo(es) pre-loading survey(s) and following-up the loading, in accordance with the relevant P&I Club recommendations.

c)    Vessel not to sail directly from Taiwan to People's Republic of China or vice versa.

d)    Charterers have the option to trade Arabian Gulf (but not north of Bandar Iman Khomeini), Saudi Arabia and other Middle East countries against paying extra war risk insurance premiums as quoted by vessel's H&M underwriters as well as crew war bonus and blocking and trapping.

e)    Notwithstanding anything in Clause 47 a), Charterers have the option to request trading in Joint War Committee (JWC) Listed areas, always subject to Owners prior approval. All extra insurances are for Charterers account.

**Clause 48 – Use of Charterers Agents**

Owners shall appoint Owners' agent for major matters like crew joining, major repairs, etc. However, Charterers' agent shall assist Master in minor matters like telex, mails, crew visit of doctor, cash advance to Master, etc. free of agency fee and Owners shall reimburse Charterers actual expenses as per invoice. Charterers shall advise Owners the details of their agent soonest possible.

**Clause 49 – Extended Port Stay / Bottom Cleaning**

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

BIMCO Hull Fouling Clause for Time Charter Parties
(a) If, in accordance with Charterers' orders, the Vessel remains at or shifts within a place, anchorage and/or berth for an aggregated period exceeding:

(i)  a period as the parties may agree in writing in a Tropical Zone or Seasonal Tropical Zone exceeding 20 days; or
(ii)  a period as the parties may agree in writing outside such Zones exceeding 20 days any warranties concerning speed and consumption shall be suspended pending inspection of the Vessel's underwater parts including, but not limited to, the hull, sea chests, rudder and propeller.
(b)  In accordance with sub-clause (a), either party may call for inspection, which shall be arranged jointly by Owners and Charterers and undertaken at Charterers' risk, cost, expense and time.
(c)  If, as a result of the inspection either party calls for cleaning of any of the underwater parts, such cleaning shall be undertaken by the Charterers at their risk, cost, expense and time in consultation with the Owners.

(i)  Cleaning shall always be under the supervision of the Master and, in respect of the underwater hull coating, in accordance with the paint manufacturers' recommended guidelines on cleaning, if any. Charterers will endeavour to carry such cleaning without damaging the vessel underwater parts or coating.

(ii)  If, at the port or place of inspection, cleaning as required under this Sub-clause (c) is not permitted or possible, or if Charterers choose to postpone cleaning, speed and consumption warranties shall remain suspended until such cleaning has been completed.
(iii)  If, despite the availability of suitable facilities and equipment, Owners nevertheless refuse to permit cleaning, the speed and consumption warranties shall be reinstated from the time of such refusal.
(d)  Cleaning in accordance with this clause shall always be carried out prior to redelivery. If, nevertheless, Charterers are prevented from carrying out such cleaning, the parties shall, prior to but latest on redelivery, agree a lump sum payment in full and final settlement of Owners' costs and expenses arising as a result of or in connection with the need for cleaning pursuant to this clause.
(e)  If the time limits set out in Sub-clause (a) have been exceeded but the Charterers thereafter demonstrate that the Vessel's performance remains within the limits of this Charter Party the vessel's speed and consumption warranties will be subsequently reinstated and the charterers' obligations in respect of inspection and/or cleaning shall no longer be applicable.


**Clause 50 – US Security**

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

Notwithstanding anything contained in this Charter Party to the contrary, all costs of expense arising out of or related to security regulations or measures required by any US authority by virtue of the vessel trading to the United States of America and not specifically related to the vessel's flag / crew, including but not limited to security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from Owners' negligence.

**Clause 51 – Asian Gypsy Moth**

Owners warrant that the vessel has not called at any Russian Far East port and guarantee that the vessel is free from Asian Gypsy Moth on delivery. Should vessel have called at any Japanese port(s) designated as an Asian Gypsy Moth high risk port by either the Japanese Government and / or USDA and / or APHIS and / or PPQ during the high risk period designated by any of those authorities during a period of one year prior to the date of delivery, then Owners shall provide an Asian Gypsy Moth free certificate, if required by Charterers. However, should Asian Gypsy Moth infestation be found, fumigation to be arranged by and paid for by Owners and the vessel to be considered as off-hire during such fumigation and until the vessel is passed as free from Asian Gypsy Moth.

In case Charterers order the vessel to any Japanese or other Far East port(s) designated as an Asian Gypsy Moth high risk port by either the Japanese Government and / or USDA and / or APHIS and / or PPQ during the high risk period designated by any of those authorities, then Charterers shall at their time and expense, prior to vessel's redelivery or prior calling at any North American port, whichever is the earlier, arrange for an inspection of the vessel by a survey firm approved by any one of such authorities and the issue of an Asian Gypsy Moth free certificate. Should infestation be found, fumigation to be arranged by and paid for by the Charterers and the vessel to remain on-hire during such fumigation and until the vessel is passed as free from Asian Gypsy Moth.

**Clause 52 – Hold Condition on Delivery**

The vessel's holds on delivery shall be clean and in all respects ready to receive any cargo permitted under this Charter Party to the satisfaction of Charterers' and / or shippers' and / or official surveyor(s). If the vessel falls hold inspection, then the vessel shall be off-hire from the time of rejection until the vessel has passed a subsequent inspection and all expenses for cleaning and / or fumigation, if required, including cost of labour standing by shall be for Owners' account. In the event that not all holds are passed as suitable for loading, the Charterers shall have the option to commence loading in those holds which have been passed, in which case hire shall be payable proportionate to the number of holds passed. However, if thereafter the vessel is delayed owing to the rejection of any hold(s) previously rejected, the vessel shall be off-hire entirely until such hold(s) is / are passed and loading is resumed.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

## Clause 53 – Extension of Off-Hire Period

Charterers to have the option of adding any or all time the vessel was off-hire to the maximum period of the Charter Party period. Charterers to declare this option to Owners in writing within 14 days of an off hire event.

## Clause 54 – Arrest / Detention / Seizure

Should the vessel be seized, arrested or detained at any time during the currency of this Charter by any authority and / or by any legal process and / or at the suit of any person having or purporting to have a claim against the vessel or any interest in the vessel, due to any reason other than fault or breach by Charterers, their servants or agents or quarantined or requisitioned:

1.   The vessel shall be off-hire from the time of the seizure, arrest or detention until the time of release.
2.   Fuel consumed during such period shall be for Owners account.
3.   Owners shall indemnify Charterers for any loss, damage or expense (including legal costs) which Charterers may incur as a consequence of the seizure, arrest or detention.
4.   Owners shall take all necessary action promptly to obtain the release including, without limitation, provision of suitable security.

## Clause 55 – Good Weather Definition

See Appendix A (Vessel's description)

## Clause 56 – Fumigation

Owners warrant that Master shall permit fumigation in port or in transit of holds and / or cargo. Such fumigation shall be at Charterers' expense and time and under Charterers responsibility, except in cases arising through the act, neglect or fault of the Master, crew or Owners or the seaworthiness of the vessel.

Fumigation to be performed always as per SOLAS regulation and as per IMO recommendations dated May 2008 or any subsequent revisions.

Charterers undertake to inform the Master of the fumigation method being employed. Owners undertake to instruct the Master to comply with instructions issued by the fumigation company, provided that such instructions are not contrary to the provisions of the IMO recommendations as referred to above.

Master / Owners are not to clause Bills of Lading by reason of such fumigation.

If the crew, by compulsory instruction from local authorities, are required to be removed from the vessel either at loading or discharging port(s) as a result of such fumigation, any additional expenses incurred including crew transfer, meals and lodging ashore as

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

well as all time lost, to be for Charterers' account, except in cases arising through the act, neglect or fault of the Master, crew or Owners.

Fumigation required as a result of crew illness to be for Owners account.

## Clause 57 – Bills of Lading for General Business

a)  Clean Bills of Lading
The vessel will only load cargo for which clean Bill(s) of Lading can be issued. Where the Master takes legitimate exception to any cargo presented for loading, he shall immediately take all precautionary steps and notify shippers, Charterers and their agents in order they may provide alternative cargo.

b)  Charterers and / or agents are hereby authorized by Owners / Master to issue ship's delivery orders in negotiable and transferable form against the collection of the full set of original Bills of Lading. Delivery orders to conform to all terms, conditions, and exceptions of the Bills of Lading. Charterers and / or agents are allowed to split Bills of Lading against Charterers Letter of Indemnity in Owners P&I Club format issued on Charterers letterhead and signed by an authorized officer of Charterers once all originally issued Bills of Lading have been cancelled and returned to Owners.

c)  Bill of Lading weight to be identical to elevator weight / shore scale weight. In the absence of either, the Bill of Lading weight shall be based on draft survey figures, established jointly between shippers and the vessel. The Charterer will indemnify and hold the Owner harmless where a cargo shortage claim arises purely as a result of the use of shore figures.

d)  If required, Owners agree to allow to make lawful amendments / additions to the Bill(s) of Lading and / or issue new Bill(s) of Lading and / or release against Charterers Letter of Indemnity in Owners P&I Club format issued on Charterers letterhead and signed by an authorized officer of Charterers for amendments / additions required by Charterers, once all originally issued Bills of Lading have been cancelled and returned to Owners.

e)  If Charterers require one original Bill of Lading to be carried on board the vessel, the full set of original Bills of Lading including the one carried on board is to be endorsed as follows: "One original Bill of Lading retained on board against which Bill of Lading delivery of the cargo shall properly be made on instruction received from shippers / Charterers / receivers."

f)  The Charterers warrant that each transport document regarding a shipment of cargo to the USA will be endorsed with a unique Bill(s) of Lading Identifier as required by the US Customs Regulation (19 CFR Part 4 Section 4.7A), as amended from time to time, no later than the first port of call. Failure of the Charterers to adhere to the foregoing is a breach of warranty for which the Charterers are fully liable. All time lost as a result is for Charterers' account and Charterers agree to indemnify and hold harmless Owners from and against any and all damages, losses and claims arising out of such breach including, without limitation, any fines imposed.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

g)   The Arbitration Clause of this Charter Party to be warranted fully incorporated into Bill(s) of Lading.

h)   The following Clauses are to be included in all Bills of Lading or Waybills issued hereunder:

1.   The War Clause contained in this Charter Party.
2.   The New Both-to-Blame-Collision Clause
3.   The General Average and the New Jason Clause
4.   The General Clause Paramount or US and / or Canadian Paramount Clauses as appropriate

## Clause 58 – Split Bills of Lading

Charterers and / or agents are hereby authorized by Owners / Master to split Bills of Lading and issue ship delivery orders in negotiable and transferable forms against collection of full set of original Bills of Lading. Delivery orders to conform to all terms, conditions and exceptions of Bills of Lading and shall not prejudice ship owner's rights. Owners shall remain responsible for the total quantity loaded, but Owners shall not be held responsible for the delivery of the cargo to each delivery order holder.

## Clause 59 – Oil Pollution Clause

Owners are required to establish and maintain financial security for responsibility in respect of oil or other pollution damages as required by any government including federal state or municipal or other division or authority thereof, to enable the vessel, without penalty or charge, lawfully to enter, remain at or leave any port, place, territorial or contiguous waters of any country, state or municipality in performance of this Charter without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof. Owners shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Owners' expense and Owners shall indemnify Charterers against all consequences (including loss of time) and all expenses and costs of any failure or inability to comply with the requirements of this clause.

Charterers not to be responsible for any claim brought against the vessel, her Owners, previous owners, her cargo or bunkers for any pollution claim. Owners warrant that they are covered for pollution liability insurance up to US$ 1,000 million by a P&I Club member of the International Group of P&I Clubs.

## Clause 60 – Piracy Clause

Bimco Piracy Clause 2009 to apply with following amendments:
Notwithstanding the Bimco Piracy Clause 2009 below and the Conwartime 2004 Clause, which are both applicable to this clause, Owners agree to transit Red Sea, Gulf of Aden and Indian Ocean when requested by Charterers on the most direct route

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

subject to the following terms:

- Before any transit of the Gulf of Aden and / or Indian Ocean Charterers will engage a security firm that will provide an armed three-man security team to the vessel for transits through the Gulf of Aden and the high-risk area.

- The security firm will work out a security plan with the vessel's command and prepare a brief for the crew for potential piracy incidents and will, taking into account the characteristics of the vessel, guide the Master and crew in preparing the "hardening" of the vessel against piracy attacks (e.g. bringing out razor wire and electrical fencing) in accordance with best management practice.

- Any material required for "hardening" of the vessel and any waiting time for embarkation / disembarkation of the security team is to be for Charterers account. Any "hardening" material on board the vessel is Charterers property and Owners to keep it well stored and accounted for so it may be reused if possible.

- Charterers are to appoint and pay the security firm directly, but it is understood that the security of the vessel and responsibility for the security team remains at all times that of the Owners and Master. Owners are to sign the security firm's unamend Bimco Guardcon Contract.

- Charterers are to pay for extra war risk insurance and loss of hire insurances covering 91st to 180th day.

- Charterers are to pay a lump sum crew bonus as per union tariff per transit.

**Bimco Piracy Clause for Time Charter Parties 2009**

(a) Except as otherwise specifically agreed, the Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area") which, in the reasonable judgement of the Master and/or the Owners, is dangerous to the Vessel, her cargo, crew or other persons on board the Vessel due to any actual, threatened or reported acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"). Should the Vessel be within any such place as aforesaid which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(b) If in accordance with sub-clause (a) the Owners decide that the Vessel shall not proceed or continue to or through the Area, they must immediately inform the Charterers. The Charterers shall be obliged to issue alternative voyage orders and shall indemnify the Owners for any claims from holders of the Bills of Lading caused by waiting for such orders and/or the performance of an alternative voyage. Any time lost as a result of complying with such orders shall not be considered off-hire.

(c) If the Owners consent or if the Vessel proceeds to or through an Area exposed to the risk of Piracy the Owners shall have the liberty:

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

(i)   to take reasonable preventative measures to protect the Vessel, her crew and cargo including but not limited to re-routeing within the Area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel or equipment on or about the Vessel;

(ii)  to comply with the orders, directions or recommendations of any underwriters who have the authority to give the same under the terms of the insurance;

(iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group, including military authorities, whatsoever acting with the power to compel compliance with their orders or directions; and

(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by  the Vessel proceeding as aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub-clause (d)(iii).

(d)  Costs

(i)   If the Vessel proceeds to or through an Area where due to risk of Piracy additional costs will be incurred including but not limited to additional personnel and preventative measures to avoid Piracy, such reasonable costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;

(ii)  If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers;

(iii) If the underwriters of the Owners' insurances require additional premiums or additional insurance cover is necessary because the Vessel proceeds to or through an Area exposed to risk of Piracy, then such additional insurance costs shall be reimbursed by the Charterers to the Owners;

(iv) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(e)  If the Vessel is attacked by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

(f)  If the Vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released. The Vessel shall remain on hire throughout the seizure and the Charterers' obligations shall remain unaffected, except that hire payments shall cease as of the ninety-first (91st) day after the seizure and shall resume once the Vessel is released. The Charterers shall not be liable for late redelivery under this Charter Party resulting from seizure of the Vessel by pirates.

(g)  If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail to the extent of such conflict, but no further.

## Clause 61 – Deductions

Without prejudice to Charterers' other rights under this Charter, it is expressly agreed that the Charterers do not have the liberty to deduct from hire any damages or consequential losses suffered by Charterers and / or shippers and / or receivers for reason of the Owners/ disponent owners / vessel not complying with any warranty / condition given in this Charter (including any Addendum) or any other Charter between Owners, Owners' group companies, managers and Charterers. The deductions shall be claimed within a reasonable time from Charterers supplying evidence.

## Clause 62 – Indian Iron Ore Fines Clause

Charterers to provide shippers' certificates of moisture content, flow moisture point (FMP) and transportable moisture limit (TML) to the Master prior to loading and Owners to permit loading unless Owners and / or Master can justify that the cargo is off specs. If Owners and / or Owners' P&I Club elect to appoint a surveyor, then the same is to be a mutually agreed and independent and accredited local surveyor (cost to be shared equally between Owners and Charterers) who is to supervise the loading. Owners to keep Charterers well in advance advised about such appointment.

Master and attending surveyor to ensure that cargo loaded is in suitable condition for carriage by the vessel and once cargo has crossed ship's rail it will be deemed to have been accepted and to be safe for shipment by Owners and Master.

In the event that Charterers / shippers are unable to provide the moisture content certificate in time then all time lost as a consequence to be for Charterers' account.

The Master and / or the surveyor have the right to reject the cargo, which falls outside the safe transportable moisture content limits as defined by IMSBC Code and Charterers are to replace with cargo meeting the IMSBC criteria. Any time lost relating to cargo quality issues, and any related expenses, shall be for Charterers' account. Any cargo rejected by Master and / or surveyor to be jointly tested at a mutually agreed test laboratory and the findings are to be binding for both parties. Any time lost and expenses caused by Master's and / or surveyor's rejection of cargo and conducting survey / testing to be for Charterers' account.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

However, should the test results declare the cargo to be within safe IMSBC limits, then the vessel is to be off-hire from the time of rejection and any time lost and all directly related expenses caused thereby, to be for Owners' account. All sampling of cargo to be witnessed by Charterers and / or shippers and jointly surveyed as necessary (any sampling by Owners P&I Club representative without Charterers' / shippers' knowledge shall be treated as null and void).

**Clause 63 – International Navigation Limits Clause**

Notwithstanding anything else in this Charter Party, the Charterers have the right to break International Navigation Limits with the Charterers giving notice to the Owners. The Charterers to reimburse extra insurance thereby, which not exceeding Lloyds scale and are entitled to have the benefit of any discounts received by the Owners for such extra insurance, provided the underwriters agree to hold the vessel covered. Vessel not to force nor push ice, nor follow icebreakers. Additional costs, insurance premiums, time lost etc. to be for Charterers' account.

**Clause 64 – Rightship**

Vessel to maintain a minimum 2 star Rightship status at all times throughout the charter.

**Clause 65 – Sale of Ship / Change of Ownership / Flag**

Owners have the option of selling this vessel at any time during the course of this Charter Party subject to Charterers approval of the buyers, which not to be unreasonably withheld and Owners will give Charterers at least 45 days prior notice of expected time and place, which will not interfere Charterers' normal operation of the ship. All time lost and all directly related expenses including additional bunker consumed in related to such sale to be for Owners' account.

The buyers undertake to perform the balance of this Charter Party at the same terms and conditions which to be stated in the sale contract. Should the Owners elect to sell the Vessel, the Charterers are to be given ROFR on the Vessel. For the purpose of clarity, ROFR refers to the right that the Charterers hold in case the Owners are selling the Vessel. No third party can be given priority before the Charterers have declared within two working days whether they want to match the price possibly achievable from third party buyer.

**Clause 66 – NYPE Interclub Agreement (1996)**

Liability for cargo claims shall be borne by the Owners and the Charterers in accordance with the New York Produce Exchange Inter Club Agreement of 1996 or any subsequent modification or amendment.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

**Clause 67 – ITF**

The Owners warrant that officers and crew of the vessel are covered for the duration of the Charter Party by an I.T.F. agreement or other bona fide Trade Union Agreement acceptable to I.T.F.

Loss of time as a result of non-compliance shall be considered as off-hire and any extra expenses incurred or time lost shall be for Owners' account. Furthermore, Owners warrant that throughout the duration of this Charter, the vessel's flag and crewing arrangements shall not interfere with or restrict the vessel's trading restrictions or employment.

**Clause 68 – Sanctions / Eligibility**

Owners represents and warrants that Owners and its vessel are not in any way directly or indirectly owned, controlled by or related to any:

(1)  Cuban or Iranian Interests; or
(2)  Designated target of economic trade sanctions promulgated by the UN, US, EU or Switzerland ("Sanctions Laws")

Owner undertakes that Owner and its agents and representatives will fully comply with all applicable Sanction Laws in their performance hereunder. If the goods are to be loaded or unloaded in the United States, then Owner represents and warrants that:

(i)  the vessel has not called at a port in North Korea within 180 days of the vessel's estimated arrival at a US port

(ii)  the vessel has not engaged in any ship-to-ship transfer with a vessel that has called at a port in North Korea within 180 days of the vessel's estimated arrival at a US port and

(iii)  in the event the vessel has called at a Cuban port within 180 days of the vessel's estimated arrival at a US port, all such calls were fully permissible under US laws imposing sanctions on Cuba

and the vessel is not restricted in its ability to call at an US port under these US laws. Owners undertakes that Owner, its agents and representative will not cause Charterer to violate applicable sanction laws in their performance hereunder. Owners agree to cooperate with Charterer's reasonable request for information or documentation to verify compliance with this clause.

Charterer represents and warrants that neither it nor any person or entity that owns or controls it is a designated target of economic trade sanctions promulgated by the UN, US, EU or Switzerland ("Sanctions Laws"). Charterer undertakes that Charterer and its agents and representatives will fully comply with all applicable Sanction Laws in their performance hereunder. Charterer undertakes that Charterer, its agents and representatives will not cause Owner to violate applicable Sanction Laws in their

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

performance hereunder. Charterer agrees to cooperate with Owners' reasonable request for information or documentation to verify compliance with this clause.

**Clause 69 – Anti-Corruption**

(a)  Anti-corruption laws include those that are implemented in accordance with the Organisation for Economic Co-operation and Development Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, the UN Convention against Corruption and other international conventions and include the United States Foreign Corrupt Practices Act, the UK Bribery Act 2010 and / or other national laws relating to bribery and corruption (collectively the "Anti-Corruption Laws").

Anti-Corruption Laws prohibit the authorisation, offering or giving of anything of value, directly or indirectly, to a government official to influence official action or to anyone in the private sector to induce a violation of the duty that the person owes to his or her employer. Violations of applicable Anti-Corruption Laws may lead to criminal proceedings, monetary and other penalties and imprisonment.

(b)  The parties represent, warrant and covenant that, in connection with this contract, neither party nor any of its shareholders, members, directors, officers, employees, Masters, crew members, agents, representatives, contractors, subcontractors or affiliates ("Associates"):

(i)   will take, or omit to take, any action that would be in breach or violation of applicable Anti-Corruption Laws;

(ii)  has authorized, offered, promised or given or will authorize, offer, promise or give anything of value to:

(A)  any "Government Official" (meaning any person employed by or acting on behalf of a government, government-controlled entity or public international organisation; any political party, party official or candidate; any individual, who holds or performs the duties of an appointment, office or position created by custom or convention; or any person who holds him / herself out to be the authorized intermediary of a Government Official) in order that the official act or refrain from acting in relation to the performance of official duties, in order to obtain or retain business or other improper advantage in the conduct of international business.

(B)  any other person while knowing or having reason to know that all or any portion of the money or thing of value will be offered, promised or given to a Government Official in order that the official act or refrain from acting in relation to the performance of official duties, in order to obtain or retain business or other improper advantage in the conduct of international business.

**Clause 70 – Ship Sanitation Control (former deratting)**

The vessel shall be delivered with valid Ship Sanitation Control Certificate or Ship Sanitation Control Exemption Certificate (formerly known as "deratting" or "deratting

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

exemption" certificate). If such certificate does not cover the whole period of this Charter, costs of renewal of certificate and fumigation, if necessary, shall be for Owners' account. Any detention and extra expenses incurred thereby shall also be for Owners' account.

### Clause 71 – Equipment & Certificates

The vessel shall be in possession of necessary certificates to comply with safety and health regulations current at all ports of call during this Charter. The Master, officers and crew of the vessel shall hold vaccination certificates against yellow fever, cholera and any other vaccination certificates required by the sanitary authorities.

The vessel's equipment shall comply with regulations and / or requirements in effect at port or ports of call and canals and countries in which the vessel will be employed. The Owners also guarantees that the vessel shall be at all times in possession of valid and up-to-date certificates on board to comply with such regulations and / or requirements. If stevedores, longshoremen or other labourers are not permitted to work by reason of any failure of the Master, the Owners and / or their agents to comply with such regulations or by reason that the vessel is not in possession of such valid up-to-date certificates, then the Owner shall make immediate corrective steps.

### Clause 72 – Grain Loading

Vessel to be grain fitted, able to load a full cargo of grain in accordance with SOLAS 74 and subsequent amendments. Vessel does not require any bagging, securing or extra trimming beyond customary spout trimming. Vessel can sail with minimum one (1) slack holds of grains / grain products subject to vessel's stresses allowing so.

### Clause 73 – Australian Hold Ladder Fitting

Vessel to be fitted with Australian Hold Ladders. Vessel to be off-hire for any period or time lost owing to Owners' failure to comply with this clause and all relevant expenses and losses to be for Owners' account.

### Clause 74 – Panama Canal

Owners confirm that the vessel is suitable to transit the new Panama Canal.

### Clause 75 – Hatch Covers

If any hatch cover is found defective, it is to be rectified at Owners' time and expense to independent surveyor's satisfaction basis hose test. In any case, Charterers have the right to perform such test at any time at their expense.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

**Clause 76 – Insurances**

a)  Hull and Machinery
The Owners warrant that the vessel is insured under Institute Time Clauses or similar Clauses for Institute Warranty Limits (IWL) trading against loss, damage and collision liabilities for the insured value as stated in Appendix A, which cover will be maintained throughout the currency of this Charter Party. Upon 10 (ten) days notice to Charterers, the Owners shall be entitled to effect any reasonable change to the insured value.

b)  Protection and Indemnity (P&I)
The Owners and the Charterers warrant that the vessel is entered on full terms with their respective Protection and Indemnity Club as indicated in Appendix A and that such entries will be maintained with all calls paid up-to-date throughout the currency of this Charter Party. The Owners and the Charterers shall not change Protection and Indemnity Clubs without the prior written consent of the other party, which shall not be unreasonably withheld.


**Clause 77 – Vessel Services**

The following services are included in the hire and shall be rendered by the Master, officers and crew, if permitted by shore regulations, without any additional payment:

a)  Raising and lowering of gangways in preparation for loading and discharging.
b)  Opening and closing of hatches in connection with loading and discharging.
c)  Closing and opening of hatches in the event of weather that may adversely affect the condition of cargo carried on board during loading and discharging.
d)  Supervision for loading and discharging and everything related hereto.
e)  Shifting vessel during loading and discharging and shifting berth.
f)  Docking and undocking in connection with loading / discharging cargo or bunkering.
g)  Necessary assistance in the vessel's bunkering operation.
h)  Officers and crew shall shape up vessel's hatches as much as possible prior to arrival at loading and / or discharging places so as to immediately commence loading and / or discharging operations.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the service to be rendered by officers and crew in accordance with the maritime code of the country under whose flag the vessel sails or in accordance with what is customary practice in the trade.


**Clause 78 – Water Ballast**

Charterers have the right to instruct the Master to utilize the vessel's maximum water ballast capacity including hold ballast in order to bring down the vessel's height to get into position under loading and / or discharging appliances, however always in conformity with freeboard, stability and / or safety requirements.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

### Clause 79 – BIMCO Electronic Bills of Lading Clause

(a)  At the Charterers' option, bills of lading, waybills and delivery orders referred to in this Charter Party shall be issued, signed and transmitted in electronic form with the same effect as their paper equivalent.

(b)  For the purpose of Sub-clause (a) the Owners shall subscribe to and use Electronic (Paperless) Trading Systems as directed by the Charterers, provided such systems are approved by the International Group of P&I Clubs. Any fees incurred in subscribing to or for using such systems shall be for the Charterers' account.

(c)  The Charterers agree to hold the Owners harmless in respect of any additional liability arising from the use of the systems referred to in Sub-clause (b), to the extent that such liability does not arise from Owners' negligence.

### Clause 80 - Slow Steaming Clause

Notwithstanding the provisions of Clause 31 (n) Charterers have the option to slow steam the vessel at any time during the course of the Charter Party on the basis of speeds and consumptions, which to be advised, but always within a safe and operable range harmless to the engine. When running under slow steaming conditions, vessel to run at full speed for minimum 1 hour in every day.

### Clause 81 - Bankruptcy Clause:

The Charterer shall have the right to terminate the Charter Party with immediate effect by tendering written notice to the Owner, if the Owner declares insolvency, bankruptcy, enters receivership and / or applies for any shelter similar to Chapter 11 of the United States Bankruptcy Code.

### Clause 82 – SOLAS Clause

Owners warrant that the vessel is compliant with latest applicable SOLAS regulations and recommendations, and if the vessel's keel was laid on or after 1st January 2009, Owners further warrant that the vessel is fully compliant with the SOLAS 2009 regulations, or any later amendment thereto - in particular but not limited to resolution MSC.216(82)- so as not to change the vessel's Charter Party deadweight and cargo intake. Owners further confirm that they have an IACS compliant and approved stability programme / software on board and will be maintained throughout the Charter Party duration.

### Clause 83 – OFAC / Financial Sanctions Clause

1.0  The Owners warrant and undertake that throughout the currency of this Charter Party:

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

1.1 The vessel shall not be named on the list of special designated nationals and blocked persons as published and amended from time to time by the US Treasury Department's Office of Foreign Assets Control ("OFAC") or the lists of persons, groups or entities subject to financial sanctions and / or restrictive measures as published and amended from time to time by the United Nations, the European Union and / or the UK (collectively the "SDN Lists"); and

1.2 The vessel's registered Owner shall not be named on the SDN Lists; and

1.3 The vessel shall not be owned, chartered, operated or controlled by any person or entity named on the SDN Lists; and

1.4 The vessel shall not be flagged or registered by a country that is subject to the US sanctions laws administered by OFAC from time to time (the "US Sanctions") and acceptance of the vessel by Charterers shall not constitute a violation of US, UN, EU and/or UK sanctions; and

1.5 The vessel shall not be owned or chartered by a disponent owner that is a person or entity that is registered, constituted or organised in, or that is a citizen or resident of or located in, a country that is subject to the US, UN, EU and / or UK sanctions such that acceptance or trading of the vessel by Charterers would constitute a violation of such sanctions. For the purpose of this sub-clause the Charterers shall be deemed to be subject to all such sanctions laws as if they were a citizen of the US, EU and / or UK respectively.

2.0 If, at any time during this Charter Party, Owners are in breach of any of the provisions and / or warranties contained in this clause, then:

2.1 Owners shall indemnify the Charterers against any losses or damages whatsoever resulting, and

2.2 Charterers shall have the right to immediately cancel the Charter Party.

3.0 The Charterers warrant and undertake that throughout the currency of this Charter Party:

3.1 The Charterers shall not be named on the SDN Lists; and

3.2 The vessel shall not be chartered, operated or controlled by any person or entity named on the SDN Lists; and

3.3 The vessel shall not be chartered by a person or entity that is registered, constituted or organised in, or that is a citizen or resident of or located in, a country that is subject to the US, UN, EU and / or UK sanctions such that employment of the vessel would constitute a violation of such sanctions.

4.0 Should at any time during this Charter Party Charterers be in breach of any of the provisions and / or warranties contained in this clause, then:

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

4.1 Charterers shall indemnify the Owners against any losses or damages whatsoever resulting, and

4.2 Owners shall have the right to immediately cancel the Charter Party.

## Clause 84 – Inspection Clause

The Charterers and / or their supercargo(es) and / or their representative(s) shall have free and unlimited access to the whole vessel including but not limited to bridge, holds, engine room, all vessels tanks including bunker, lubricating oil, sludge, ballast, water, freshwater tanks during the charter period. Whenever required, the Master must bring the vessel to an even trim to ensure correct bunker soundings. The Charterers and / or their supercargo(es) and / or their representative(s) to have free and unlimited access to the vessels decks and engine log books, radio logs, tank plans, calibration scales and / or other plans as requested and are allowed to make copies of same.

## Clause 85 – EU MRV Clause

Owners warrant that they and the vessel shall at all times during the currency of this Charter Party comply with "Regulation (EU) 2015/757 of the European Parliament and of the Council of 29 April 2015 on the monitoring, reporting and verification of carbon dioxide emissions from maritime transport, and amending directive 2009/16/EC" and directive 2009/16/EC (as amended) and that Charterers are able to trade the vessel in the waters and ports of the European Economic Area (EEA) without restriction.

Owners further warrant that:

(i)   the vessel's monitoring plan and document of compliance shall be kept up-to-date and valid at all times during the currency of this Charter Party; and

(ii)  the document of compliance will be carried on board the vessel at all times during the currency of this Charter Party.

## Clause 86 – Ballast Water Management, Treatment and Control

Owners warrant that they and the vessel shall at all times during the currency of this Charter Party comply with the current / latest version (including any modification or re-enactment thereof) of the International Convention for the Control and Management of Ships' Ballast Water and Sediments and the United States Coast Guard's final rule on "Standards for Living Organisms in Ships' Ballast Water Discharged in US Waters".

Owners further warrant that they will ascertain and use reasonable endeavours to comply with all other applicable local or port-specific regulations related to ballast water management and / or ballast water treatment at ports to which the vessel is ordered during the currency of this Charter Party.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

Owners shall indemnify Charterers for any and all additional costs / expenses / losses whatsoever (but excluding consequential and indirect losses) and the vessel shall be off-hire for any time lost as a result of a breach of this warranty.

**Clause 87 – Scrubber Clause**

Definitions:

"**Actual Consumption**" means the actual quantity (in metric tonnes) of HS IFO consumed by the vessel.

"**Benchmark Ports**" means Rotterdam, Houston, Gibraltar, Fujairah and Singapore.

"**Compliant Fuel**" means a fuel defined by an applicable ISO8217 or equivalent standard (as may be amended from time to time) generally accepted as suitable for use in the marine diesel engines and boilers of the Vessel, or LSMGO as set forth in Clause 9, which complies with the Regulations following the Effective Date.

"**Effective Date**" means the date established in the Regulations to limit Sulphur oxides and particulate matter emissions to 0.5% m/m outside Emission Control Areas, and to 0.1% m/m inside Emission Control Areas (as may be amended from time to time).

"**Fuel Spread**" means the difference in price (US$ per metric tonne) between the average Platts prices published over the last 15 days for HS IFO and Compliant Fuel at the Benchmark Ports.

"**HS IFO**" means intermediate fuel oil conforming to the specifications set forth in Clause 9 and Appendix A with a Sulphur Content above 0.5% m/m, and below 3.5% m/m.
"**LS IFO**" means intermediate fuel oil conforming to the specifications set forth in Clause 9 and Appendix A with a Sulphur Content below 0.5% m/m.

"**Non-Compliant Fuel**" means a fuel defined by an applicable ISO8217 or equivalent standard (as may be amended from time to time) generally accepted as suitable for use in the marine diesel engines and boilers of the Vessel, which does not comply with the Regulations following the Effective Date.

"**Regulations**" means Annex VI to the International Convention for the Prevention of Pollution from Ships (as may be amended and supplemented from time to time).

"**Scrubbing System**" means the multi-stream open loop wet scrubbing system to be installed onboard the Vessel for the purpose of reducing Sulphur dioxide (SO2) emissions from HS IFO with up to 3.5% Sulphur content from the Vessel's exhaust gas sources to less than 0.1% equivalent Sulphur content, in accordance with the Regulations.

"**Sulphur Content Requirements**" means any Sulphur content and related requirements as stipulated in MARPOL Annex VI (as amended from time to time) and/or by any other applicable lawful authority.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

**"Works"** shall mean the installation, commissioning and testing of an open loop exhaust gas cleaning system.

87.1        Scrubber Installation and Drydock Clause

(a) The Owners shall have the right to take the Vessel temporarily out of Charterers' service under this Charterparty in order to perform the Works and Charterers agree to temporarily redeliver the Vessel to Owners for this purpose commencing at any date between 20th November 2019 to 20th December 2019 (the "Temporary Redelivery Window").

(b) Prior to 20th September 2019 (60 days prior to the first day of the Temporary Delivery Window) Charterers shall narrow the Temporary Redelivery Window to no more than 14 days and confirm same to Owners.

(c) Prior to 20th October 2019 (30 days prior to the first day of the Temporary Redelivery Window) Charterers shall narrow the Temporary Redelivery Window to no more than 7 days and confirm same to Owners.

(d) Charterers shall provide Owners with 10/5 approximate and 3/1 firm days' notice of the date of temporary redelivery to Owners for the purpose of Scrubber Installation.

(e) Charterers shall place the Vessel at the disposal of Owners within the 7 day Temporary Redelivery Window within the range Gijon to Port Said, which it is understood excludes all other seas, channels, pilotages and waterways joining to the Mediterranean.

(f) Charterers undertake to cooperate with Owners in good faith to minimize the quantity of HS IFO onboard as far as reasonably practicable prior to placing the Vessel at the disposal of Owners within the Temporary Redelivery Window.

(g) The payment of hire shall be suspended from the time Charterers place the Vessel at Owners' disposal until Owners deliver the Vessel back to Charterers' service at the same location or a location equidistant to the next load port and any fuel used by Owners during such period shall be for Owners' account.

(h) Owners shall keep Charterers advised of the progress of the Works every 2 days and shall provide at least 5 days' notice of redelivery back into Charterers' service.

(i) The period during which the Vessel is temporarily out of service and off hire under this Clause may at Charterers' option be added to the Charter period.

(j) During the period from delivery back into Charterers' service until midnight on 31 December 2019, Charterers shall have free use of the Scrubbing System and no Scrubber Premium shall be payable.

(k) Owners intend to complete the Works prior to 01st January 2020. Notwithstanding the provisions of Clause 19, if for any reason the Works are not completed and/or the Vessel is not delivered back into the service of the Charterers with an operational

Rider Clauses to the Charter Party dated 28th June 2021
MV Anglo Jessica / Swiss Marine

Scrubbing System capable of demonstrating compliance with the Regulations, Clause 87.4 shall apply.

(l) Upon being delivered back into Charterers' service following completion of the Works, an additional 350 cubic tank capacity for LS IFO will be made available to Charterers (see attached – Tank No 3 Port).

87.2    Scrubber Premium

From the Effective Date, or such later time upon which the Vessel has delivered back into Charterers' service following completion of the Works, except as provided for in clause 87.3 below, Charterers shall pay to Owners a daily premium (the "Scrubber Premium") for use of the Vessel's Scrubbing System. The Scrubber Premium shall be determined as follows:

- i) At the end of each 30 day period, the Master is to issue a statement of consumption to Owners and Charterers confirming the Actual Consumption of the vessel during the preceding 30 days (or part thereof).
- ii) Charterers to pay Owners 85% of the Actual Consumption multiplied by the average Fuel Spread for the same 30 day period, with the next hire payment.

87.3    Scrubbing System Off-Hire

(a) Any time during which  i) the Scrubbing System is not immediately available to the Charterers due to a breakdown/defect of the Scrubbing System and/or ii) the Scrubbing System becomes incapable of demonstrating compliance with the Regulations, and the vessel is not permitted to continue using HS IFO, shall be considered **"Scrubbing System Off-Hire"** and the following provisions shall apply:

- i) Owners shall compensate Charterers for all direct additional costs incurred for running the vessel on a Compliant Fuel that is more expensive than the benchmark price for Compliant Fuel, as defined in the Fuel Spread; and
- ii) Owners shall promptly inform the Charterers with respect to the extent and expected duration of the Scrubbing System Off-hire and shall provide the Charterers with reasonable updates until the Scrubbing System is brought back into service;
- iii) Payment of the Scrubber Premium shall cease for the duration of any Scrubbing System Off-Hire days (or part thereof). Notwithstanding the rights of the Charterers in accordance with Clause 17, Scrubbing System Off-Hire shall not automatically constitute an Off-Hire event under this Charterparty;
- iv) Owners shall issue notification to the relevant authorities;
- v) The Parties shall provide full and prompt cooperation to assist with any application and/or reasonable notification requirements of any relevant authorities to allow enforcement action for non-compliance with the Regulations to be avoided;
- vi) Where the Vessel is required to change to a Compliant Fuel, the Vessel shall be permitted to utilise any quantity of Compliant Fuel held onboard;
- vii) In the event the Scrubbing System cannot be brought back into operation in accordance with the Regulations at the next port of call, or if required by the Vessel's Flag State, Clause 87.4 shall apply;

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

viii)    Owners shall indemnify Charterers against any costs/losses incurred as a result of a breach of the Regulations arising due to Scrubbing System Off-Hire.

(b) Where the Scrubbing System is not permitted to be used as a result of any current or future restrictions on the use of the Scrubbing System contained in the Regulations, or as stipulated by local and/or regional and/or national and/or international authorities where the Vessel is ordered to trade, the associated time shall not be considered Scrubbing System Off-Hire and the provisions of Clause 87.3 (a) i) to ix) above shall not apply.

(c) In the event the Scrubbing System can no longer be lawfully operated in international waters by the Owner due to a change in the Regulations:
i) No Scrubber Premium shall be payable from the date such changes come into effect; and
ii) Clause 87.4 shall apply.

(d) Where Scrubbing System Off-Hire is caused by fuel supplied by Charterers that does not meet the agreed specification, and/or as a result of a breach of this Charterparty by Charterers, the associated time shall not be considered Scrubbing System Off-Hire and the provisions of Clause 87.3 (a) i) to xi) shall not apply.

87.4     Compliant Fuel Trading
(a) Where provided for in Clause 87.1 to 87.3, in order to comply with the Regulations:

(i)     the Owners shall at their risk, time and cost ensure any Non-Compliant Fuel remaining on board after the 01st January 2020 shall be handled in accordance with, or comply with, the Regulations or as stipulated by local and/or regional and/or national and/or international authorities where the Vessel is ordered to trade; and

(ii)     in respect of bunker tanks, Owners shall at their risk, time and cost use all reasonable endeavors to ensure the Vessel's tanks are fit to receive Compliant Fuel, taking into account the type of Compliant Fuel that will be loaded into such bunker tanks.

Compliant Fuel shall not be loaded into a Vessel's bunker tanks until the steps described above in subclauses (a)(i) and (a)(ii) have been carried out in respect of any such bunker tanks.

Once bunker tanks are fit in accordance with section (a), no Non-Compliant Fuel shall be loaded into such bunker tanks.

(iii)     Disposal of Non-Compliant Fuel - In respect of Non-Compliant Fuel, if any, which needs to be discharged from the Vessel in accordance with (a)(i), Owners shall dispose of/transfer such fuel if required, in accordance with any applicable local regulations as well as flag state, National and International laws and regulations at Owners' risk, time and cost.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

(iv) Segregation - Unless otherwise agreed between Owners and Charterers, each supply of Compliant Fuel shall be bunkered into empty tanks that are suitable to receive the Compliant Fuel within the Vessel's natural segregation

(b) Once the Compliant Fuel Trading Clause has been invoked, it shall remain in force until mutually agreed by the Parties.

(c) For the entire period that such Compliant Fuel Trading clause remains in force:

i) No Scrubber Premium shall be payable;
ii) Charterers shall be responsible for all requirements towards Compliant Fuel supply in accordance with the remaining provisions of this Agreement.

**Clause 88 – Further Standard Clauses**

The following standard Clauses shall apply to this Charter Party (and incorporated into Bill(s) of Lading where appropriate), as amended:

a) BIMCO War Risks Clause for Time Chartering (CONWARTIME 2013);
b) BIMCO North American Advanced Cargo Notification Clause for Time Charter Parties;
c) BIMCO EU Advanced Cargo Declaration Clause for Time Charter Parties 2012;
d) BIMCO Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005;
e) BIMCO Bunker Quality and Liability Clause 2011;
f) BIMCO Bunker Quality Control Clause for Time Chartering;
g) BIMCO Dunnage Removal Clause for Time Charter Parties;
h) BIMCO ISPS/MTSA Clause for Time Charter Parties 2005;
i) BIMCO Hold Cleaning / Residue Removal Clause for Time Charter Parties;
j) BIMCO Sanctions Clause;
k) BIMCO Slow Steaming Clause for Time Charter Parties;
l) BIMCO Solid Bulk Cargoes that can Liquefy Clause for Time Charter Parties;
m) BIMCO Ship to Ship Transfer Clause for Time Charter Parties;
n) BIMCO ISM Clause for Voyage and Time Charter Parties;
o) BIMCO Designated Entities Clause for Charter Parties;
p) BIMCO 2020 Fuel Transition Clause for Time Charter Parties;

q) Clause 89 - COVID Crew Changes (applicable after 1st January 2022)

Owners shall make reasonable efforts to keep Charterers updated of crew change requirements and crew change planning for the duration of this charterparty. Where deviation or delay is required due to COVID-19 in order to execute a "COVID strategic / critical crew change", and subject to Charterers' prior agreement that the proposed crew change is considered "COVID strategic / critical", the resulting off-hire time and bunkers shall be split 75/25 between Charterers and Owners. Owners remain ultimately fully responsible for any further consequential delays and or costs/damages whatsoever resulting directly or indirectly from owners placing infected crew on board during any crew change.

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

### APPENDIX A

## VESSEL'S DESCRIPTION

Name:        MV ANGLO JESSICA
Ex-name:      Jake D
Type:        Mini Cape Single Deck Bulk Carrier
Yard:        New Times Shipbuilding Co. Ltd.
Built:       November, 2010
IMO:         9490480
Flag:         United Kingdom
Class:       ABS
DWT:         114,671 MT deadweight on 14.5m SSW
TPC:         103.5 SSW when laden
GRT/NRT:     64,100 / 37,823 MT
LOA/Beam:    255.3m / 43m
Ho/Ha:       7 / 7 (side rolling)
Gearless

Hold Capacity (Grain CBM):
- No. 1 14,951
- No. 2 20,072
- No. 3 20,148
- No. 4 20,148
- No. 5 20,148
- No. 6 20,147
- No. 7 18,408
Total:  134,022 CBM / 4,732,942.36 CFT

Fuel tank Capacity: including settling tank and service tank.
IFO:  about 3,377 CBM
LSGO:  about 573 CBM
LO:  about 257 CBM
FW:  about 649 CBM

M/E: MAN B&W / 6S60MC-C7 (Tier II) / Power Output MCR 13,560 KW x 105 rpm; NCR 11,526 KW x 99.5 rpm.

Speed and Consumption at sea at full speed:
- about 14 knots Ballast on about 47 MT IFO + about 0.1 MT LSMGO, and
- about 13 knots Laden on about 47 MT IFO + about 0.1 MT LSMGO

Speed and Consumption at eco-speed condition:
- about 12 knots Ballast on about 32 MT IFO + about 0.1 MT LSMGO, and
- about 12 knots Laden on about 39.5 MT IFO + about 0.1 MT LSMGO

Slow steaming speed and consumptions:
- about 11 knots on about 26 MT IFO in Ballast and about 33 MT IFO in Laden + about 0.1 MT LSMGO on both

**Rider Clauses to the Charter Party dated 28th June 2021**
**MV Anglo Jessica / Swiss Marine**

- about 10 knots on about 20.5 MT IFO in Ballast and about 26 MT IFO in Laden + about 0.1 MT LSMGO on both

All slow steaming figures are reference only and without guarantee.

Furthermore, owners only agree with vessels' slow steaming subject to the vessel to run at full speed for minimum 1 hour in every day. Daily running at CSO for 1 hour has been taken into account for fuel oil consumption calculation.

Port Consumption:
about 4.5 MT IFO + about 0.3 MT LSMGO per day idle and about 6.5 MT + about 0.3 MT LSMGO per day working

Burning Additional IFO/LSMGO:
Vessel may use additional IFO/LSMGO when entering/leaving port, manoeuvring and in narrow, shallow or congested waters, canals, rivers, straits, when ballasting/de-ballasting, heating fuel in cold weather, familiarization and maintenance.

IFO/LSMGO specs:
ISO 8217 (2010) RMG380 (ex. RMG35) for IFO / ISO 8217(2010) DMA for LSMGO.
In case ISO 8217 being updated, an equivalent or higher grade.

All speed / consumption figures are given basis good weather conditions up to BF4 / DSS3 in temperate waters and with no hull fouling due to extended stays in ports or at anchor, no against adverse currents, tidal streams and/or significant wave plus swells exceeding 1.50m. For clarity sake effect of positive currents to be taken into account when evaluating vessel's performance.

All figures given basis full sea days only and as an average of all days sea pilot to sea pilot and any reference to about means +/-5% allowance for consumption and +/-0.5 knots allowance for speed.

All details about

# EXHIBIT B

## PURCHASE ORDER NO. 06-2024IT

This Purchase Order No. 06-2024IT, consisting of total 25 pages, shall confirm the agreement reached on the Transaction Date referenced below between Consol Pennsylvania Coal Company L L C ("Seller") and ITOCHU Singapore Pte Ltd. ("Buyer"), and shall incorporate the General Terms and Conditions (the "General Terms and Conditions") attached hereto and the Shipping Terms and the Terminal Rules and Regulations issued by CONSOL Marine Terminals LLC ("CMT Rules and Regulations"). Seller and Buyer may be referred to individually as a "Party" and collectively as the "Parties".

| Seller:<br>Consol Pennsylvania Coal Company LLC<br>275 Technology Drive, Suite 101<br>Canonsburg, Pennsylvania 15317<br>Attn: Sr. Vice President Marketing<br>Telephone: (724) 416-8269 | Buyer:<br>ITOCHU Singapore Pte Ltd<br>6 Shenton Way #22-08<br>OUE Downtown 2<br>Singapore 06889<br>Attn: General Manager<br>Telephone: +65 6230 0413 |
| --- | --- |

**Transaction Date**       October 9, 2024

**Coal Source:**       Coal sourced and blended from the Bailey/Enlow Fork/Harvey Mines, (collectively, the "Coal Source").
Coal supplied is well washed coal without coal gangue, rocks and other impurity materials.

**Quantity:**       75,000 – 100,000 metric tons ("MT") +/- 10% at buyer's option for loading purposes, in one (1) Shipment.

**Commodity:**       **BAILEY HIGH VOL COKING COAL**

**Origin:**       United States of America

**Delivery Point:**       FOBT (INCOTERMS 2020) Buyer's Vessel at CONSOL Marine Terminal Baltimore, Maryland USA    ("CMT Terminal"), basis 25,000 MT/day load rate PWWD SSHINC.for cargo size 60,001 – 100,000MT; basus 30,000 MT/day load rate PWWD SSHINC for cargo size above 100,000MT .

**Delivery Period:**       November 1-30 2024.  10 day laycan of November 9-18, 2024 has been mutually agreed.

**Shipment:**       A "Shipment" shall be defined as a vessel loading of 75,000MT – 100,000MT, +/- 10% shipping tolerance.

**Vessel Nomination:**       Buyer's Vessel Nomination shall be in compliance with CMT Rules and Regulations.

**Specifications:**        The Shipment shall be of substantially uniform quality, substantially free of extraneous material, fully suited for bulk sea transport, and shall conform to the as-received or dry quality Specifications below as sampled and analyzed in accordance with Section 6 of the General Terms and Conditions ASTM results will be used for invoicing purposes.



| Specification Table A | Typical* | Min /Max | Rejection |
|---|---|---|---|
| Total Moisture (% as received) | 7.00% | 8.00% max | >10.00% |
| Volatile Matter (% dry) | 38.50% | N/A | >42.00% |
| Ash (% dry) | 8.25% | 8.75% max | >10.00% |
| Total Sulphur (% dry) | 2.60% | 2.80% max | >3.00% |
| Net Calorific Value (kcal/kg as received) | 6900 kcal/kg | 6700 kcal/kg min | < 6700 kcal/kg |
| Max Fluidity, ddpm | 30,000 | N/A | N/A |
| FSI | 7 - 9 | N/A | N/A |
| SIZE 0X50MM | 100% | | |

Table B

| TRACE ELEMENT | REJECTION |
|---|---|
| MERCURY (DRY BASIS) | above 0.6 μ g/g |
| ARSENIC (DRY BASIS) | above 80 μ g/g |
| FLUORINE (DRY BASIS) | above 200 μ g/g |
| PHOSPHORUS (DRY BASIS) | above 0.15% |
| CHLORINE (DRY BASIS) | above 0.3% |

* Typical specifications shall not be used for determining whether or not the Shipment complies with the Specifications and shall not constitute grounds for rejection.

If any of the above specifications exceeds the Rejection Limit on the Certificate of Sampling and Analysis provided by Seller, Buyer shall have the right to reject the cargo.

Additional items to be provided by seller to buyer before ETA of discharging port.

Table C

| |
|---|
| Gross Calorific Value (as received basis), kcal/kg |
| Gross Calorific Value (air dry basis), kcal/kg |
| Gross Calrific Value (dry basis), kcal/kg |
| Gross Calorific Value (moisture ash-free basis), kcal/kg |
| Gross Calorific Value (moisture mineral-matter free basis ), kcal/kg |
| Volatile Matter (moisture mineral-matter free basis) |
| Volatile Matter (dry-ash-free basis ) |
| Volatile Matter (dry mineral-matter free basis) |
| Volatile Matter (air dry basis) |
| Volatile Matter (as received basis) |
| Ash (air dry basis) |
| Ash (as received basis) |
| Total Sulphur (dry basis) |
| Total Sulphur (air dry basis) |



| | |
|---|---|
| | Total Sulphur (as received basis) |
| | Light Transmittance,% |
| | Max Plastic Layer Thickness (Y INDEX) |
| | Caking Index (G INDEX) |
| | HYDROGEN VALUE (AIR DRY BASIS) |
| | ASH FUSION TEMPERATURE REDUCING ATMOSPHERE |
| | ASH FUSION TEMPERATURE OXIDIZING ATMOSPHERE |
| | ASH FUSION TEMPERATURE - INITIAL DEFORMATION TEMPERATURE (IDT) |
| | ASH FUSION TEMPERATURE  - SPHERICAL TEMPERATURE (ST) |
| | ASH FUSION TEMPERATURE - HEMISPHERICAL TEMPERATURE (HT) |
| | ASH FUSION TEMPERATURE  - FLOW TEMPERATURE (FT) |
| | MINERAL ASH ANALYSIS(DRY BASIS) |
| | ULTIMATE ANALYSIS(AS RECEIVED,AIR DRY,DRY AND DRY ASH FREE) Full Ash Analysis (Dry Basis) Ultimate Analysis (Dry Basis) |
| | PROXIMATE ANALYSIS(AS RECEIVED,AIR DRY,DRY AND DRY ASH FREE) |
| | INHERENT MOISTURE  (AIR DRY) |
| | FIXED CARBON  (AIR DRY) |
| | HGI |
| | PHOTOPERMEABILITY (**PM**) |
| | SIZE(0-1MM) |
| | SIZE(0-10MM) |
| | SIZE(0-100MM) |

**Base Price:**    US$83.50 / metric ton, FOB Trimmed Vessel CMT Terminal per metric ton

**Price Adjustments:**    For each Shipment that generally conforms to the quality specifications set forth above or is otherwise accepted by Buyer, the Base Price shall be adjusted as follows:

**Ash:** If the dry ash content of the Shipment exceeds 8.75%, a price reduction of US$1.50 per metric ton shall apply for each 1.00 percentage point by which the actual dry ash content exceeds 8.75%, fractions pro rata. If the dry ash content exceeds 10.00% , then buyer shall have the right to reject the cargo.

**Sulphur:** If the dry sulphur content of the Shipment exceeds 2.80%, a price reduction of US$1.50 per metric ton shall apply for each 0.10 percentage point by which the actual dry sulphur content exceeds 2.80%, fractions pro rata. If the dry sulphur content exceeds 3% , then buyer shall have the right to reject the cargo.

**Moisture:** If the as-received total moisture content of the Shipment exceeds 8.00%, the invoice weight of the Shipment shall be reduced by the percentage of the total moisture content exceeding 8.00%, fractions pro rata. If the as-received total moisture content  exceeds 10% , then buyer shall have the right to reject the cargo.

**Destination:**    Coal is intended for re-sale by Buyer into China and Southeast Asia (including but not limited to Indonesia, Malaysia, Vietnam) That buyer's option.



**Weights & Analysis:**   Weights by certified draft survey by American Marine & Cargo Inc. and Sampling/Analysis conducted by Sampling Associates International/Hampton Roads Testing Laboratory, Inc. in accordance with ASTM Standards as set forth in Sections 4 through 6 of the General Terms and Conditions.

**Loading:**   In accordance with the Shipping Terms (attached as Exhibit A) and CMT Rules and Regulations (attached as Exhibit B).

**Notices:**   In accordance with CMT Rules and Regulations.

**Demurrage/Despatch:**   Demurrage/Despatch rates to be advised in vessel nomination.
Demurrage/Despatch shall be paid by wire transfer to the receiving Party's designated account no later than 10 days from receipt of the invoice.

**Payment Terms and Credit Assurances:**   Shipment value will be paid by irrevocable confirmable letter of credit ("L/C") payable at sight upon presentation of the documents identified in Section 8.1 of the General Terms and Conditions covering 110% of Shipment value. The L/C must be received by Seller 4 days prior to the agreed upon Laycan and the Vessel will not commence loading unless an irrevocable confirmable L/C is received by Seller through its advising bank. Any direct and indirect costs associated with delays in berthing vessel as a result of not having a confirmable L/C to be solely for Buyer's account.

**Terminal Rules**   Owner and its agent shall at all material times comply with CMT Rules and Regulations, incorporated herein by reference.  Seller shall have no liability for Owner's failure to comply in all material respects with said Rules and Regulations, and shall be indemnified by Owner for all penalties or damages incurred by Seller resulting from Owner's or its agent's non-compliance with same.

4



THIS PURCHASE ORDER IS SUBJECT TO THE GENERAL TERMS AND CONDITIONS ATTACHED HERETO AND INCORPORATED BY REFERENCE HEREIN. ALL PROVISIONS CONTAINED IN THE GENERAL TERMS AND CONDITIONS GOVERN THIS PURCHASE ORDER TO THE EXTENT NOT IN CONFLICT WITH THE TERMS HEREOF.

**SELLER:**

**Consol Pennsylvania Coal Company LLC**
By:
Title:   Vice President
Date:   Oct. 14, 2024

**BUYER:**

**ITOCHU Singapore Pte Ltd**
By: Yuta Kawagoe
Title: General Manager
Date:  14th October 2025

5



## GENERAL TERMS AND CONDITIONS

**THESE GENERAL TERMS AND CONDITIONS** ("General Terms and Conditions") are entered into by CONSOL Pennsylvania Coal Company LLC ("Seller"), and ITOCHU Singapore Pte Ltd. ("Buyer") (together, the " Parties"), and are an essential part of and form one integrated agreement with the Purchase Order No. 05-2024IT between the Parties. The underlying Purchase Order and these General Terms and Conditions are collectively referred to as the "Agreement." In the event of a conflict between the terms of the General Terms and Conditions and the terms of the Purchase Order, the terms of the Purchase Order shall prevail.

1. **SOURCE OF COAL**
   The Coal Source for deliveries to Buyer shall be as identified in the Purchase Order.

2. **QUANTITY**
   Buyer shall purchase, accept and pay for, and Seller shall sell and deliver, the quantity set forth in the Purchase Order in accordance with the delivery schedule agreed in the Purchase Order (the "Delivery Schedule").

3. **DELIVERY**
   *3.1*   *Delivery.* Seller shall sell and deliver coal FOBT (INCOTERMS 2020) Trimmed Buyer's Vessel at the Delivery Point identified in the Purchase Order. Upon such delivery, title and risk of loss shall pass to Buyer.

   *3.2*   *Transportation.* Seller shall be responsible for all transportation costs associated with the transportation of coal up to delivery at the Delivery Point. Buyer shall be responsible for all transportation costs associated with the transportation of coal after delivery at the Delivery Point.

   If at any time a Party has reason to believe that deliveries will not be made or accepted as scheduled, such Party shall give written notice to the other Party setting forth the cause of the anticipated delay. At all material times, the Parties shall exercise commercially reasonable efforts to mitigate any losses or damages resulting from any delayed Shipment. Each Party shall be responsible for payment of demurrage, unless its performance is excused for reasons of Force Majeure or, in the case of demurrage, unless excused under the charter party of the carrying vessel.

4. **WEIGHING**
   *4.1*   *Draft Survey.* The weight of coal delivered hereunder shall be determined by draft survey at Seller's expense at the Delivery Point by an independent, certified marine surveyor for vessels employed by American Marine and Cargo who is experienced in the conduct of draft surveys.

   *4.2*   *Weighing Observation.* Buyer or Buyer's representative, at its sole risk and expense, may be present to observe the draft survey conducted by the independent surveyor.

5. **COAL QUALITY**
   *5.1*   *Price Adjustments.* If coal delivered under this Agreement varies from the Specifications but is within the Rejection Limits, Price Adjustments shall be calculated pursuant to the formulas as set forth in the Purchase Order and Seller shall credit Buyer the net negative-price adjustment or shall Buyer credit Seller the net positive-price adjustment, as applicable, if any, in accordance with the billing and payment terms of Section 8.1 of these General Terms and Conditions.

   *5.2*   *Rejection Rights.* Coal delivered hereunder shall be generally consistent with the Specifications set forth in the Purchase Order. If Seller delivers a Shipment which exceeds any of the maximum Rejection Limits or falls below any of the minimum Rejection Limits as set forth in the Purchase Order ("Non-Conforming Shipment"), then Buyer shall have the right to reject the Non-Conforming Shipment within seventy two (72) working hours after receipt of the Analysis Report and in any event prior to unloading.

   Provided that Seller fails to replace the Non-Conforming Shipment as set forth in the last paragraph



of this Section 5.2, Seller shall pay Buyer an amount for each metric ton of the Non-Conforming Shipment equal to the positive difference, if any, obtained by subtracting the Base Price from the Replacement Price(buyer to provide the replacement price with similar quality cargo). In addition, Seller shall be responsible for any direct damages and losses, including freight, demurrage, detention, deviation or cancellation costs resulting from the delivery of such Non-Conforming Shipment.

In lieu of rejection, and at Buyer's sole discretion, Buyer may, and Seller shall afford Buyer the opportunity to, accept any Non-Conforming Shipment subject to a price reduction agreed to by the Parties.

If Buyer rejects the Non-Conforming Shipment, title and risk, if already passed, shall immediately revert to Seller and all Costs of removing, selling or otherwise disposing of the rejected coal and all Costs of such removal, sale or disposal shall be for Seller's account. Buyer shall be under no obligation to make any payment whatsoever to Seller and Seller shall have no claim whatsoever against Buyer in respect of the Shipment.LC shall be canceled and seller shall refund any payment received from buyer, if any.

In lieu of a damage claim for rejected coal, Buyer may require Seller to replace the rejected coal, at Buyer's sole election, within a reasonable period of time and reduced price agreed upon by the Parties not to exceed ninety (90) days.

**6.    SAMPLING AND ANALYSIS**
**6.1    *Sampling:*** Sampling shall be performed in accordance with applicable ASTM International ("ASTM") or ISO standards at Seller's expense by Sampling Associates International (the "Sampling Person") at the Delivery Point.  Upon request received by Seller prior to loading, Seller shall provide Buyer with a copy of the last certification for mechanical sampling equipment used to sample coal under this Agreement verifying the date that such equipment has been bias tested. In the event the Sampling Person is not able to obtain a sample in accordance with ASTM or ISO standards, the Parties shall confer for purposes of reaching agreement as to an alternative means of sampling. Samples shall be taken on an "as loaded" basis. The Sampling Person's samples of coal representing each Shipment and the analysis thereof as set forth below shall be used to determine quality adjustments and any rejection rights. All samples collected by the Sampling Person shall be divided into four parts. One (1) part shall be retained by the Sampling Person for a period of ninety (90) days to be used for a Referee Analysis, if necessary; one (1) part shall be analyzed in accordance with Section 6.2 ("Seller's Sample"); one (1) part shall be retained by Sampling Person for a period of forty five (45) days, or shipped at Buyer's expense as Buyer directs ("Buyer's Sample"); and one (1) part shall be for the end-use customer ("End-Use Customer's Sample") to be retained or shipped along with Buyer's Sample at Buyer's expense as Buyer directs.

**6.2    *Analysis.*** Analysis of Seller's Sample shall be performed by Hampton Roads Testing ("HRT") (the "Analysis Person"). Seller's Sample shall be analyzed on an "as received" basis in accordance with applicable ASTM or ISO standards. The Analysis Person shall cause the results of such analysis to be reported to Buyer and Seller by electronic mail, telephone (to be confirmed promptly by electronic mail) or other means agreed upon by the Parties (the "Analysis Report") as soon as available. By notice to Seller within seventy-two (72) working hours after receipt of the Analysis Report, and in any event prior to unloading at the destination, Buyer shall exercise any rejection rights pursuant to Section 5.2 above. In addition, Buyer may object to the Analysis Report, and if so, may submit Buyer's Sample to an independent testing laboratory selected by and unaffiliated with Buyer for an independent analysis ("Buyer's Analysis").

The costs of Buyer's Analysis shall be paid by Buyer. If the results of Buyer's Analysis establish that the analysis of Seller's Sample for a particular Specification is within ASTM Reproducibility Limits, the analysis of Seller's Sample shall control. If the results of Buyer's Analysis establish that the analysis of Seller's Sample for a particular Specification is outside ASTM Reproducibility Limits, ,the analysis of Buyer's Sample shall control.
In case no agreement is reached, then either Party may request that the Sampling Person submit



the Referee Sample to an independent testing laboratory selected by mutual agreement of the Parties for further analysis of such Specification ("Referee Analysis"). If the results of the Referee Analysis establish that the analysis of Seller's Sample for such Specification is within ASTM Reproducibility Limits, the analysis of Seller's Sample shall control, and the costs of the Referee Analysis shall be paid by the Party requesting the Referee Analysis. If the results of the Referee Analysis establish that the analysis of Seller's Sample is outside ASTM Reproducibility Limits, the Referee Analysis shall control and the costs of the Referee Analysis shall be paid by Seller. Except as set forth above, all costs associated with sampling and analysis hereunder shall be for Seller's account.

6.3 **Representative Presence:** Each Party has the right to have a representative present, at such Party's risk and expense and in compliance with CMT Rules and Regulations, at the Delivery Point during the loading, weighing and/or sampling of the coal.

**7. BASE PRICE**

The Base Price to be paid by Buyer for each ton of coal delivered hereunder shall be as set forth in the Purchase Order, subject to adjustment as set forth in this Agreement.

**8. PAYMENT TERMS**

8.1 **Invoicing and Payment.** Shipment value will be paid by irrevocable confirmable letter of credit ("L/C") payable at sight upon presentation of the documents identified below covering 110% of Shipment value. L/C clauses to be mutually agreed. The L/C must be received by Seller at least 4 days prior to the VESSEL'S ETB AT THE LOADING PORT and the Vessel will not commence loading unless an irrevocable and confirmable L/C is received by Seller through its advising bank identified below. Any direct and indirect costs associated with delays in berthing vessel as a result of not having a confirmable L/C to be solely for Buyer's account.

Consol Pennsylvania Coal Company LLC



Upon Seller's presentation to the issuing bank of the documents listed below, Seller shall by entitled to draw under the L/C for one hundred percent (100%) of the total amount of the Invoice Price set out in the Commercial Invoice on presentation of the following documents:

1.  Seller's signed commercial invoice.

2.  Full set of 3 originals and 3 copies clean on board Charter Party Bills of Lading made out to order and blank endorsed with marked "Freight payable as per Charter Party"; made out "To Order" and blank endorsed by shipper. Notify party to be informed by Buyer to Seller under LC draft and showing shipper as "Consol Pennsylvania Coal Company LLC".

3.  1 original and 3 copies of Certificate of Sampling and Analysis issued and signed by independent inspection agency – Hampton Roads Testing Laboratories Inc. at loading port indicating the vessel name and BL date, showing the actual result of all specifications called for in specifications Table A and Table B, and indicating samples performed by Sampling Associates International at loading or during vessel loading and sampling date on or before shipment date.

4.  1 original and 3 copies of Certificate of Weight issued and signed by independent inspection agency – American Marine and Cargo Inc.at loading port indicating the vessel name and bl date.

5.  1 original and 3 copies of Certificate of Origin issued and signed by independent inspection agency – American Marine and Cargo Inc. at loading port indicating the vessel name and B/L date.

8



6.  1 original and 3 copies of Certificate of Draft Survey report issued and signed by independent inspection agency – American Marine and Cargo Inc. at loading port indicating he vessel name and bl date

7.  2 original Certificate of Origin issued by Chambers of Commerce or by relevant Government Authority at USA.

8.  One original and three signed and stamped Hold cleanliness certificates issued by the independent inspection agency at loading port indicating the vessel name and bl date

Other terms of the L/C:

a.  Charter Party and split Bills of Lading shall be allowed. BL must be signed by the master or vessel owner or his named agent for and on behalf of the master or vessel owner. Shipper as agent unacceptable.
b.  Third party documents acceptable except commercial invoice, draft and issuers stipulated in the LC.
c.  Under drawing of L/C due to quality / quantity adjustments acceptable.
d.  A tolerance of + / - 10% in quantity and amount are acceptable.
e.  If Buyer requires split Bills of Lading, Seller shall be notified at least 3 days prior to vessel ETA load port with breakup of the same. A maximum of twenty-five (25) Bills of Lading will be issued showing the same consignee and identifying the notification party.
f.  Letter of Credit to permit 21 Days Presentation period from the BL date.
g.  Confirmation charges, if any, shall be to Seller's account.

Additional Documents need to be provided outside LC by Seller as follows:

1. 1 original and 3 copies of Certificate of Sampling and Analysis issued and signed by independent inspection agency – Hampton Roads Testing Laboratories Inc. at loading port indicating the vessel name and B/L date; showing the actual result of all specifications called for in Specifications TABLE C, and indicating samples performed by Sampling Associates International at loading port during mother vessel loading and sampling date on or before shipment date;;

2. 1 original and 1 copy of Shipper Invoice and Shipper invoice that reflects the content of Certificate of Origin issued by Chambers of Commerce or by relevant Government Authority at USA, for custom clearance purpose

The Seller shall email copies of one set of non-negotiable Shipping documents including above additional documents (1,2) to the Buyer within 7 working days after the BL date and courier to buyer 's request address within 10 days after the BL date.

Demurrage and Despatch shall be payable within 10 business days of receipt and agreement of the other Party's invoice and relevant supporting documents.

8.2  *Taxes and Other Liabilities.* Seller shall pay or cause to be paid and indemnify, defend and hold harmless Buyer from and against all sales, export duties, use, gross receipts, occupation, production, severance, black lung, excise, ad valorem or other taxes, royalties, fees, licenses, or charges that are imposed by any federal, state or local governmental authority ("Governmental Charges") relating to the export, mining, beneficiation, production, sale, use, loading and delivery of coal to Buyer at the country of Loading, or in any way accrued or levied prior to loading at the Delivery Point.

All import duties and taxes levied in the country of discharge shall be for Buyer's account. In addition, Buyer shall pay or cause to be paid and indemnify, defend and hold harmless Seller from and against all Governmental Charges that arise and are imposed with respect to the coal at the country of discharge. Unless Buyer has delivered to Seller certificates, documents or other evidence in its



possession, custody or control reasonably requested by Seller to confirm the exempt sales and use tax status of Buyer so as to enable Seller to reduce or eliminate Seller's obligation for charging, collecting or remitting sales and use tax in relation to such purchase, sale or delivery, then Buyer shall be responsible for and hold Seller harmless from sales and use taxes that arise after the Delivery Point as a result of Buyer's failure to provide such certificates, documents or other evidence despite Seller requesting for such documents well in advance.

If a Party is required to pay or remit Governmental Charges that are the other Party's responsibility hereunder, the Party responsible for such Governmental Charges shall reimburse the other Party for its payment of such Governmental Charges within ten (10) Business Days of its receipt of a written request for reimbursement of such Governmental Charges. If a Party claims an exemption from Governmental Charges, it shall furnish the other Party, upon its request, with resale certificates or other reasonably acceptable documentation of the Party's right to claim the exemption from Governmental Charges. Each Party shall use commercially reasonable efforts to administer this Agreement and implement its provisions to minimize Governmental Charges within the good faith parameters of the law. Each Party shall give the other Party such assistance as is reasonable in the circumstances to comply with the local rules regarding the collection, payment and administration of Governmental Charges. Seller or Seller's agent shall act as the exporter of record and Buyer or Buyer's agent shall act as the importer of record in respect of coal sold under this Agreement.

**8.3** **_Disputed Invoices and Overpayments:_** Unless otherwise stipulated, Any dispute as to the amount owed to Seller for the delivery of coal hereunder, including without limitation disputes regarding the quality and tonnage of coal loaded for Buyer and/or the Parties' submission of samples for a Referee Analysis as provided in Section 6.2 above, shall not permit any delay in or deduction from the payment of that, or of any other, invoice(s); provided, however, that if it is later determined that any portion of any payment represents overpayment or is otherwise not due to Seller, then Seller shall promptly refund to Buyer the amount of such overpayment plus interest thereon, calculated from the date of such overpayment to the date of repayment, at the Interest Rate as of the date of such overpayment.

**9.** **FORCE MAJEURE**
**9.1** **_Force Majeure Defined:_** The term "Force Majeure" as used herein shall mean any event which (a) is not within the control of the Party relying thereon (the "Claiming Party") and (b) could not have been prevented or avoided or overcome by such Party through the exercise of due diligence. Subject to the foregoing, Force Majeure includes, by way of illustration and without limitation: war; acts of God; equipment breakdowns provided not resulted due to Seller's negligence or outages at the Source Mines or CMT Terminal; insurrections, riots, labor disputes, or strikes; fires, explosions, or floods; adverse geologic conditions; accidents at, closing of, or restrictions upon the use of mooring facilities, docks, ports, harbors, railroads or other navigational or transportation mechanisms; notices or declarations of Force Majeure by transportation carriers or coal terminals; perils of the sea; accidents of navigation or breakdown or delay of or injury to vessels; embargoes; legislation, court orders, governmental regulation; orders or acts of any governmental or military authority; or any other cause reasonably beyond the control of a Party, whether similar or dissimilar to those above and whether foreseeable or unforeseeable, which, by the exercise of due diligence, such Party could not have been able to avoid or overcome. Notwithstanding the foregoing, Force Majeure specifically excludes: (i) the loss of Buyer's markets or Buyer's inability economically to use or resell coal purchased hereunder; (ii) Seller's ability to sell coal to a market at a more advantageous price or Buyer's or Buyer's customer's ability to buy coal at a lower price whether or not foreseeable; and (iii) transportation delays (unless the transportation carrier itself declares Force Majeure). The Parties acknowledge and agree that Seller shall be entitled to exercise all rights under this Section 9.1 in the event of a Force Majeure encountered or prevailing at any Source Mine identified in the Purchase Order, and that such Force Majeure shall be deemed that of Seller. For the sake of clarity, Seller shall not be entitled to claim Force Majeure for conditions affecting any alternate source of coal.

**9.2** **_Obligations in Event of Force Majeure._** If a Party is totally or partially unable to carry out its obligations hereunder as a result of a Force Majeure, then such obligations shall be excused during the duration of such Force Majeure to the extent that the affected Party is prevented from performing



them. Each Party shall, in the event it experiences a Force Majeure, use all efforts which are economically practical and otherwise reasonable to mitigate or eliminate such Force Majeure and/or the effects thereof with all reasonable dispatch. Neither Party shall be required to settle strikes, differences with employees or unions or governmental claims by acceding to any demands when, in the discretion of the Party whose performance is interfered with, it would be inadvisable to accede to such demands. The Party asserting Force Majeure shall give written notice thereof to the other Party as promptly as practicable of the nature and probable duration of such Force Majeure after the occurrence of the Force Majeure prevents the performance of a Party's obligations under this Agreement, and will keep the other Party advised as to its efforts to remedy the Force Majeure. Deliveries not completed as a result of Force Majeure shall be made up at the sole discretion of the Party that has not declared Force Majeure, provided that such notice is provided to the Party declaring Force Majeure within fifteen (15) Business Days following the cessation of the Force Majeure event and the resumption of the affected Party's performance hereunder.

Notwithstanding any provision hereof, neither Party shall be relieved by the occurrence of an event of Force Majeure of its obligation to pay demurrage, deadfreight, costs and charges imposed by CMT Terminal, damages for detention or deviation or cancellation costs on vessels chartered by Buyer or trains scheduled by Seller before the notification of the Force Majeure under this clause, unless the non-affected Party is excused from such obligations to the vessel owner, the railroad or CMT Terminal under the provisions of the governing charter party, transportation contract, or terminal agreement.

**9.3** ***Termination Rights Based on Force Majeure***. If an event of complete or partial Force Majeure persists for a continuous period of sixty (60) days, then the Party not claiming Force Majeure shall have the option, upon three (3) calendar days' prior written notice, to terminate, liquidate and close out affected shipment of this Agreement and the associated obligations of the Parties hereunder without further obligation of either Party (other than payment obligations for prior performance hereunder).

## 10. COVER COSTS, EVENTS OF DEFAULT, REMEDIES
**10.1** ***Quantity Shortage.***
(a) Unless excused by Force Majeure or Buyer's failure to perform, if Seller fails to deliver all or part of the agreed quantity of coal in accordance with the Delivery Schedule, Seller shall pay Buyer an amount for each ton of such shortfall equal to the positive difference, if any, obtained by subtracting the Base Price from the Replacement Price, plus any additional direct costs or expenses reasonably incurred by Buyer as a result of such failure, including without limitation, freight, deadfreight, demurrage, detention, deviation or cancellation costs. In lieu of a damage claim, at Buyer's sole discretion, the Parties may agree upon Seller's delivery of the deficiency within a time period agreed upon by the Parties.

(b) Unless excused by Force Majeure or Seller's failure to perform, if Buyer fails to take delivery all or part of the agreed quantity of coal in accordance with the Delivery Schedule, Buyer shall pay Seller an amount for each ton of such shortfall equal to the positive difference, if any, obtained by subtracting the Resale Price from the Base Price, plus any additional direct costs or expenses reasonably incurred by Seller as a result of such failure, including without limitation, freight costs, demurrage, detention, deviation or cancellation costs and charges imposed by CMT Terminal or trains scheduled by Seller. In lieu of a damage claim, at Seller's sole discretion, the Parties may agree upon Buyer taking delivery of the deficiency within a time period agreed upon by the Parties.

(c) Any amounts payable under Sections 10.1(a) and (b) above shall be due five (5) Business Days after receipt of an invoice and supporting documentation sufficient to verify and confirm the amounts payable.

**10.2** ***Event of Default.*** An event of default ("Event of Default") with respect to a Party (the "Defaulting Party") shall mean any of the following:



(a) the Party fails to make, when due, any payment (other than a payment with regard to a damage claim asserted by a Party that is reasonably disputed by the other Party) required to be made by it under this Agreement, and such failure is not remedied within five (5) Business Days of receipt of notice of non-payment;

(b) any material representation or warranty made, or deemed to have been made, by the Party in this Agreement is false or materially misleading at the time it is made or deemed to have been made;

(c) the Party fails to perform a material obligation under this Agreement (other than a failure to deliver or take delivery of coal, the exclusive remedy for which is set forth in Section 10.1 above) and such failure is not remedied within five (5) Business Days;

(d) the Party repudiates this Agreement;

(e) a Bankruptcy Event occurs with respect to such Party; or

(f) a breach of either Section 11.15 or 11.16 below.

**10.3 *Notice and Termination Rights:*** Upon the occurrence of an Event of Default, and provided such Event of Default is not cured by the Defaulting Party within fifteen (15) days of written notice of such default, the non-defaulting Party (the "Non-Defaulting Party") may do one or more of the following with respect to the Defaulting Party: (i) suspend or withhold performance to the Defaulting Party required under this Agreement, (ii) upon at least five (5) Business Days' written notice to the Defaulting Party, but no more than twenty (20) calendar days after such notice is effective, designate in such written notice a date for the termination of the Parties' obligations under this Agreement ("Early Termination Date"), and (iii) liquidate and terminate this Agreement as of such Early Termination Date, and (iv) take such other actions as may be permitted at law, in equity or in contract.

**10.4 *Calculation of Net Settlement Amount:*** In the event of termination and liquidation upon the occurrence or designation of an Early Termination Date in accordance with Section 10.3 above, the Non-Defaulting Party shall in good faith calculate its Gains, Losses and Costs resulting from the termination of this Agreement, aggregate such Gains, Losses and Costs and any other amounts due under this Agreement into a single net amount (the "Net Settlement Amount"), and then notify the Defaulting Party of the Net Settlement Amount owed to or by the Non-Defaulting Party. If the calculation of the Net Settlement Amount results in monies owed by the Defaulting Party to the Non-Defaulting Party, payment of the Net Settlement Amount shall be made by the Defaulting Party within ten (10) Business Days after the later of the Early Termination Date and the Defaulting Party's receipt of notice of the Net Settlement Amount. If the calculation of the Net Settlement Amount does not result in monies owed by the Defaulting Party to the Non-Defaulting Party, vice versa shall apply. .

**10.5 *Setoff:*** Without affecting the provisions of this Agreement requiring the calculation of Net Settlement Amounts, all payments under this Agreement will be made without set-off or counterclaim.

**11. MISCELLANEOUS**

**11.1 *Computation.*** All computations relevant to adjustments hereunder shall be carried to two decimal places and any resulting price adjustment rounded to two decimal places.

**11.2 *Waivers and Remedies.*** The failure of either Seller or Buyer to insist in any one or more instances upon strict performance of any of the provisions of this Agreement or to take advantage of any of its rights hereunder at any time, including but not limited to its rights with respect to breach of this Agreement, shall not be construed as a waiver of any such provisions or the relinquishment of any such rights at any future time or times, but the same shall continue and remain in full force and effect.

**11.3 *Notices.*** All notices under this Agreement shall be in writing, and shall be addressed to Buyer and/or Seller as set forth below:



| Buyer: | Seller: |
|---|---|
| **ITOCHU Singapore Pte Ltd**<br>6 Shenton Way #22-08<br>OUE Downtown 2<br>Singapore 068809<br>Attn: General Manager<br>Telephone: +65 6230 0413<br>Email: sprri@itochu.com.sg | **Consol Pennsylvania Coal Company LLC**<br><br>275 Technology Drive, Suite 101<br>Canonsburg, Pennsylvania 15317<br>Attn: Vice President Marketing<br>Telephone: (724) 416-8269<br>Email: robertbraithwaite@consolenergy.com |

**11.4  *Limitation of Liability:*** The Parties confirm that the express remedies and measures of damages provided in this Agreement satisfy the essential purposes hereof. For breach of any provision for which an express remedy or measure of damages is herein provided, such express remedy or measure of damages shall be the sole and exclusive remedy, the liable Party's liability shall be limited as set forth in such provision, and all other remedies or damages at law or in equity are waived unless otherwise provided in this Agreement. If no remedy or measure of damages is expressly herein provided, the liable Party's liability shall be limited to direct actual damages only. Subject to any losses or damages resulting from a Party's breach of sections 11.15, 11.16 or 11.17 below, neither Party shall be liable to the other for consequential, incidental, punitive, special, exemplary or indirect damages, legal fees or costs, lost profits or revenue, loss of use, or business interruption damages, whether by statute, in tort or in contract, under this agreement, except to the extent that the payments required to be made pursuant to this Agreement are related to indemnity claims or deemed to be such damages.

**11.5  *Representations and Warranties.*** Each Party represents and warrants to the other Party as of the date of this Agreement and every delivery hereunder, that:

(a)  It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing, and has the corporate, governmental and/or other legal capacity, authority and power to execute this Agreement or other document relating hereto to which it is a party, to deliver this Agreement or other document relating hereto that it is required hereby to deliver, and to perform its obligations under this Agreement or other document relating hereto to which it is a party, and has taken all necessary action to authorize such execution, delivery and performance;

(b)  No Event of Default with respect to it, or event which with notice and/or lapse of time would constitute an Event of Default, has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or other document relating hereto to which it is a party;

(c)  Seller further represents and warrants that it enters into this Agreement in the ordinary course of business and that at the time of delivery it will have good title to the coal, it will deliver to Buyer the coal free from all liens, security interests, encumbrances, claims or any interest therein or thereto by any person arising prior to the Delivery Point and that it has the right to sell to Buyer the coal required to be sold hereunder.

(d)  Neither Party makes any other representation or warranty of any kind, express or implied, whether as to merchantability, fitness for any or a particular purpose, or any other matter, except as expressly set forth herein. Buyer specifically agrees that it is not relying on Seller's skill or judgment to select or furnish coal that is suitable for a particular purpose of Buyer, provided that it must meet the specifications as specified herein or in a purchase order.

**11.6  *Successors and Assigns; Assignment.*** This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. However, no Party shall assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.

13



Notwithstanding the foregoing, no consent is required for an assignment or other transfer by a Party of this Agreement as part of a merger, reorganization or consolidation involving such Party. Furthermore, any Party may, without the need for consent from the other Party (and without relieving itself from liability hereunder), on written notice to the non-assigning Party, transfer, sell, pledge, encumber or assign the accounts, revenues or proceeds under this Agreement in connection with any financing or other financial arrangements.

**11.7 Entire Agreement.** All prior writings, communications and representations by and between the Parties are merged into this Agreement which is the full and complete expression of all understandings between Seller and Buyer regarding the object hereof, and this Agreement includes within it or supersedes all prior discussions and agreements, and may be modified only in a writing signed by both parties.

**11.8 Controlling Law.** The validity, construction and performance of this Agreement shall be determined in accordance with the laws of the state of Pennsylvania.

**11.9 Confidentiality.** Except to the extent that disclosure of information contained in this Agreement is required by law or governing regulatory authority or is requested by a governmental regulatory, self-regulatory or supervisory authority with jurisdiction over the Party receiving the request, the contents of this Agreement shall remain confidential and shall not be disclosed or released by either Party without consent of the other Party. Notwithstanding the foregoing, each Party shall be permitted to disclose this Agreement to its Affiliates, attorneys, consultants, professional advisors, banks, insurers and/or investors for legitimate business purposes so long as the recipient agrees to maintain its confidentiality.

**11.10 Arbitration.** All claims, disputes or controversies arising out of or relating to this Agreement or the breach, termination or validity thereof, ("Disputes") shall be fully and finally settled by binding arbitration in, New York in accordance with the American Arbitration Association's ("AAA") Commercial Arbitration Rules then in effect, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitration proceeding shall be conducted by a sole arbitrator to be agreed upon by the Parties. If the Parties do not agree upon an arbitrator within 20 calendar days after notice of the demand for arbitration is given in accordance with Rule R–4, then the AAA shall make the appointment in accordance with Rule R-12(c). The language of the arbitration shall be English.

**11.11 No Presumption against Drafter.** Each of the Parties hereto has jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by each of the Parties hereto and no presumptions or burdens of proof shall arise favoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**11.12 Third Party Beneficiaries.** This Agreement is made and entered into for the sole protection and legal benefit of the Parties, and their permitted successors and assigns, and no other person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with this Agreement.

**11.13 Counterparts.** This Agreement may be executed in any number of counterparts each of which shall be deemed an original but all of which shall constitute one and the same instrument.

**11.14 Severability.** If any of the provisions of this Agreement are invalid or unenforceable, the invalidity or unenforceability shall not affect the operation, construction or interpretation of any other provision of this Agreement.

**11.15 Compliance with Laws.** Notwithstanding anything to the contrary stated or implied in this Agreement, nothing contained in this Agreement is intended to induce or require either Party to act in any manner which is or is likely to be inconsistent with, penalized, prohibited or in violation of the laws, regulations or rules (where applicable). Either Party may terminate this Agreement with

14




immediate effect without incurring any liability to the other Party if at any time they become aware that performance of this Agreement may involve an act or omission penalized or prohibited under the laws, rules or regulations (where applicable).

**11.16 Anti-Corruption.**
In connection with the Agreement, the parties warrant that neither they nor their directors, officers, shareholders, employees, agents, consultants or representatives have given, offered, promised or authorized and shall not give, offer, promise or authorize anything of value, directly or indirectly, to a government official or any other person to influence or reward official action; to influence or induce a person to perform his or her work duties disloyally or otherwise improperly; or to reward a person for doing so. Each Party shall comply with all laws applicable to that Party relating to anti-corruption, including the anti-corruption laws of any country in which any activities or obligations arising under the Agreement have been or are to be performed. Each Party will permit the other, its authorized representative, including third part auditors to inspect the activities and premises, including but not limited to its access to facilities and private access to its managers and employees, accounting books and invoices relevant to the Agreement in order to confirm compliance with all the terms of the Agreement during the term of the Agreement and 2 years thereafter.

**11.17 Trade sanction provisions:** Both parties represent and warrant that the goods and/or the raw materials and/or the components of the goods will not be sold/procured directly or indirectly to/from any company/organization listed on Specially Designated Nationals (SDN) list or any similar list maintained by United States of America (US), United Nations (UN) and European Union (EU) and/or is not in breach of any other sanctions and would not be in breach if Parties or any other person involved in the transaction were US or EU Persons.

**12.   DEFINITIONS**
In addition to any other terms defined herein, the following terms shall have the meaning ascribed to them as set forth below:

*"Affiliate"* means in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person.   For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Bankruptcy Event"* means with respect to any entity, such entity (a) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy, insolvency, reorganization or similar law, or has any such petition filed or commenced against it and such proceeding or cause of action is not withdrawn, dismissed, stayed or restrained within five (5) Business Days of such filing, (b) makes an assignment or any general arrangement for the benefit of creditors, (c) otherwise becomes bankrupt or insolvent (however evidenced), (d) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets, or (e) is generally unable to pay its debts as they fall due.

*"Business Day"* means any day other than a Saturday, Sunday or public holiday on which banks in New York City and London and Singapore are open for business.

*"Costs"* means, with respect to the Non-Defaulting Party, direct costs and expenses reasonably incurred by such Party in order to replace or resell the quantity of coal not delivered or received under a  Purchase Order as a  result of the  purchase of  replacement  coal  in  accordance with Section 5.2 of this Agreement,  or early termination of this Agreement.

*"Delivery Point"* means the agreed point(s) of delivery and receipt of the coal pursuant to this Agreement.

*"Gains"* means

15



(a) with respect to Seller, an amount equal to the positive difference between (i) the Resale Price, minus (ii) the Base Price; and

(b) with respect to Buyer, an amount equal to the positive difference between (i) the Base Price, minus (ii) the Replacement Price.

*"Interest Rate"* means, for any date, the lesser of (a) the per annum rate of interest equal to the prime lending rate as may from time to time be published in The Wall Street Journal under "Money Rates" on such day (or if not published on such day on the most recent preceding day on which published), plus two percent (2%) and (b) the maximum rate permitted by applicable law.

*"Losses"* means
(a) with respect to Seller, an amount equal to the negative difference between (i) the Resale Price, minus (ii) the Base Price; and

(b) with respect to Buyer, an amount equal to the negative difference between (i) the Base Price, minus (ii) the Replacement Price.

*"Purchase Order"* means a confirmation of a transaction.

*"Replacement Price"* means the price at which Buyer, in view of its obligation to take any and all reasonable steps to mitigate its losses and always acting in a commercially reasonable manner, purchases substitute coal in an amount and quality equivalent to the shortfall quantity (plus incremental costs, including without limitation additional transportation charges, if any incurred by Buyer to or at the Delivery Point or incurred by Buyer as a result of taking substitute coal at a location other than at the Delivery Point), or absent any purchase, the market price for such quantity and quality of coal at such Delivery Point, as determined by Buyer in a commercially reasonable manner.

*"Resale Price"* means the price at which Seller, in view of its obligation to take any and all reasonable steps to mitigate its losses and always acting in a commercially reasonable manner, resells coal in an amount and quality equivalent to the shortfall quantity (plus incremental costs, including without limitation additional transportation charges, if any incurred by Seller to or at the Delivery Point or incurred by Seller as a result of reselling the coal at a location other than at the Delivery Point), or absent any resale, the market price for such quantity and quality of coal at such Delivery Point, as determined by Seller in a commercially reasonable manner.

*"Source"* means the mine(s), mining complexes, loadout river dock(s) or other point(s) of origin that Seller and Buyer agree are acceptable origins for the coal for a Transaction as specified in the applicable Purchase Order.



For and behalf of Seller

**Consol Pennsylvania Coal Company LLC**

BY:

Title:  Vice President

Date:  Oct 14, 2024

For and behalf of Buyer

**ITOCHU Singapore Pte Ltd**

BY: Yuta Kawagoe
Title: General Manager
Date: 14th October 2024



**EXHIBIT A: SHIPPING TERMS**

1. The Seller shall load the Coal at the load port in compliance with the International Maritime Solid Bulk Cargoes Code (IMSBC Code) as revised from time to time, and all applicable laws, regulations and standards from time to time issued by any relevant governmental or other statutory body or authority.

2. Seller shall be responsible for the performance of all obligations of the Shipper under the IMSBC Code, including providing the Shipper's declaration and complete documentation relating to the cargo and if requested by the vessel owners, test reports showing the MC (moisture content), TML (transportable moisture limit) and FMP (flow moisture point) of the cargo.

3. Seller shall trim the cargo as level as possible to the boundaries of the cargo spaces.

4. All taxes, duties, imposts, fees, charges (including, without limitation, pilotage, mooring and towage expenses) and dues (including, without limitation, quay dues) in respect of the vessel incurred at the loading terminal shall be for the account of Seller.

5. If the vessel departure from the load port is delayed for cargo documents or other Seller's purposes, then time shall continue counting uninterrupted, as laytime or as time on demurrage until completion of such Seller's purposes.

6. The performing vessel shall be entitled to tender NOR when vessel has arrived at the load port whether in berth or not. Any time used for loading prior to the commencement of laytime shall count as used laytime or time on demurrage.

7. Should the Seller fail to supply the cargo quantity declared by the Buyer, the Seller shall be liable for deadfreight at the charter party rate on the difference between the bill of lading quantity and the cargo quantity specified.

8. The stevedores at load port are to be appointed by the Sellers at their risk and expense. The stevedores shall be considered as the Sellers servants and the Sellers are to be responsible for any negligence, default or error in judgment of the stevedores and/or the barges/lighters employed in loading the vessel(s).

9. The Sellers shall rectify all stevedore damage, at Sellers time and cost, to the satisfaction of the ship owners and/or their classification society as applicable prior to sailing from the load port.





# CONSOL MARINE TERMINALS LLC.

## EXHIBIT B

## COAL CARGO SHIPPING

## RULES AND REGULATIONS

*APPLICABLE TO*

**BALTIMORE TERMINAL**

*LOCATED AT*

**BALTIMORE, MARYLAND**

*ISSUED BY*

**CONSOL MARINE TERMINALS LLC.**
**3800 NEWGATE AVENUE**
**BALTIMORE, MD  21224   U.S.A.**

**410-631-6400**

*FAX* **410-631-6425**

19

CONSOL MARINE TERMINALS LLC (CMT)

BALTIMORE TERMINAL

BALTIMORE, MD, U.S.A.

COAL CARGO SHIPPING – RULES AND REGULATIONS

TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| 1.0 | VESSEL NOMINATION | 21 |
| 2.0 | NOTICE OF READINESS | 22 |
| 3.0 | COMMENCEMENT OF LAYTIME | 22 |
| 4.0 | LAYTIME EXCEPTIONS | 22-23 |
| 5.0 | ENDING LAYTIME | 23 |
| 6.0 | SPECIFICATIONS | 24 |
| 7.0 | LOADING AND TRIMMING | 24 |
| 8.0 | VESSEL REQUIREMENTS | 24-25 |



**GENERAL:**

The cargo(es) shall be loaded always afloat in the customary manner at the CMT Terminal at Baltimore, Maryland, U.S.A. ("CMT"). Cargo(es) shall be loaded into vessels, scheduled by Shipper, in accordance with these Rules and Regulations.

**1.0    VESSEL NOMINATION**

1.1    A ten (10) day window shall be established as follows, but not greater than sixty (60) days **from date requested.**

With at least:

a)    **Thirty (30) days prior notice,** Shipper shall request a ten (10) day window starting with an "odd" date of the month

1.2    Definitions:

a)    "Arrived" shall mean the vessel is in the Port of Baltimore.

b)    The Port of Baltimore to include:

(i)    Customary waiting areas in the Port of Baltimore
(ii)    Annapolis Anchorage

c)    "On-time arrival" shall mean a vessel arriving in the Port of Baltimore within its ten (10) day window.

d)    "Early arrival" or "late arrival" shall mean a vessel arriving in the Port of Baltimore outside of its ten (10) day window.

e)    "In–inventory" shall mean all coal dumped to ground at CMT -OR- on rail at CMT as agreed to load direct to vessel.

f)    "Load–ready" shall mean the vessel has arrived, the coal is in inventory and the vessel is ready in all respects to receive cargo.

1.3    Vessel Arrival Guidelines:

a)    Only load-ready vessels will be considered to be placed into the queue. Exceptions shall be at the discretion of CMT management.

b)    Load ready, on-time arrivals shall be called to the berth in the order they enter the queue.

c)    Load-ready, early arrivals will be called to the berth if the berth is clear and the expected berth occupancy of the early arrival is less than the expected length of time until the next load-ready, on-time arrival. If the berth is not clear, the vessel shall be deemed to enter the queue on the first day of its ten (10) day window.

d)    d.) Load-ready, late arrivals will be called to the berth if the berth is clear and the expected berth occupancy of the late arrival is less than the expected length of time until the next load-ready, on-time arrival. If the berth is not clear, the vessel shall enter the queue behind vessel(s) already in the queue at that time

21





1.4    Nomination of the performing vessel with customary vessel description shall be submitted as soon as available, but no later than four (4) days prior to ETA at the Port of Baltimore. Another vessel with similar ETA may be substituted for nominated vessel, provided the Terminal is given a minimum of forty-eight (48) hours' notice of such substitution.

1.5    At least four (4) days prior to the performing vessel's ETA at the Port of Baltimore, Owner shall provide requirements for vessel loading, including loading and stowage plan, deballasting plan, trimming plan, and any other specific vessel loading requirements.

1.6    The Shipper shall give nominated vessel or substitute, ETA notice 10, 5, 2, 1 day (s) in advance of arrival at the Port of Baltimore.

1.7    If official weight is provided by the Terminal, on behalf of Shipper, a certified weight will be determined by certified belt scale as cargo is loaded. If Terminal cannot provide certified belt scale weight, a draft survey weight, provided by a certified surveyor, will be used as the official weight.

**2.0    NOTICE OF READINESS (NOR)**

2.1    Notice of Readiness may be tendered at any time, day or night SHINC, and Terminal will acknowledge for receipt only. In observance of the Thanksgiving Holiday, The Terminal will suspend operations from 07:00 every fourth Thursday in November to 07:00 the following day. In observance of the Christmas Holiday, the Terminal will suspend operations from 19:00 hrs. on December 24th through 07:00 hrs. on December 26th.

2.2    Notice of Readiness may be given by cable, fax, telex, or e-mail.

**3.0    COMMENCEMENT OF LAYTIME**

3.1    If vessel tenders NOR before established laydays, laytime shall commence twelve (12) hours (Notice Time) after 00:01 hrs. on the first day of the established laydays, unless loading starts earlier in which case actual time used to count until commencement of laydays and expiration of Notice Time

3.2    If vessel tenders NOR within established laydays, laytime shall commence twelve (12) hours after NOR is tendered, unless loading starts earlier, in which case actual time used to count until expiration of Notice Time.

3.3    If vessel arrives in the Port of Baltimore after established laydays and provided vessel is not cancelled, the Terminal shall make a good faith effort to accommodate the Shipper's late vessel as soon as designated berth is next available. Laytime shall commence when vessel is all fast at designated berth and ready to load in all respects.

**4.0    LAYTIME EXCEPTIONS**

4.1    Time shifting from anchorage to loading berth, commencing when anchor is lifted and ceasing when all fast at designated berth shall not count as laytime or Notice Time, or time on demurrage.

4.2    Time required after NOR is tendered to fulfill the requirements for readiness to load in all respects (which term does include free pratique, Customs and Coast Guard clearance, and in case of OBO tonnage, providing a valid gas-free certificate) shall not count as laytime or time on demurrage, but only to such an extent that such time needed caused a delay in loading the vessel.



4.3      Time required after NOR is tendered to provide a Marine Surveyor's certificate of readiness shall not count as laytime or time on demurrage.

4.4      Time lost due to loading delays caused by vessel, whether such situation existed at the time of tendering NOR or thereafter, shall not count as laytime or time on demurrage. Loading delays caused by vessel shall include but not be limited to:

- deballasting
- moving vessel equipment
- moving hatch covers
- trim checks by vessel
- draft checks by vessel
- any restrictions imposed by vessel

4.5      If official weight is provided by the Terminal, on behalf of Shipper, a certified weight will be determined by certified belt scale as cargo is loaded. If Terminal cannot provide certified belt scale weight, a draft survey weight, provided by a certified surveyor, will be used as the official weight and time lost for the draft survey shall count as laytime.

If official weight is by draft survey, time lost to provide the draft survey by a certified surveyor, after the completion of the requirements in Section 4.2 and 4.3, shall not count as laytime or time on demurrage.

4.6      Time lost due to severe weather causing unsafe equipment operating conditions as determined by the Terminal shall not count as laytime.

4.7      Time lost due to Thanksgiving and Christmas Day from 19:00 hrs. on December 24 through to 07:00 hrs. on December 26, and New Year's Day from 19:00 hrs. on December 31 through to 07:00 hrs. on January 2 shall not count as laytime, unless loading actually takes place during this period, when only actual loading time to count as laytime.

## 5.0    ENDING LAYTIME

5.1      Laytime shall cease upon completion of loading and withdrawal of loading equipment.

## 6.0    SPECIFICATIONS

6.1      The Terminal advises that the specifications for the coal loading berth and loading facilities at Baltimore, MD are:

| | |
|---|---|
| Channel Depth | 50 ft. |
| Berth Depth | 50 ft. |
| Berth Working Length | 1150 ft. |
| Berth Working Width | 175 ft. |
| Air Draft (max) | 55 ft. – MLLW |
| Unrestricted Sailing Draft | 47 ft. 0 in. – MLLW |
| Restricted Sailing Draft (1) | 47 ft. 6 in. – MLLW |
| Loading Rate – Peak | 7500 TPH |
| Loading Rate – Typical Range | 4500 – 6500 TPH |
| **Note** (1) | Draft may be increased subject to Maryland Pilot Association approval & Terminal approval. |



6.2    In no way does the Terminal warrant, guarantee, or represent the depth of the channel of the Port of Baltimore and/or the Chesapeake Bay.

## 7.0    LOADING AND TRIMMING

7.1    The coal cargo shall be loaded and spout trimmed in accordance with the Master's written instructions to the Master's satisfaction in conformity with the latest edition of the IMO code and applicable regulations. Provided not in default, the Terminal shall not be required to rehandle coal loaded or to load coal in a manner not in conformity with the performance characteristics of the shiploading equipment.

7.2    The coal cargo shall be loaded in such a manner to dispatch the vessel as expeditiously as possible utilizing the full capacity of the shiploading equipment, always provided loading is safe to vessel and in compliance with all applicable regulations.

7.3    Prior to loading, the Shipper shall provide details regarding the nature of the material as required by the latest edition of the IMO code. The Terminal, on behalf of Shipper, will provide a copy of the certificate to the Master.

## 8.0    VESSELS

8.1    The performing vessel shall comply with all applicable federal, state, local and port and harbor authority regulations in force.

8.2    Vessel shall present a Marine Surveyor's certificate that the holds are clean and in all respects ready to receive coal.

8.3    The vessels to be loaded shall be (a) gearless single deck self- trimming bulk carriers; (b) combination vessels; (c) geared single deck self-trimming bulk carriers acceptable to the Terminal.

8.4    The vessel's master shall be responsible for the safe docking and undocking of the vessel. Tugboats shall be used for all docking and undocking activity. On-board power and bow thrusters shall not be used alongside berth.

8.5    If vessel cannot be loaded in accordance to Master's written stowage/loading plan, or be materially delayed in loading because of vessel's fault (for instance, not being able to deballast within a reasonable period of time), the Terminal may order the vessel to vacate the berth until such time that such deficiencies are overcome.

Vessel shall provide gangway ladders with safety nets in compliance with local, state and federal regulations.

8.6    Customary Vessel Charges

a)    Line handling services to include both docking and undocking shall be charged at the rate of $1,600.00 per vessel as of January 1, 2022. Such rate may be adjusted from time to time as reasonably determined by the Terminal.

b)    Dockage Charge of $0.83 per NRT per vessel as of January 1, 2022. Such Charge may be adjusted from time to time as reasonably determined by the Terminal.

24




c)  Security Fee of $4.03 / linear foot (LOA) will be charged for all vessels docked at the CMT berth as of January 1, 2022.  Such Fee may be adjusted from time to time as reasonably determined by the Terminal.

d)  Coal pier and berthing area shall not be used by vessel for any purpose other than cargo loading without the prior approval of the Terminal.  Receiving or offloading of any materials, parts, stores or any other items is prohibited without the prior approval of the Terminal.

e)  Rubbish, refuse or other materials related to the vessel must be removed; otherwise it will be removed by the Terminal at the expense of the vessel.  No rubbish or material of any kind shall be dumped overboard from the vessel.

25




# **EXHIBIT C**

Adopted by
the Documentary Committee of the General
Council of British Shipping London
and the Documentary Committee of The Japan
Shipping Exchange, Inc., Tokyo

| 1. Shipbroker | RECOMMENDED |
|---|---|
| **Howe Robinson Partners Pte Ltd** | THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE UNIFORM GENERAL CHARTER (AS REVISED 1922 and 1976) INCLUDING "F.I.O." ALTERNATIVE ETC. (To be used for trades for which no approved form is in force) CODE NAME: "G E N C O N" |

Part I

| | 2. Place and date |
|---|---|
| | **Singapore** **15th October 2024** |

| 3. Owners/Place of Business (Cl. 1) | 4. Charterers/Place of business (Cl. 1) |
|---|---|
| **Swissmarine Pte Ltd** **20 Cecil Street, #07-06 Plus, Singapore 049705** | **PSL Shipping Limited** |

| 5. Vessel's name (Cl. 1) | 6. GRT/NRT (Cl. 1) |
|---|---|
| **SWISSMARINE TBN** | **See Clause 18** |

| 7. Deadweight cargo carrying capacity in tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
|---|---|
| **See Clause 18** | **Now Trading** |

| 9. Expected ready to load (abt.) (Cl. 1) | |
|---|---|
| **12th November 2024** | |

| 10. Loading port or place (Cl. 1) | 11. Discharging port or place (Cl. 1) |
|---|---|
| **one-two safe berth(s) / one safe port at Consol Marine Terminal, Baltimore, Maryland, U.S.A.** | **See Clause 19** |

| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1) |
|---|
| **100,000 metric tons 10 per cent more or less in Owners' option Coal in bulk** |

| 13. Freight rate (also state if payable on delivered or intaken quantity) (Cl. 1) | 14. Freight payment (state currency and method of payment, also beneficiary and bank account) (Cl. 4) |
|---|---|
| **See Clause 20** | **See Clause 21** |

| 15. Loading and discharging costs (state alternative (a) or (b) of Cl. 5; also indicate if Vessel is gearless) **Free in and out and spout trimmed** | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) |
|---|---|
| | a) Laytime for loading **See Clause 23** |
| 17. Shippers (state name and address) (Cl. 6) | b) Laytime for discharging **See Clause 24** |
| | c) Total laytime for loading and discharging |

| 18. Demurrage rate (loading and discharging) (Cl. 7) | 19. Cancelling date (Cl. 10) |
|---|---|
| **See Clause 21, 23 & 24** | **18th November 2024** |

| 20. Brokerage commission and to whom payable (Cl. 14) |
|---|
| ▮ **per cent address commission to Charterers plus** ▮ **per cent brokerage commission to Howe Robinson Partners Pte Ltd on freight, dead freight and demurrage earned.** |

| 21. Additional clauses covering special provisions, if agreed. |
|---|
| **Rider Clauses No. 18 - No. 47 inclusive as attached are to be incorporated in this Charter Party.** **Charterers' Shipping Terms should be as legal attachment of this Charter Party.** |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen

Computer generated form printed by authority of The Baltic and International Maritime Council (BIMCO), Copenhagen, using software which is the copy right of Strategic Software Ltd.

**PART II**

**"GENCON" Charter (As Revised 1922 and 1976)**
Including "F.I.O." Alternative, etc.

**1.** It is agreed between the party mentioned in Box 3 as Owners of the   1
steamer or motor-Vessel named in Box 5 of the gross/nett Register   2
tons indicated in Box 6 and carrying about the number of tons of   3
deadweight cargo stated in Box 7, now in position as stated in Box 8   4
and expected ready to load under this Charter about the date   5
indicated in Box 9, and the party mentioned as Charterers in Box 4   6
that:   7
The said Vessel shall proceed to the loading port or place stated   8
in Box 10 or so near thereto as she may safely get and lie always   9
afloat, and there load a full and complete cargo (if shipment of deck   10
cargo agreed same to be at Charterers' risk) as stated in Box 12   11
(Charterers to provide all mats and/or wood for dunnage and any   12
Separations required, the Owners allowing the use of any dunnage   13
wood on board if required) which the Charterers bind themselves to   14
Ship, and being so loaded the Vessel shall proceed to the discharging   15
port or place stated in Box 11 as ordered on signing Bills of   16
Lading or so near thereto as she may safely get and lie always   17
afloat and there deliver the cargo on being paid freight on delivered   18
or intaken quantity as indicated in Box 13 at the rate stated in   19
Box 13.   20

**2. Owners' Responsibility Clause**   21
Owners are to be responsible for loss of or damage to the goods   22
or for delay in delivery of the goods only in case the loss, damage   23
or delay has been caused by the improper or negligent stowage of   24
the goods (unless stowage performed by shippers/Charterers or their   25
stevedores or servants) or by personal want of due diligence on the   26
part of the Owners or their Manager to make the Vessel in all respects   27
seaworthy and to secure that she is properly manned, equipped and   28
supplied or by the personal act or default of the Owners or their   29
Manager.   
And the Owners are responsible for no loss or damage or delay   30
arising from any other cause whatsoever, even from the neglect or   31
default of the Captain or crew or some other person employed by the   32
Owners on board or ashore for whose acts they would, but for this   33
clause, be responsible, or from unseaworthiness of the Vessel on   34
loading or commencement of the voyage or at any time whatsoever   35
damage caused by contact with or leakage, smell or evaporation   36
from other goods or by the inflammable or explosive nature or   37
insufficient package of other goods not to be considered as caused   38
By improper or negligent stowage, even if in fact so caused.   39
   40

**3. Deviation Clause**   41
The Vessel has liberty to call at any port or ports in any order, for   42
any purpose, to sail without pilots, to tow and/or assist Vessels in   43
all situations, and also to deviate for the purpose of saving life and/   44
or property.   45

**4. Payment of Freight *(See Clause 21)***   46
The freight to be paid in the manner prescribed in Box 14 in cash   47
without discount on delivery of the cargo at mean rate of exchange   48
ruling on day or days of payment, the receivers of the cargo being   49
bound to pay freight on account during delivery, if required by   50
Captain or Owners.   51
Cash for Vessel's ordinary disbursements at port of loading to be   52
advanced by Charterers if required at highest current rate of exchange,   53
subject to two per cent. to cover insurance and other   54
expenses.   55

**5. Loading / Discharging Costs**   56
* *(a) Gross Terms*   57
The cargo to be brought alongside in such a manner as to enable   58
Vessel to take the goods with her own tackle. Charterers to procure   59
and pay the necessary men on shore or on board the lighters to do   60
the work there, Vessel only heaving the cargo on board.   61
If the loading takes place by elevator, cargo to be put free in Vessel's   62
holds, Owners only paying trimming expenses.   63
Any pieces and/or packages of cargo over two tons weight, shall be   64
loaded, stowed and discharged by Charterers at their risk and expense.   65
The cargo to be received by Merchants at their risk and expense   66
alongside the Vessel not beyond the reach of her tackle.   67
* *(b) F.I.O. and free stowed trimmed*   68
The cargo shall be brought into the holds, loaded, stowed and/or trim-   69
med and taken from the holds and discharged by the Charterers or   70
their Agents, free of any risk, liability and expense whatsoever to the   71
Owners.   72
The Owners shall provide winches, motive power and winchmen from   73
the Crew if requested and permitted; if not, the Charterers shall   74
provide and pay for winchmen from shore and/or cranes, if any. (This   75
provision shall not apply if Vessel is gearless and stated as such in Box   76
15).   77
* *Indicate alternative (a) or (b), as agreed, in Box 15.*   78

**6. Laytime *(See Clause 23 & 24)***   79
* *(a) Separate laytime for loading and discharging*   80
The cargo shall be loaded within the number of running days/hours as   81
indicated in Box 16, weather permitting, Sundays and holidays   82
excepted, unless used, in which event time actually used shall count.   83
The cargo shall be discharged within the number of running days/hours   84
as indicated in Box 16, weather permitting, Sundays and holidays   85
excepted, unless used, in which event time actually used shall count.   86
* *(b) Total laytime for loading and discharging*   87
The cargo shall be loaded and discharged within the number of total   88
running days/hours as indicated in Box 16, weather permitting, Sundays   89
and holidays excepted, unless used, in which event time actually used   90
shall count.   91
* *(c) Commencement of laytime (loading and discharging)*   92
Laytime for loading and discharging shall commence at 1 p.m. if   93
if notice of readiness is given before noon and at 6 a.m. next working   94
day if notice given during office hours after noon. Notice at   95
loading port to be given to the Shippers named in Box 17.   96
Time actually used before commencement of laytime shall count.   97
Time lost in waiting for berth to count as loading or discharging time, as   98
the case may be.   99
* *Indicate alternative (a) or (b) as agreed, in Box 16.*   100

**7. Demurrage *(See Clause 23 & 24)***   101
Ten running days on demurrage at the rate stated in Box 18 per   102
day or pro rata for any part of a day, payable day by day, to be   103
allowed Merchants altogether at ports of loading and discharging.   104

**8. Lien Clause**   105
Owners shall have a lien on the cargo for freight, dead-freight,   106
demurrage and damages for detention. Charterers shall remain re-   107
sponsible for dead-freight and demurrage (including damages for   108
detention), incurred at port of loading. Charterers shall also remain   109
responsible for freight and demurrage (including damages for deten-   110
tion) incurred at port of discharge, but only to such extent as the   111
Owners have been unable to obtain payment thereof by exercising   112
the lien on the cargo.   113

**9. Bills of Lading**   114
The Captain to sign Bills of Lading at such rate of freight as   115
presented without prejudice to this Charter Party, but should the   116
freight by Bills of Lading amount to less than the total Chartered   117
freight the difference to be paid to the Captain in cash on signing   118
Bills of Lading.   
   119

**10. Cancelling Clause *(See Clause 29)***   120
Should the Vessel not be ready to load (whether in berth or not) on   121
or before the date indicated in Box 19, Charterers have the option   122
of canceling this contract, such option to be declared, if demanded,   123
at least 48 hours before Vessel's expected arrival at port of loading.   124
Should the Vessel be delayed on account of average or otherwise,   125
Charterers to be informed as soon as possible, and if the Vessel is   126
delayed for more than 10 days after the day she is stated to be   127
expected ready to load, Charterers have the option of canceling this   128
contract, unless a canceling date has been agreed upon.   129

**11. General Average**   130
General average to be settled **in Hong Kong** according to   131
York-Antwerp Rules, *1990*   132
1974. Proprietors of cargo to pay the cargo's share in the general   133
expenses even if same have been necessitated through neglect or   134
default of the Owners' servants (See Clause 2).   

**12. Indemnity**   135
Indemnity for non-performance of this Charter Party, proved damages,   136
not exceeding estimated amount of freight.   137

**13. Agency *(See Clause 26)***   138
In every case the Owners shall appoint his own Broker or Agent both at   139
the port of loading and the port of discharge.   140

**14. Brokerage *(See Part 1 Box 20)***   141
A brokerage commission at the rate stated in Box 20 on the freight   142
earned is due to the party mentioned in Box 20.   143
In case of non-execution at least 1/3 of the brokerage on the   144
estimated amount of freight and dead-freight to be paid by Owners to   145
the Brokers as indemnity for the latter's expenses and work. In case of   146
more voyages the amount of indemnity to be mutually agreed.   147

**15. GENERAL STRIKE CLAUSE**   148
Neither Charterers nor Owners shall be responsible for the con-   149
sequences of any strikes or lock-outs preventing or delaying the   150
fulfillment of any obligations under this contract.   151
If there is a strike or lock-out affecting the loading of the cargo,   152
or any part of it, when Vessel is ready to proceed from her last port   153
or at any time during the voyage to the port or ports of loading or   154
after her arrival there Captain or Owners may ask Charterers to   155
declare, that they agree to reckon the laydays as if there were no   156
strike or lock-out. Unless Charterers have given such declaration in   157
writing (by telegram if necessary) within 24 hours Owners shall   158
have the option of canceling this contract. If part cargo has already   159
been loaded, Owners must proceed with same, (freight payable on   160
loaded quantity only) having liberty to complete with other cargo   161
on the way for their own account.   162
If there is a strike or lock-out affecting the discharge of the cargo   163
on or after Vessel's arrival at or off port of discharge and same has   164
not been settled within 48 hours, Receivers shall have the option of   165
keeping Vessel waiting until such strike or lock-out is at an end   166
against paying half demurrage after expiration of the time provided   167

"GENCON" Charter (As Revised 1922 and 1976)
Including "F.I.O." Alternative, etc.

for discharging, or of ordering the Vessel to a safe port where she 168
can safely discharge without risk of being detained by strike or lockout 169
Such orders to be given within 48 hours after Captain or Owners 170
have given notice to Charterers of the strike or lock-out affecting
the discharge. On delivery of the cargo at such port, all conditions 171
of this Charter Party and of the Bill of Lading shall apply and Vessel 172
shall receive the same freight as if she had discharged at the 173
original port of destination, except that if the distance of the sub- 174
stituted port exceeds 100 nautical miles, the freight on the cargo 175
delivered at the substituted port to be increased in proportion. 176
177

16.  **War Risks ("Voywar 1950")**  178
(1) In these clauses "War Risks" shall include any blockade or any 179
action which is announced as a blockade by any Government or by 180
any belligerent or by any organized body, sabotage, piracy, and any 181
actual or threatened war hostilities, warlike operations, civil war, civil 182
commotion, or revolution. 183
(2) If at any time before the Vessel commences loading, it appears 184
that performance of the contract will subject the Vessel or her Master 185
and crew or her cargo to war risks at any stage of the adventure, the 186
Owners shall be entitled by letter or telegram despatched to the 187
Charterers, to cancel this Charter. 188
(3) The Master shall not be required to load cargo or to continue 189
loading or to proceed on or to sign Bill(s) of Lading for any adventure on 190
which or any port at which it appears that the Vessel, her Master and 191
crew or her cargo will be subjected to war risks. In the event of the 192
exercise by the Master of his right under this Clause after part or full 193
cargo has been loaded, the Master shall be at liberty either to discharge 194
such cargo at the loading port or to proceed therewith. In the latter case 195
the Vessel shall have liberty to carry other cargo for Owners' benefit and 196
accordingly to proceed to and load or discharge such other cargo at any 197
other port or ports whatsoever, backwards or forwards, although in a 198
contrary direction to or out of or beyond the ordinary route. In the event 199
of the Master electing to proceed with part cargo under this Clause 200
freight shall in any case be payable on the quantity delivered. 201
(4) If at the time the Master elects to proceed with part or full cargo 202
under Clause 3, or after the Vessel has left the loading port, or the 203
last of the loading ports, if more than one, it appears that further 204
performance of the contract will subject the Vessel, her Master and 205
crew or her cargo, to war risks, the cargo shall be discharged, or if 206
the discharge has been commenced shall be completed, at any safe 207
port in vicinity of the port of discharge as may be ordered by the 208
Charterers. If no such orders shall be received from the Charterers 209
within 48 hours after the Owners have despatched a request by 210
telegram to the Charterers for the nomination of a substitute discharging 211
port, the Owners shall be at liberty to discharge the cargo at any safe 212
port which they may, in their discretion, decide on and such discharge 213
shall be deemed to be due fulfillment of the contract of affreightment. In 214
the event of cargo being discharged at any such other port, the Owners
shall be entitled to freight as if the discharge had been effected at the 215
port or ports named in the Bill(s) of Lading or to which the Vessel may 216
have been ordered pursuant thereto. 217
(5) (a) The Vessel shall have liberty to comply with any directions 218
or recommendations as to loading, departure, arrival, routes, ports 219
of call, stoppages, destination, zones, waters, discharge, delivery or 220
in any other wise whatsoever (including any direction or recom- 221
mendation not to go to the port of destination or to delay proceeding 222
thereto or to proceed to some other port) given by any Government or 223
by any belligerent or by any organized body engaged in civil war, 224
hostilities or warlike operations or by any person or body acting or 225
purporting to act as or with the authority of any Government or 226
belligerent or of any such organized body or by any committee or 227
person having under the terms of the war risks insurance on the 228
Vessel, the right to give any such directions or recommendations. If, 229
by reason of or in compliance with any such direction or recom- 230
mendation, anything is done or is not done, such shall not be deemed 231
a deviation. 232
(b) If, by reason of or in compliance with any such directions or re- 233
commendations, the Vessel does not proceed to the port or ports 234
named in the Bill(s) Lading or to which she may have been 235
ordered pursuant thereto, the Vessel may proceed to any port as 236
directed or recommended or to any safe port which the Owners in 237
their discretion may decide on and there discharge the cargo. Such 238
discharge shall be deemed to be due fulfilment of the contract of 239
affreightment and the Owners shall be entitled to freight as if 240
discharge had been effected at the port or ports named in the Bill(s) 241
of Lading or to which the Vessel may have been ordered pursuant 242
thereto. 243
(6) All extra expenses (including insurance costs) involved in 244
discharging cargo at the loading port or in reaching or discharging the 245
cargo at any port as provided in Clauses 4 and 5 (b) hereof shall be paid 246
by the Charterers and/or cargo Owners, and the Owners shall have a 247
lien on the cargo for all moneys due under these Clauses. 248
249
250

17.  **GENERAL ICE CLAUSE**  251
*Port of loading*  252
(a) In the event of the loading port being inaccessible by reason of 253
ice when Vessel is ready to proceed from her last port or at any 254
time during the voyage or on Vessel's arrival or in case frost sets in 255
after Vessel's arrival, the Captain for fear of being frozen in is at 256

liberty to leave without cargo, and this Charter shall be null and 257
void. 258
(b) If during loading the Captain, for fear of Vessel being frozen in, 259
deems it advisable to leave, he has liberty to do so with what cargo 260
he has on board and to proceed to any other port or ports with 261
option of completing cargo for Owners' benefit for any port or ports 262
including port of discharge. Any part cargo thus loaded under this 263
Charter to be forwarded to destination at Vessel's expense but 264
against payment of freight, provided that no extra expenses be 265
thereby caused to the Receivers, freight being paid on quantity 266
delivered (in proportion if lumpsum), all other conditions as per 267
Charter. 268
(c) In case of more than one loading port, and if one or more of 269
the ports are closed by ice, the Captain or Owners to be at liberty 270
either to load the part cargo at the open port and fillup elsewhere 271
for their own account as under section (b) or to declare the Charter 272
null and void unless Charterers agree to load full cargo at the open 273
Port. 274
(d) This Ice Clause not to apply in the Spring. 275

*Port of discharge*  276
(a) Should ice (except in the Spring) prevent Vessel from reaching 277
port of discharge Receivers shall have the option of keeping Vessel 278
waiting until the re-opening of navigation and paying demurrage, or 279
of ordering the Vessel to a safe and immediately accessible port 280
where she can safely discharge without risk of detention by ice. 281
Such orders to be given within 48 hours after Captain or Owners 282
have given notice to Charterers of the impossibility of reaching port 283
of destination. 284
(b) If during discharging the Captain for fear of Vessel being frozen 285
in deems it advisable to leave, he has liberty to do so with what 286
cargo he has on board and to proceed to the nearest accessible 287
port where she can safely discharge. 288
(c) On delivery of the cargo at such port, all conditions of the Bill 289
of Lading shall apply and Vessel shall receive the same freight as 290
if she had discharged at the original port of destination, except that if 291
the distance of the substituted port exceeds 100 nautical miles, the 292
freight on the cargo delivered at the substituted port to be increased 293
in proportion. 294

## ADDITIONAL CLAUSES TO MV 'SWISSMARINE TBN' CHARTER PARTY DATED 15 October 2024

**18.**
Performing Vessel:

Performing Vessel: SWISSMARINE TBN (Owner to nominate vessel with Babycape Size)

Owners to nominate the performer not later than 14 days prior to ETA at the port of loading and sub shipper / receiver's approval within two working days after the nomination.

The Owner may nominate a substitute definite performing vessel may be substituted at least four (4) days prior to with similar ETA of first nomination, but always for arrival within the laycan and sub shipper / receiver's approval within two working days after the nomination.

Vessel to be Rightship approved during the duration of charter period.

Charterers hv option to reject the vessel due to charter party chain of vessel. (please advise the charter party chain)

Owners guarantee vessel is fitted in all respect to load cargo in bulk.

Owners guarantee no bag and/or bagging and/or securing and/or strapping to be required from loading port to discharging port.

Owners guarantee vessel is P+I covered for the entire charter period (please advise which of the club).

Owners guarantee vessel is fully classed for the entire charter period (please advise which class)

Owners guarantee all vessel's certificate is valid during the entire charter period.

Owners confirm that vessel has not called following countries: Iran, North Korea, Sudan, Cuba, Syria, Myanmar & Russia.

Owner shall provide the details of vessel speed and bunker consumption (ballast/laden and in port working/idle) together with vessel nomination.

**19.**
Discharging port: one-two safe berth(s) / one-two safe port(s) China Main Port(s)

**20.**

Freight Rate:

███████ per metric ton FIOST basis 1/1 for discharge at Jingtang port or Caofeidian port or Huanghua Port, China.

Page **4** of **19**

Charterers have option to discharge at other China main port or main port of Singapore to Japan range and freight rate to be calculated on open book basis the same time-charter equivalent and bunker cost for base (Baltimore / Jingtang) and no repositioning advantage / dis-advantage for Owners.

**21.**

95 per cent freight to be paid within 7 banking days after completion of loading and signing / releasing Bill(s) of Lading marked "clean on board" & "freight payable as per Charter Party" but always before break bulk, demurrage/dispatch if any to be settled together with the 5 per cent balance freight within 30 days after completion of discharging. Full freight is deemed earned as cargo loaded on board and is discountless non-returnable whether the vessel and or cargo is lost or not lost.

Owners Bank Details:



**22.**

Prior to commencement of loading the vessel's holds are to be clean, dry and in all respects fitted and suitable to Shippers' satisfaction - which should not be unreasonably withheld - to load the specified cargo. Any loss/damage incurred from failing cargo hold inspection to be for Owners' account.

The vessel's hold condition on arrival at load port is clean and in all respect ready to receive Charter Party cargo.

**23.**

At Loading Port:
Notice of Readiness tendered: as per attached Charterers' Shipping Terms.

Laytime: as per attached Charterers' Shipping Terms.

Loading Rate: as per attached Charterers' Shipping Terms.

Demurrage: ▮▮▮▮▮▮▮ per day pro rata.

Despatch: half of demurrage on working time saved.

**24.**

At Discharging Port:
Notice of Readiness tendered: as per attached Charterers' Shipping Terms.

Laytime: as per attached Charterers' Shipping Terms.

Discharging Rate: 15,000 metric tons per weather working day Sundays and holidays included.

Demurrage: ▮▮▮▮▮▮ per day pro rata.

Despatch: half of demurrage on working time saved.

**25.**
Charterers' agents at both loading and discharging port, both to be for Owners account with reasonable port disbursement.

**26.**
Once vessel is on demurrage always on demurrage.

26.1. Notwithstanding any other inconsistent clauses in this Charter Party and the scale terms incorporated if any, once the vessel is on demurrage, the time continues to run without any deduction, i.e. once on demurrage always on demurrage subject to clause 26.2 below.

26.2. However normal time used in vessel shifting from anchorage to berth and draft survey would not count into demurrage.

**27.**
Tax/dues on vessel/freight to be for Owners' account, any tax/dues on cargo to be for Charterers' account.

**28.**
Other Costs at Loading/Discharging Port(s):

Lightening / lighterage if any, due to vessel's draft to be for Owners' account, if Charterers / Shippers / Receivers demand lightering / lighterage, to be for Charterers' / Shippers' / Receivers' account.

Any extra charges at loading / discharging due to vessel exceed port limit / restriction at Owners' account.

Vessel age must be a maximum 20 years old from build date.
OAP (Overage Premium), if any, for Owners' account.

**29.**
Cancelling Clause:

Should the vessel not be ready to load (whether in berth or not) on the cancelling date indicated in box 19, the Owners shall as soon as their aware of the likely delay, give written notice thereof to the Charterers with their reasonable estimate for the Vessel's revised ETA. On receipt of this notice, Charterers have the option of cancelling this voyage, such option to be declared by Charterers latest with two (2) working days after receipt of Owner's notice, If cancelled, Owners have to compensate Charterers for the losses so caused by finding substitute Vessel(s) to perform.

Alternatively, Charterers have the option to require Owners to nominate a substitute Vessel within the CP laycan such option be declared by Charterers latest with two (2) working days after receipt of Owner's notice; or Charterers have the option to extend the laycan basis the Vessel revised ETA, but laytime shall commence from commencement of loading, such option be declared by Charterers latest with two (2) working days after receipt of Owner's notice.

**30.**
Vessel to supply adequate lights for night work on deck and in holds free of costs to Charterers / Shippers / Receivers, if, when and where required.

**31.**
Permitted Cargoes

Permitted cargoes are harmless. Cargo to be loaded, transported and discharged in accordance with latest IMO recommendations.

**32.**
Cargo to be loaded, stowed, trimmed and discharged under supervision and responsibility of the Master.

**33.**
Stevedores Damage

Stevedore damage, if any, shall be settled between stevedore and Owners, but Charterers will lend all possible assistance to Owners in collecting any stevedore damage claims.

**34.**
All opening and closing of hatches to be for Owners' account and to be done in their time.

Vessel to comply with all laws, rules, requirements and regulations of all countries involved during the currency of this Charter Party. Any failure of vessel to comply with all such laws, rules, requirements and regulations of the countries resulting in any delay or expenses to Charterers, same to be for Owners' account which to be promptly reimbursed.

**35.**
Stevedores' overtime to be for account of the party ordering same. However, officers'/crew's overtime always to be for Owners' account.

**36.**
No cargo to be loaded/stowed in deep tanks, wing tanks or similar places. Cargo to be loaded/stowed in the main holds of the vessel only.

**37.**
Owners/Master to give ETA notices to Charterers as following:

Loading port: Owners/Master to give 7/5/3/2/1 days ETA notice to Charterers/Agents.

Discharging port: Owners/Master to give 7/5/3/2/1 days ETA notice to Charterers/Agents.

**38.**
Upon vessel's sailing at loading port, Owners/Master/their appointed agent to telex/cable Charterers advising time of completion of loading and sailing time, Bills of Lading quantity and ETA discharge port with estimated sea water arrival draft.

**39.**
It is expressly agreed by Owners that the vessel to allow forklift trucks and/or bulldozers for the discharging of cargoes, within the permissible weight load of each compartment.

**40.**
New Jason Clause, Both-to-Blame Collision Clause, Chamber of Shipping War Risk Clause 1 and 2 are deemed fully incorporated in this Charter Party.

**41.**
General Average / Arbitration in Hong Kong and English law to apply.

If any dispute arises between Owners and Charterers, the matter in dispute shall be referred to three (3) persons in Hong Kong, one of them to be appointed by each of the parties hereto and the third by the two so chosen, them decision, or that of any two of them, shall be final and for the purpose of enforcing any award, this agreement may be made a rule of the court. The arbitrators shall be commercial men.

If either of the appointed arbitrators refuses to act, or is incapable of acting, or expires, the party who appointed him may appoint a new arbitrator in this place.

If one party fails to appoint an arbitrator for 30 clear days after the other party having appointed his arbitrator, has served the party making default with notice to make the appointment, the party who has appointed an arbitrator may appoint that arbitrator to act as sole arbitrator in the reference, and his award shall be binding upon both parties as if he had been appointed by consent.

**42.**
If original Bill(s) of Lading cannot be available in discharging port, Owners / Master agree to discharge / release the entire cargo against Charterers' single Letter of Indemnity in Owners' P and I Club standing wording. - signed by Charterers' authorized representative.

Owners agree to switch Bill(s) of Lading in Hong Kong (Charterers nominated bank's counter), free of charge against Charterers single Letter of Indemnity in Owners P and I club standard wording, but always subject to Head Owners' procedures and their approval which not to be unreasonably withheld. Charterers may request Owners to issue a second set of Bills of Lading marked different shippers / (receivers / notify party) than those of the first set of Bills of Lading.

The switching of 1st set and 2nd set Bill(s) of Lading will be taken place at Charterer's banker's counter in Hong Kong at the same time.

Owners agree to provide the photocopy of signed 2nd set Bill(s) of Lading upon Charterers request before switching of Bill(s) of Lading for customs clearance at discharge port.

**43.**
All documents/certificate to be valid/kept on board by Owners included compliance with ISM (International Safety Management) Regulations carrying an accredited SMS/ISM certificate issued by International Recognized Classification Society.

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that the vessel and "The Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss damages, expense or delay caused by failure on the part of "The Company" to comply with the ISM Code shall be for the Owners' account.

**44.**
BIMCO ISM / 2000 Year Standard Clause to be applied.

**45.**
This Charter Party should be kept strictly private and confidential.

Negotiations and eventual fixture to be strictly private and confidential, all the terms please keep private and confidential.

**46.**
Crew change is not allowed on its laden leg, unless in case of emergency.

**47.**
If vessel is placed under quarantine by health authorities for crew health reasons, time not to count from the discovery until such quarantine is lifted, even if vessel is on demurrage.

## SHIPPING TERMS

Description of Goods
Name of Commodity: Coal
Country of Origin: USA
Packing: In Bulk
Quantity: 100,000MT +/-10% Coal
Port of Loading: Consol Marine Terminal, Baltimore, Maryland, U.S.A.
Laycan loading port: 12-18/Nov/2024

## LOADING PORT

### A.  Owner responsible

Owner is responsible for the provision of ocean transportation of the Coal from the Loading Port to the Discharging Port including without limitation:

(a)  the payment of port charges, tonnage dues, light dues and other tax assessments or charges which are customarily payable on or with respect to the Vessel at the Loading Port.

(b)  any damages, costs, charges, expenses, penalties, interest, fines and other losses arising as a result of loss of or damage to the Vessel, including without limitation, loss of or damage to the Vessel caused by the operator of the Loading Port or its employees, contractors or agents.

(c)  the Owners and the Master to satisfy themselves with the vessel's suitability to load the intended cargo and the suitability of Trigon Terminal including but not limited to the draft, the berthing facilities and all approaches.

### B.  VESSEL NOMINATION

(a)  Definitions:
   (i) "Arrived" shall mean the vessel is in the Port of Baltimore.
   (ii)The Port of Baltimore to include:
      1.  Customary waiting areas in the Port of Baltimore
      2.  Annapolis Anchorage
   (iii) "On-time arrival" shall mean a vessel arriving in the Port of Baltimore within the laycan.
   (iv) "Early arrival" or "late arrival" shall mean a vessel arriving in the Port of Baltimore outside of the laycan.
   (v)"In–inventory" shall mean all coal dumped to ground at CMT -OR- on rail at CMT as agreed to load direct to vessel.
   (vi) "Load–ready" shall mean the vessel has arrived, the coal is in inventory and the vessel is ready in all respects to receive cargo.

(b)  Vessel Arrival Guidelines:
   (i) Only load-ready vessels will be considered to be placed into the queue. Exceptions shall be at the discretion of CMT management.
   (ii)Load ready, on-time arrivals shall be called to the berth in the order they enter the queue.
   (iii) Load-ready, early arrivals will be called to the berth if the berth is clear and the expected berth occupancy of the early arrival is less than the expected

length of time until the next load-ready, on-time arrival.  If the berth is not clear, the vessel shall be deemed to enter the queue on the first day of its ten (10) day window.

    (iv)   Load-ready, late arrivals will be called to the berth if the berth is clear and the expected berth occupancy of the late arrival is less than the expected length of time until the next load-ready, on-time arrival.  If the berth is not clear, the vessel shall enter the queue behind vessel(s) already in the queue at that time

(c)    Nomination of the performing vessel with customary vessel description shall be submitted as soon as available, but no later than 14 days prior to ETA at the Port of Baltimore.  Another vessel with similar ETA may be substituted for nominated vessel, provided the Terminal is given a minimum of forty days notice of such substitution.

(d)    At least four (4) days prior to the performing vessel's ETA at the Port of Baltimore, Owner shall provide requirements for vessel loading, including loading and stowage plan, deballasting plan, trimming plan, and any other specific vessel loading requirements.

(e)    The Shipper shall give nominated vessel or substitute, ETA notice 10, 5, 2, 1 day (s) in advance of arrival at the Port of Baltimore.

(f)    If official weight is provided by the Terminal, on behalf of Shipper, a certified weight will be determined by certified belt scale as cargo is loaded.  If Terminal cannot provide certified belt scale weight, a draft survey weight, provided by a certified surveyor, will be used as the official weight.

**C.  NOTICE OF READINESS (NOR)**

(a)    Notice of Readiness may be tendered at any time, day or night SHINC, and Terminal will acknowledge for receipt only.   In observance of the Thanksgiving Holiday, The Terminal will suspend operations from 07:00 every fourth Thursday in November to 07:00 the following day. In observance of the Christmas Holiday, the Terminal will suspend operations from 19:00 hrs. on December 24th through 07:00 hrs. on December 26th.

(b)    Notice of Readiness may be given by cable, fax, telex, or e-mail.

**D.  COMMENCEMENT OF LAYTIME**

(a)    If vessel tenders NOR before established laydays, laytime shall commence twelve (12) hours (Notice Time) after 00:01 hrs. on the first day of the established laydays, unless loading starts earlier in which case actual time used to count until commencement of laydays and expiration of Notice Time

(b)    If vessel tenders NOR within established laydays, laytime shall commence twelve (12) hours after NOR is tendered, unless loading starts earlier, in which case actual time used to count until expiration of Notice Time.

(c)    If vessel arrives in the Port of Baltimore after established laydays and provided vessel is not cancelled, the Terminal shall make a good faith effort to accommodate the Shipper's late vessel as soon as designated berth is next available.   Laytime shall commence when vessel is all fast at designated berth and ready to load in all respects.

**E.  LAYTIME EXCEPTIONS**

(a)    Time shifting from anchorage to loading berth, commencing when anchor is lifted and ceasing when all fast at designated berth shall not count as laytime or Notice Time, or time on demurrage.

(b)    Time required after NOR is tendered to fulfill the requirements for readiness to load in all respects (which term does include free pratique, Customs and Coast Guard clearance, and in case of OBO tonnage, providing a valid gas-free certificate) shall not count as laytime or time on demurrage, but only to such an extent that such time needed caused a delay in loading the vessel.

(c)    Time required after NOR is tendered to provide a Marine Surveyor's certificate of readiness shall not count as laytime or time on demurrage.

(d)    Time lost due to loading delays caused by vessel, whether such situation existed at the time of tendering NOR or thereafter, shall not count as laytime or time on demurrage.   Loading delays caused by vessel shall include but not be limited to:
  - deballasting
  - moving vessel equipment
  - moving hatch covers
  - trim checks by vessel
  - draft checks by vessel
  - any restrictions imposed by vessel

(e)    If official weight is provided by the Terminal, on behalf of Shipper, a certified weight will be determined by certified belt scale as cargo is loaded.   If Terminal cannot provide certified belt scale weight, a draft survey weight, provided by a certified surveyor, will be used as the official weight and time lost for the draft survey shall count as laytime.

If official weight is by draft survey, time lost to provide the draft survey by a certified surveyor, after the completion of the requirements in Section 4.2 and 4.3, shall not count as laytime or time on demurrage.

(f)    Time lost due to severe weather causing unsafe equipment operating conditions as determined by the Terminal shall not count as laytime.

(g)    Time lost due to Thanksgiving and Christmas Day from 19:00 hrs. on December 24 through to 07:00 hrs. on December 26, and New Year's Day from 19:00 hrs. on December 31 through to 07:00 hrs. on January 2 shall not count as laytime, unless loading actually takes place during this period, when only actual loading time to count as laytime.

## F.  ENDING LAYTIME

Laytime shall cease upon completion of loading and withdrawal of loading equipment.

## G.  SPECIFICATIONS

The Terminal advises that the specifications for the coal loading berth and loading facilities at Baltimore, MD are:

Channel Depth              50 ft.
    Berth Depth                  50 ft.
    Berth Working Length          1150 ft.
    Berth Working Width              175 ft.
    Air Draft (max)          55 ft. – MLLW
    Unrestricted Sailing Draft      47 ft. 0 in. – MLLW
    Restricted Sailing Draft (1)      47 ft. 6 in. – MLLW
    Loading Rate – Peak          7500 TPH
Loading Rate – Typical Range      4500 – 6500 TPH

**Note** (1)      Draft may be increased subject to Maryland Pilot Association approval & Terminal approval.

In no way does the Terminal warrant, guarantee, or represent the depth of the channel of the Port of Baltimore and/or the Chesapeake Bay.

**H.  LOADING AND TRIMMING**
   (a)    The coal cargo shall be loaded and spout trimmed in accordance with the Master's written instructions to the Master's satisfaction in conformity with the latest edition of the IMO code and applicable regulations.   Provided not in default, the Terminal shall not be required to rehandle coal loaded or to load coal in a manner not in conformity with the performance characteristics of the shiploading equipment.

   (b)    The coal cargo shall be loaded in such a manner to dispatch the vessel as expeditiously as possible utilizing the full capacity of the ship loading equipment, always provided loading is safe to vessel and in compliance with all applicable regulations.

   (c)    Prior to loading, the Shipper shall provide details regarding the nature of the material as required by the latest edition of the IMO code.  The Terminal, on behalf of Shipper, will provide a copy of the certificate to the Master.

   (d)    Loading Rate:
     -  basis 25,000 MT/day load rate PWWD SSHINC.for cargo size 60,001 – 100,000MT;
     -  basis 30,000 MT/day load rate PWWD SSHINC for cargo size above 100,000MT .

**I.  VESSELS**
   (a)    The performing vessel shall comply with all applicable federal, state, local and port and harbor authority regulations in force.

   (b)    Vessel shall present a Marine Surveyor's certificate that the holds are clean and in all respects ready to receive coal.

   (c)    The vessels to be loaded shall be (a) gearless single deck self- trimming bulk carriers; (b) combination vessels; (c) geared single deck self-trimming bulk carriers acceptable to the Terminal.

   (d)    The vessel's master shall be responsible for the safe docking and undocking of the vessel.  Tugboats shall be used for all docking and undocking activity.  On-board power and bow thrusters shall not be used alongside berth.

   (e)    If vessel cannot be loaded in accordance to Master's written stowage/loading plan, or be materially delayed in loading because of vessel's fault (for instance, not being able to deballast within a reasonable period of time), the Terminal may order the vessel to vacate the berth until such time that such deficiencies are overcome.

   (f)    Vessel shall provide gangway ladders with safety nets in compliance with local, state and federal regulations.

   (g)    Customary Vessel Charges
       (v)Line handling services to include both docking and undocking shall be charged at the rate of ▓▓▓▓▓ per vessel as of January 1, 2022. Such rate may be adjusted from time to time as reasonably determined by the Terminal.

      (vi) Dockage Charge of ▓▓▓▓ per NRT per vessel as of January 1, 2022.   Such Charge may be adjusted from time to time as reasonably determined by the Terminal.

     (vii) Security Fee of ▓▓▓▓ / linear foot (LOA) will be charged for all vessels docked at the CMT berth as of January 1, 2022.   Such Fee may be adjusted from time to time as reasonably determined by the Terminal.

(viii) Coal pier and berthing area shall not be used by vessel for any purpose other than cargo loading without the prior approval of the Terminal.   Receiving or offloading of any materials, parts, stores or any other items is prohibited without the prior approval of the Terminal.

(ix) Rubbish, refuse or other materials related to the vessel must be removed; otherwise it will be removed by the Terminal at the expense of the vessel. No rubbish or material of any kind shall be dumped overboard from the vessel.

## J.   Other Loading Terms and Conditions

(a)   Other loading terms and conditions shall be on a case-by-case basis, mutually negotiated in good faith.

(b)   All other policies, terms, rules and regulations of Consol Marine Terminal or Curtis Bay Piers not addressed by the above, in place and effective as issued in the terminal rules and regulations and to be considered fully incorporated into these terms and Owners of the vessel performing this voyage shall accept these terms.

(c)   Owner and its agent shall at all material times comply with CMT Rules and Regulations, incorporated herein by reference.   Charterer shall have no liability for Owner's failure to comply in all material respects with said Rules and Regulations, and shall be indemnified by Owner for all penalties or damages incurred by Charterer resulting from Owner's or its agent's non-compliance with same.

## DISCHARGE PORT

**Notice of Readiness Tendering and Laytime Commencement:**

Laytime for each discharging port(s) shall commence 24 hours (unless otherwise mutually agreed) after the tendering of a Notice of Readiness, whether the vessel is in berth or not (Turn Time), unless discharging is commenced sooner, in which case actual time is to count for such commencement. The Notice of Readiness may be presented, at any time in or out of office hours, after the vessel has arrived at or off the Discharge Port (whether or not the vessel is in berth or port, whether Customs cleared or not, whether vessel is in free pratique or not, at any time day or night, Saturday, Sunday and legal National holiday always included).

If the Charterer nominated discharging berth is not free and available upon arrival of the ocean going vessel to enable discharging operations to commence immediately, all time lost in waiting for a safe discharging berth or anchorage shall count as time.

**Discharging terms:**

(i)   Laytime is non-reversible.
(ii)  Laytime is allowed at Discharge port shall be calculated by dividing the total Bills of Lading weight of the shipment by the Discharge Rate
(iii) Laytime shall cease on completion of discharge.
(iv)  Shifting at the Owner's request after vessel is berthed due to vessel's size or for any other reason shall not count as laytime even if vessel is on demurrage and the cost of such shifting shall be for the Owner's account.
(v)   Shifting at the Charterer/Receiver's or the Port Authority request after vessel is berthed shall count as laytime and the cost of such shifting shall be for the Charterer's account, except bunkers consumed whilst shifting which to be for the Owner's account.
(vi)  Shifting from anchorage to berth shall not count as laytime even if vessel is on demurrage.
(vii) The time used for draft surveys and joint inspection/Inward formalities shall not be counted as laytime even if vessel is on demurrage and the time used by the vessel for draft checking shall not be counted as laytime.
(viii) Due to bad weather conditions that interrupt the discharge shall not count as laytime even if vessel is on demurrage.
(ix)  Any stoppage of discharging at the Vessel's request shall not be counted as laytime even if vessel is on demurrage.
(x)   Any time lost during discharging due to inability of the vessel to ballast or deballast at a rate commensurate with the respective discharging rate, then such time lost shall not count as laytime even if vessel is on demurrage.
(xi)  In the event of a declaration of Force Majeure by the Charterer/end-receiver time lost does not count as laytime.
(xii) The opening and closing of hatches at the commencement and completion of the discharging at each port, and the removal of any other remaining equipment on board obstructing a smooth work flow shall be at the Owners' expense, provided that the port authorities allow for such, and the time used therefore shall not be counted as laytime.
(xiii) If the Vessel suffers any problems due to the Vessel's condition, it shall be the Owners' responsibility and the time and expenses required to settle such problems shall be borne by the Owners.

(xiv) Laytime shall cease to be counted upon the completion of discharging. The Vessel shall sail from the Discharging Port as soon as the discharging is complete, barring unforeseen circumstances, which shall be notified to the Charterers immediately.

**Discharge Rate and Demurrage/Despatch:**
Discharge Rate: 15,000 Metric Tons per Weather Working Day SHINC.

If Charterer fails to achieve the discharging requirements, and such failure is not attributable wholly or in part to the fault of the vessel, BUYER shall pay demurrage to Owner at a rate of ██████████ per 24 hours per day or pro rata for part of a day, for all time lost after expiration of allowable laytime. Owner shall pay despatch to Charterer for laytime saved at one-half (1/2) the demurrage rate.

Agreement on each demurrage/despatch calculation shall be settled within thirty (30) calendar days of after completion of discharge. Charterer / Owner shall pay any demurrage / despatch charges within thirty (30) calendar days of such agreement date. Any disputes on demurrage or despatch shall under no circumstances be a reason to withhold payment of the shipment value as stated in the invoice.

**Shipping Agent Nomination:**

The Charterer shall recommend a shipping agent at the discharging port but to be appointed by the owner for owner's account.

**STEVEDORES:**

At loading/discharge port, Stevedores, although appointed by Shipper/Receiver/Charterer, or their agents, to be under the direction and control of the Master who shall be responsible for all matters regarding ship's safety. Shipper/Receiver/Charterer or its agents not to be responsible for act and/or default of Stevedores.

All claims for damages to a ship occurring during loading or discharging, or at any time during the voyage, through improper or negligent stowage of the cargo shall be settled directly between Owner and Stevedores, without recourse against Charterer, Shippers, Receivers or their agents.

Master or Owners or their agents shall notify Stevedores of damage, if any, in writing within 24 hours of occurrence, but latest before departure from the port.

Charterer/Shipper/Receiver to assist Owners in obtaining acceptance of responsibility for damages from Stevedores.

Time for repairs caused by Stevedores not to count as laytime even if the vessel is already on demurrage.

**FORCE MAJEURE**

**Force Majeure Defined:** The term "Force Majeure" as used herein shall mean any event which (a) is not within the control of the Party relying thereon (the "Claiming Party") and (b) could not have been prevented or avoided or overcome by such Party through the exercise of due diligence. Subject to the foregoing, Force Majeure includes, by way of illustration and without limitation: war; acts of God; equipment breakdowns provided not resulted due to Seller's negligence or outages at the Source Mines or CMT Terminal; insurrections, riots, labor disputes, or strikes; fires, explosions, or floods; adverse geologic conditions; accidents at, closing of, or restrictions upon the use of mooring facilities, docks, ports, harbors, railroads or other navigational or transportation mechanisms; notices or declarations of Force Majeure by transportation carriers or coal terminals; perils of the sea; accidents of navigation or breakdown or delay of or injury to vessels; embargoes; legislation, court orders, governmental regulation; orders or acts of any governmental or military authority; or any other cause reasonably beyond the control of a Party, whether similar or dissimilar to those above and whether foreseeable or unforeseeable, which, by the exercise of due diligence, such Party could not have been able to avoid or overcome. Notwithstanding the foregoing, Force Majeure specifically excludes: (i) the loss of Buyer's markets or Buyer's inability economically to use or resell coal purchased hereunder; (ii) Shipper's ability to sell coal to a market at a more advantageous price or Buyer's or Buyer's customer's ability to buy coal at a lower price whether or not foreseeable; and (iii) transportation delays (unless the transportation carrier itself declares Force Majeure).  The Parties acknowledge and agree that Shipper shall be entitled to exercise all rights under this clause in the event of a Force Majeure encountered or prevailing at any Source Mine identified in the Purchase Order, and that such Force Majeure shall be deemed that of Shipper. For the sake of clarity, Shipper shall not be entitled to claim Force Majeure for conditions affecting any alternate source of coal.

**Obligations in Event of Force Majeure.**  If a Party is totally or partially unable to carry out its obligations hereunder as a result of a Force Majeure, then such obligations shall be excused during the duration of such Force Majeure to the extent that the affected Party is prevented from performing them. Each Party shall, in the event it experiences a Force Majeure, use all efforts which are economically practical and otherwise reasonable to mitigate or eliminate such Force Majeure and/or the effects thereof with all reasonable dispatch. Neither Party shall be required to settle strikes, differences with employees or

unions or governmental claims by acceding to any demands when, in the discretion of the Party whose performance is interfered with, it would be inadvisable to accede to such demands. The Party asserting Force Majeure shall give written notice thereof to the other Party as promptly as practicable of the nature and probable duration of such Force Majeure after the occurrence of the Force Majeure prevents the performance of a Party's obligations under this Agreement, and will keep the other Party advised as to its efforts to remedy the Force Majeure. Deliveries not completed as a result of Force Majeure shall be made up at the sole discretion of the Party that has not declared Force Majeure, provided that such notice is provided to the Party declaring Force Majeure within fifteen (15) Business Days following the cessation of the Force Majeure event and the resumption of the affected Party's performance hereunder.

Notwithstanding any provision hereof, neither Party shall be relieved by the occurrence of an event of Force Majeure of its obligation to pay demurrage, deadfreight, costs and charges imposed by CMT Terminal, damages for detention or deviation or cancellation costs on vessels chartered by Charterer or trains scheduled by Shipper before the notification of the Force Majeure under this clause, unless the non-affected Party is excused from such obligations to the vessel owner, the railroad or CMT Terminal under the provisions of the governing charter party, transportation contract, or terminal agreement.

**Termination Rights Based on Force Majeure.** If an event of complete or partial Force Majeure persists for a continuous period of sixty (60) days, then the Party not claiming Force Majeure shall have the option, upon three (3) calendar days' prior written notice, to terminate, liquidate and close out affected shipment of this Agreement and the associated obligations of the Parties hereunder without further obligation of either Party (other than payment obligations for prior performance hereunder).

## SANCTIONED PERSONS

    1.1     Definitions

Unless the context otherwise requires, the following terms shall have the meanings given to them when used in this clause:

'Sanction' means any sanction, regulation, statute, official embargo measures or any 'Specially Designated Nationals' or 'Blocked Persons' lists, or any equivalent lists maintained and imposed by the United Nations, the European Union, Her Majesty's Treasury in the United Kingdom, the United States Department of Treasury's Office of Foreign Assets Control, the Commonwealth of Australia or any other government body.

'Sanctioned Person' means any person, being an individual, corporation, company, association or government, who:

    (a) is subject to a Sanction; or

    (b) is connected to any person who is subject to a Sanction.

    1.2     Sanctioned Person obligations

    (a) The Owners shall ensure that, at all times:

    (i) it is not a Sanctioned Person;

    (ii) each Vessel is not arrested and is not owned, chartered, operated or controlled by a Sanctioned Person, or any other person involved in the chartering or operation of the Vessel, is not a Sanctioned Person;

    (iii)     it is not in breach of any Sanction

    (iv) it shall not involve a Sanction Person in any action or obligation in respect of the Charter Party.

(v)  it shall not require the other or any third party to take any action or perform any obligation in relation to the Charter Party which involves or may reasonably be considered to involve a violation of Sanctions.

(b)  The Owners shall provide the Charterer, upon request, with such information as the Charterer may reasonably require to allow the Charterer to determine that the Owners have complied with clause 1.2(a).

(c)  The Owners and Charterer agree that the obligations contained in clauses 1.2(a) and 1.2(b) are material obligations under the Charter Party.

(d)  Notwithstanding clauses 1.3 and 1.4, if the Owners breaches an obligation contained in clauses 1.2(a) or 1.2(b), the Charterer may immediately suspend deliveries in whole or in part upon providing written notice to the Owner, without any liability whatsoever to the Charterer. If the Owners fails to rectify such breach within a reasonable period of time, the Charterer may terminate the Charter Party in whole or in part upon providing written notice to the Owner, without any liability whatsoever to the Charterer.

# __EXHIBIT D__

**Andrea Ayala**

---

| | |
|---|---|
| **From:** | Mark Newcomb <mark.newcomb@woodsrogers.com> |
| **Sent:** | Tuesday, January 14, 2025 7:39 AM |
| **To:** | Jonathan W Thames <Jonathan.Thames@kennedyslaw.com> |
| **Cc:** | Brad Pace <brad.pace@kennedyslaw.com>; |
| | Washington, Alonzo <AWashington@flahertylegal.com> |
| | |
| **Subject:** | Re: Consul Request for Access to M/V ANGLO MARIE LOUISE |

**CAUTION:** External email. Verify sender and content before opening .

John / Brad

You will have (or will very shortly) received an email giving you access to a data room, where you will find documents Owners have collected with respect to the loading of the cargo of coals at Consol's facilities in Baltimore, the subsequent explosion experienced in Holds No. 1 and 2, and relevant materials collected following the incident.

Having made these documents available, we ask that you provide the Cargo Quality Certificate issued by Consul related to the cargo of coal loaded to M/V ANGLO MARIE LOUISE.

With that in mind, a request to board M/V ANGLO MARIE LOUISE in order to collect the documents listed below appears to be duplicative.  Should you identify documents that are not available in the data room, please let me know and I will coordinate with Owners to provide a timely response.

Please also be advised that our clients have appointed an arbitrator today in accordance with the provisions of the contract of carriage evidenced by the B/Ls, which provide for English law and HK arbitration, and notice of that appointment will very shortly be served on your clients at their business address. I attach a copy as a matter of professional courtesy. In light of the U.S. Supreme Court's opinion in *ZF Automotive US, Inc. v. Luxshare, Ltd.*, No. 21-401, 2022 WL 2111355 (U.S. June 13, 2022) [holding that a private commercial arbitral tribunal does not qualify as a "foreign or international tribunal" under Section 1782], we do not agree that a discovery order under 28 USC 1782 is available.

In that light, we stand on our prior notice of scope of access to be granted to your designee, Mr. Willis:

· Deck level access around all holds;
· Deck level viewing into access hatches for all holds – but NOT entry into the access hatches.
· Visual inspection of any electrical appliances or fittings, ventilation or gas monitoring points in the area of holds #1 & #2, but NOT dismantling, testing, etc.
· Visual inspection of the switchboard controlling the lights in the access hatches, but NOT testing, opening up, etc.
· Obtaining gas / LEL readings

1

Mr. Willis must be accompanied by a designated Owner's representative at all times while on board the vessel.  Again, if he is aboard during a meal hour, he will be invited to have lunch on board.

We understand that both Burgoynes has indicated that they might be able to attend this week and you are awaiting a response from MTD.  As you noted, our retained experts, Brookes Bell, is also available.  Upon receipt of confirmation of Burgoynes and MTDs attendance - and the identity of the individuals attending, we will notify the Master.  Again, and to be clear, their terms of attendance would be the same as above.

I trust this is responsive; should you have any questions, please let me know.

Best regards,


**Mark Newcomb**
Of Counsel
Woods Rogers Vandeventer Black PLC

mark.newcomb@woodsrogers.com
P (757) 446-8547 | F (757) 446-8670

101 West Main Street, Suite 500
Norfolk, Virginia 23510



## Andrea Ayala

| | |
|---|---|
| **From:** | Jonathan W Thames <Jonathan.Thames@kennedyslaw.com> |
| **Sent:** | Sunday, January 12, 2025 6:13 PM |
| **To:** | Mark Newcomb <mark.newcomb@woodsrogers.com> |
| **Cc:** : | Brad Pace <brad.pace@kennedyslaw.com>; |
| | Washington, Alonzo <AWashington@flahertylegal.com> |

**Subject:**     RE: Consul Request for Access to M/V ANGLO MARIE LOUISE

Dear Mark,

Thanks for your time on Friday to discuss the requested inspection of the vessel. As we discussed, your scope increase below is appreciated but we still do not believe it is sufficient under Rules 26 or 34. We request that the agreed inspection scope be expanded further to also include the following:

1.      the deck log for the period of arrival at the load berth to present,

2.      hot work record for the period between loading and the incident,

3.      the crew list,

4.      the ship's copy of IMSBC,

5.      the documentation provided to the Master by the Shipper (stamped signed copies or the emails or print outs of them from the ship's computer),

6.      the gas detection and calibration equipment,

7.      the temperature monitoring equipment,

8.      the pH monitoring equipment.

9.      Details/drawings for the lighting in the holds.

10.      The ventilation points of every hold and the seal condition.

11.      The gas monitoring points of every hold

12.      The hatch cover weather seal condition of every hold

13.      The hatch cover cleat tie down condition of every hold

14.      All hatch cover condensate drains.

15.      An mechanical ventilation

16.      The fire control station

17.     The fire alarm repeater panel on the bridge and take a note of the activations (if any) for the day of the incident,

18.     The main fire pump

19.     The aux fire pump, and

20.     The emergency generator

As we discussed during our call, 28 USC 1782 allows Consol to file an application with the federal District Court there in Norfolk to allow emergency discovery, including document production, crew depositions and a full vessel inspection. I'm attaching the emergency application and the court's order granting same that we filed when the ONE Apus finally returned to California after her huge container loss at sea in November 2020. We filed the application with supporting documentation on May 3, 2021, and the Court issued the order granting same the very next day.  We hope that judicial intervention will not be necessary in this instance.

The above information we request on behalf of our client Consol is eminently discoverable and reasonable under the circumstances, and we are certain that the court will grant our application, should we be forced to make one.   Please note that at this time we are not asking for any crew depositions, but reserve all rights on that front. If we are forced to seek judicial intervention, we will absolutely ask for those depositions, though.

Our expert Paul Willis at Hawkins is still scheduled to travel this week and hopefully we can get all of these items ticked off during his attendance. He has also confirmed that the experts from Brookes Bell and Burgoyne are both able to attend, but is still waiting to hear from MTD.  We look forward to working with you to make this inspection as smooth as possible for the experts, the master and crew.  Please let us know your and your client's position on our request as soon as possible.

Very truly yours,


Jonathan


Jonathan W Thames
Partner
for Kennedys

# Kennedys

T +1 415 323 4464
M +1 415 317 4003
F +1 415 323 4445
www.kennedyslaw.com

**Andrea Ayala**

| | |
|---|---|
| **From:** | Mark Newcomb <mark.newcomb@woodsrogers.com> |
| **Sent:** | Saturday, January 11, 2025 4:54 AM |
| **To:** | Brad Pace <brad.pace@kennedyslaw.com> |
| **Cc:** | Marc Fazioli <marc.fazioli@brookesbell.com>;<br>Anglo Marie Louise <AMarieLouise@skyfile.com> |
| **Subject:** | Consul Request for Access to M/V ANGLO MARIE LOUISE |

CAUTION: External email. Verify sender and content before opening .

Brad

To follow up on your request for ANGLO MARIE LOUISE's Owner to provide access for your retained expert, surveyor and marine chemist to the vessel on 15-17 January (expert and marine chemist) and the following week (marine surveyor), please note that Owner will agree to the following:

- Deck level access around all holds;
- Deck level viewing into access hatches for all holds – but NOT entry into the access hatches.
- Visual inspection of any electrical appliances or fittings in the area of holds #1 & #2, but NOT dismantling, testing, etc.
- Visual inspection of the switchboard controlling the lights in the access hatches, but NOT testing, opening up, etc.
- Obtaining gas / LEL readings

The following are specifically not authorized:

- Inspection of the ship's gas detectors;
- Access to the ship's office or any ship's documentation;
- Access to or interviews of any vessel officer or crewmember, including observation of any crew work;
- Access to crew accomodations.

Your designated expert, marine chemist and marine surveyor must be accompanied by a designated Owner's representative at all times while on board the vessel.  Recognizing that your expert, marine chemist, and marine surveyor may be aboard during a meal hour, he or she will be invited to have lunch on board.

As a matter of professional courtesy between experts - and understanding that Mr. Willis is a fire expert, Brookes Bell has notified MTD and Burgoynes that a fire expert is attending on board.  If we receive a request that their fire expert(s) also attend, we will let you know.  To be clear, their terms of attendance would be the same as above.

I would appreciate your confirmation of the date(s) of attendance, as well as the details for both your marine chemist and marine expert.

While I am happy to arrange the launches for those dates, please also provide appropriate billing information, so that we may pass that on for your action.

Best regards,

Mark

**Mark Newcomb**
Of Counsel
Woods Rogers Vandeventer Black PLC

mark.newcomb@woodsrogers.com
P (757) 446-8547 | F (757) 446-8670

101 West Main Street, Suite 500
Norfolk, Virginia 23510

